UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

JEFFREY COHEN, on behalf of himself : CV 09-4352 (PKC)
individually, and on behalf of all similarly :
situated employees, :
                  Plaintiff, : **AFFIDAVIT OF**
: **JEFFREY COHEN**
v. :
:
GERSON LEHRMAN GROUP, INC. :
                  Defendant. :
:
------------------------------------------------------------X

STATE OF FLORIDA      )
                             ) ss.:
COUNTY OF PALM BEACH )

Jeffrey Cohen, being duly sworn, deposes and says:

1. I am the Plaintiff in the above referenced action, which was filed on May 5, 2009 against my former employer, Gerson Lehrman Group, Inc. ("Gerson Lehrman," "Defendant" or "the Company"), alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").

2. On or about April 10, 2007, I was hired by Gerson Lehrman as a Research Associate assigned to the Company's Tech, Media and Telecom Research team working out of the New York office. From April 2007 until December 31, 2008, I was employed in the position of Research Associate. Effective January 1, 2009, I was promoted to the position of Research Manager. My employment with the Company terminated on April 24, 2009.

3. During the course of my employment, there were approximately 25 individuals employed by the Company as Research Associates at any given time. While most of the Research Associates were assigned to the New York, San Francisco and Boston offices, the

Company may have also employed Research Associates in its Austin, TX, Chicago, IL, Los Angeles, CA and Washington, D.C. offices during the past three years. While the Company's Research Associates worked in different offices, the duties and responsibilities of the position were the same. During the three year period prior to the filing of my Complaint, there were approximately 50 Research Associates that worked for the Company at any one of its United States locations.

## Job Responsibilities of the Position of Research Associate

4. While employed by Gerson Lehrman as a Research Associate, my primary duty was to serve as a liaison between the Company's clients and the Company's network of subject matter experts. These experts were also referred to as "Council Members." In order to perform this primary duty, I would receive research requests from clients, either through the Company's website, directly from clients, or directly from senior managers, and would then format the client's request so that it could be distributed to a selection of the Company's Council Members to determine whether the subject matter expert would be able to provide insight into the client's research question. After receiving initial responses from the Council Members, I would then forward those responses to the client so that the client could select the Council Member that the client would like to engage to provide a response to its research inquiry. At this point the client would, if they so chose, engage in a consultation with their selected Council Members with no involvement or participation on my part in the actual consultation from that point forward.

5. In this position, I was expected to merely act as a liaison between Gerson Lehrman's clients and its network of subject matter experts. I was not permitted to give investment advice and was not permitted to provide any substantive response to a client's research inquiry. Rather,

I was required to follow the guidelines and instruction put in place by compliance officers and senior managers.

6. In addition to my primary responsibility of serving as a liaison between the Company's clients and its Council Members, I was also required to solicit new business from the Company's existing clients in order to expand the services that it provided to these existing clients. This primarily involved contacting these clients to offer the Company's services on a variety of levels. Similarly, I was encouraged to recruit additional subject matter experts to increase the Company's network of Council Members.

7. Other Research Managers and I were also required to host educational events and conferences for the Company's clients. In this capacity, I was required to notify and invite the Company's clients that might have been interested in the featured topic. Additionally, other Research Managers and Research Associates and I would then serve as the host of these events.

8. During the course of my employment with the Gerson Lehrman, all of the Research Associates assigned to the New York office performed those same primary job duties that are described above. Additionally, having worked with other Research Associates in the Company's other United States offices, I am aware that Research Associates assigned to these other offices performed the same job duties and had the same job responsibilities as me and the other Research Associates assigned to the New York office. I regularly interacted with Research Associates in the Company's Boston and San Francisco offices and know that Research Associates assigned to these offices during past three years were performing the same job duties and were assigned the same job responsibilities as the Research Associates assigned to the New York office. Prior to January 1, 2009, I am not aware of any of the Company's Research

Associates, in any office, being paid overtime compensation for working in excess of 40 hours in a given week.

### Hours of Work for Research Associates

9. Throughout the course of my employment with the Company as a Research Associate, I was regularly required to work in excess of 40 hours per week. I was not, however, required to report my overtime nor was I compensated for any hours in excess of 40 that I worked in a given week.

10. Throughout the course of my employment with the Company as a Research Associate, the other Research Associates and I were expected to work, at a minimum, from 8:30 a.m. until 7:30 p.m. and were encouraged to work longer hours, work through our lunch break and work weekends. Despite frequently working between 50 and 60 hours a week, we were never paid any additional compensation for any hours that were worked in excess of 40 in a given workweek.

11. Further, the Company encouraged Research Associates to work late by permitting us to expense dinner and a cab ride home when we worked past 9 p.m. Thus, the Company was aware that I and other Research Associates were working in excess of 40 hours a week.

12. Throughout the course of my employment, I was not required to keep track of my hours by filling out a time sheet or cataloging my hours by any other means. In fact, the Company did not institute a record-keeping system until it decided to reclassify the Research Associates as "non-exempt" from the FLSA's overtime provisions and pay them overtime compensation when they worked more than 40 hours in a given week.

13. From September to December 2008, a time period referred to by senior managers as the Final Assault, the other New York Research Associates and I were encouraged to work

4

longer hours in order to meet the Company's year-end goals. Indeed, the Company's official start time was pushed forward from 8:30 a.m. to 8:20 a.m.

**Reclassification of the Research Associate Position**

14. On December 19, 2008, the Company sent an email notifying all Research Associates that, effective January 1, 2009, it would be reclassifying the FLSA status of its Research Associates from "exempt" to "non-exempt." The following notice was provided to all Research Associates working in the Companies United States offices:

> When Gerson Lehrman was first launched ten years ago, we were a small start-up company. Happily, GLG has grown significantly since then, and with growth comes an exception of (and need for) increased sophistication and state of the art practices and policies. One of the objectives of the Human Resources Department is to ensure that GLG's compensation practices and procedures are consistent, competitive, legally compliant and up-to-date.
>
> As you and your manager have discussed, we recently completed a review of the Company's compensation structure and have determined that employees in certain positions will be eligible for overtime compensation (meaning that those employees will be classified as "non-exempt" from the overtime provisions of the Fair Labor Standards Act). Effective January 1st, 2009, your current position will be reclassified as non-exempt and going forward, you will be entitled to overtime pay if you are required to work in excess of 40 hours per week. . . .
>
> With this classification change, you will be required to submit a record of all time worked. We will be introducing an easy to use electronic system shortly.

15. This job reclassification was provided to the Company's employees that were subject to the change in classification and the change in recordkeeping requirements. Because I was scheduled to be promoted to the position of Research Manager effective January 1, 2009, the Company did not provide a copy of this email to me. Indeed, I received a copy of the notice from my colleagues that did receive a copy of the notice. Thus, I have personal knowledge of the contents of the notice cited above.

16. Since January 1, 2009, there has been no material change in the job duties or responsibilities of the Research Associate position. Even though I was no longer employed as a Research Associate, I continued to work with the Company's Research Associates and was aware that the work that they were performing was the same as the work that I performed while I was employed in the position of Research Associate. In fact, there was very little change in my primary job duties and responsibilities following my promotion from Research Associate to Research Manager as my primary duty was still to serve as a liaison between the Company's clients and its Council Members.

17. Following the reclassification, neither I nor any other Research Associate was paid any overtime compensation for overtime that was worked in the time period preceding the reclassification.

_____
Jeffrey Cohen

Sworn to before me on 12 of June, 2009

_____
Notary Public