UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
JEFFREY COHEN, on behalf of himself           :
individually, and on behalf of all similarly  :
situated employees,                           :  No. 09 Civ. 4352 (PKC)
                                              :
                        Plaintiffs,           :
                                              :
         v.                                   :
                                              :
GERSON LEHRMAN GROUP, INC.,                   :
                                              :
                        Defendant.            :
------------------------------------------------------------ X

## PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO LIABILITY

Pursuant to Local Rule 56.1, Plaintiffs Jeffrey Cohen ("Plaintiff Cohen" or "Mr. Cohen"), Matthew Ronen ("Plaintiff Ronen" or "Mr. Ronen") and Ashleigh Baldwin ("Plaintiff Baldwin") (collectively, "Plaintiffs") hereby submits this statement of undisputed material facts, as to which there is no genuine issue to be tried, in support of their Motion for Summary Judgment With Respect To Liability. All record citations herein are contained in the accompanying Declaration of Gregory N. Filosa, Esq. ("Filosa Decl.").

1. Defendant Gerson Lehrman Group ("Defendant," "GLG" or the "Company") characterizes itself as a "global marketplace for expertise" that "help[s] the world's leading institutions find, engage, and manage experts across a broad range of industries and disciplines." *See* About Us – Gerson Lehrman Group,

www.glgroup.com/about.html (last visited February 18, 2011), attached as Exhibit M to the Declaration of Gregory Filosa ("Filosa Decl.").[1]

2. GLG is, at its core, an expert network – essentially a virtual rolodex – that sold access to its network of more than 200,000 experts (or Council Members) to its clients. *See* Deposition of Matthew Ronen ("Ronen Dep."), attached as Exhibit F to the Filosa Decl., at 81:5-16; 82:1-4; *see also* Deposition of Ashleigh Baldwin ("Baldwin Dep."), attached as Exhibit E to the Filosa Decl., at 90:4-11; *see also* Deposition of Todd Schaefer (Schaefer Dep."), attached as Exhibit I to the Filosa Decl., at 44:3-20.

3. The Job Description for the Research Associate position provided that "Research Associates are responsible for managing and executing primary research deliverables to add value to Gerson Lehrman Group's client." *See* Research Associate Job Description, attached as Exhibit N to the Filosa Decl.

4. In the context of the Research Associate position, this meant that Research Associates were responsible for "taking a client interview, panel assembly, matchmaking between clients and experts, follow-up afterwards to make sure that the client had received the insights they needed." *See* Deposition of Dmitri Mehlhorn ("Mehlhorn Dep."), attached as Exhibit L to the Filosa Decl., at 141:20-142:9.

5. The Job Description for the Research Associate position lists the following responsibilities:

---

[1] Pursuant to the terms of the Stipulation and Order of Confidentiality (*see* Dkt. No. 46), as amended by the Stipulation and Order Regarding Redaction of Documents (*see* Dkt. No. 49) and the Amended Stipulation and Order Regarding Redaction of Documents (*see* Dkt. No. 97), before a party may publicly file any documents designated as Highly Confidential, such party shall first send a service copy of the documents to opposing counsel to propose redactions. Accordingly, Plaintiffs' declaration in support of their motion for summary judgment, which attaches documents designated as Confidential and/or Highly Confidential, has been served upon counsel for Defendant, but has not been filed with the Clerk of Court. Once the parties have had the opportunity to confer and reach a resolution of any disputes regarding the filing of any documents designated as Confidential or Highly Confidential, Plaintiffs will promptly file their declaration with the Clerk of Court.

- Learning Gerson Lehrman Group's underlying business processes and assisting senior team members with high-level product execution, and developing a fundamental understanding of their practice area's industries;

- Fulfilling time-sensitive research requests delegated by senior team members on behalf of Gerson Lehrman Group clients by analyzing client requests, and building and qualifying primary populations of topic experts;

- Assisting senior team members with high-level service fulfillment by managing premium products including Market and Custom Surveys, Education Seminars, Roundtable luncheons and Custom Research Trips; and

- Develop a working knowledge of the practice area's core industries to improve project and product service quality.

*See* Exhibit N.

6. The Research Associate position was launched in early 2007 and the purpose of the position was to: "support [GLG's] undergraduate recruiting efforts . . . by creating an opportunity for undergraduates to be employed . . . with GLG" and "was intended to work closely with the rest of the research organization." *See* Deposition of Samuel Jacobs ("Jacobs Dep."), attached as Exhibit K to the Filosa Decl., at 30:22-31:18; 36:3-8; Mehlhorn Dep. at 86:16-22; 114:17-117:11.

7. Research Associates, which were part of the larger Research Management Department, served in the following capacities: (i) "as thought partners to client," (ii) "as the front line bulwark for the compliance framework," and (iii) "as ambassadors of the GLG brand." *See* Jacobs Dep. at 21:10-22:11; 24:13-16.

8. The decision was made to eliminate the Research Associate position in late 2008 and Defendant decided to phase the position out by promoting some individuals to the Research Manager position, moving others laterally and laying others off as part of a reduction in force with the last employee being promoted around June or July 2009,

3

which was only a few weeks after the Complaint was filed in this matter. *See* Mehlhorn Dep. at 86:16-87:21; 89:17-20; 96:24-97:18.

**Plaintiff Cohen's Employment as a Research Associate**

9. From April 2007 through December 31, 2008, Plaintiff Jeffrey Cohen was employed by GLG in the position of Research Associate, assigned to the Technology Media & Telecommunications ("TMT") team in the New York office. *See* Deposition of Jeffrey Cohen ("Cohen Dep."), attached as Exhibit D to the Filosa Decl., at 38:8-10; *see also* Jeffrey Cohen Linkedin Profile, attached as Exhibit O to the Filosa Decl.

10. Effective January 1, 2009, Mr. Cohen was promoted from the position Research Associate to the position of Research Manager. *See* Exhibit O.

11. Effective April 24, 2009, Mr. Cohen resigned his employment with GLG. *See* Cohen Dep. at 87:14-16.

12. During the time that he was a Research Associate, Mr. Cohen's primary duty was to serve as a liaison between clients and GLG's network of experts (or Council Members) to facilitate projects, which primarily included facilitating phone conversations for clients. *See* Cohen Dep. at 164:17-165:1; *see also* Deposition of Todd Johnson ("Johnson Dep."), attached as Exhibit G to the Filosa Decl., at 101:16-24.

13. During the period time that he was employed as a Research Associate, approximately 70% to 80% of Mr. Cohen's time was spent facilitating phone conversations between GLG's clients and its network of experts. *See* Cohen Dep. at 174:15-19.

14. Mr. Cohen's duties with respect to phone consultations were to: (i) determine what the client was looking to understand, (ii) search GLG's network to

4

identify experts with the relevant background, (iii) reach out to the expert to gauge their interest in discussing the particular topic with the client and (iv) set up the call between the client and the expert. *See* Cohen Dep. at 164:20-166:15; Johnson Dep. at 79:12-81:8.

15. In addition to Mr. Cohen's primary duties regarding phone consultation, Mr. Cohen also performed the following tasks: (i) trying to facilitate project work other than phone calls, (ii) calling current clients to extract additional project work and (iii) reading up on the industry. *See* Cohen Dep. at 174:23-175:9.

16. With respect to outreach to GLG's current clients, on a monthly basis, Mr. Cohen was required to contact certain clients of GLG that were on his "call plan" which was assigned by GLG in order to pitch upcoming events or conferences or whatever service GLG was emphasizing to its clients during that period of time. *See* Cohen Dep. at 178:2-17; 180:7-8; Johnson Dep. at 134:13-136:24.

17. As a Research Associate, Mr. Cohen was not involved in sales or negotiating contracts with GLG's client, instead he executed the clients' project work. *See* Cohen Dep. at 193:17-194:8.

18. While Mr. Cohen did perform a compliance function, which included monitoring communications between clients and experts for potential compliance concerns, in doing so he followed GLG's extensive compliance policies. *See* Cohen Dep. at 221:21-222:12.

19. However, most of Mr. Cohen's did not involve compliance issues, but if a compliance issue came up he would address the concern with GLG's Compliance Department. *See* Cohen Dep. at 223:5-224:7.

5

**Plaintiff Ronen's Employment as a Research Associate**

20.     From March 2007 through December 31, 2008, Plaintiff Matthew Ronen was employed by GLG in the position of Research Associate. *See* Ronen Dep. at 16:9-15.

21.     Effective January 1, 2009, Mr. Ronen was promoted from the position Research Associate to the position of Research Manager. *See* Ronen Dep. at 16:21-17:2.

22.     As a Research Associate, Mr. Ronen's primary role was to assist GLG in providing its clients access to its network of experts. Specifically, it was Mr. Ronen's role to respond to requests from GLG's clients by searching GLG's network of experts using a variety of keywords (i.e. a "Google search") to locate potential experts and then "invite" them to consult with GLG's clients. *See* Ronen Dep. at 82:8-83:8; 83:17-85:11.

23.     In order to do this, Mr. Ronen frequently relied on prior research requests that he or other Research Associates executed on behalf of clients and simply copied these projects and re-executed them. *See* Ronen Dep. at 100:2-8.

24.     During the period of time that he was employed as a Research Associate, Mr. Ronen's primary goal was "getting projects out the door" and "cranking out a greater volume of projects." *See* Ronen Dep. at 87:20-23; 90:4-13; 100:21-24; 105:3-4.

25.     At the end of calendar year 2008, Plaintiff Ronen's supervisor recommended that he be promoted from the Research Associate position to the Research Manager position. In her recommendation, Plaintiff's Ronen's supervisor noted that, "Matt's most visible key accomplishment lies in his stellar performance. He outperforms not only the [Multi-Sector Research] team average but most firm wide averages in almost all metrics . . . and this outperformance is by some margin. Matt has successfully

managed over 30 client accounts this year, quite a feat considering he is responsible for all practice areas for these accounts and they represent[] a significant piece of the [Multi-Sector Research] team's overall hedge fund business in New York." *See* Matt Ronen Year End Promotion Recommendation, attached as Exhibit P to the Filosa Decl; *see also* Deposition of Jacqueline Dille, attached as Exhibit H to the Filosa Decl., at 190:3-22.

26.     Plaintiff's Ronen's supervisor also noted that, "Matt's addition to revenue can be seen most directly in his 'Gold' number, which outperforms both the GLG and MSR team averages, with an average monthly 'Gold' number of $80K (firm average is ~$50K and team average is ~$57K)." *See* Exhibit P.

**Plaintiff Baldwin's Employment as a Research Associate**

27.     From September 11, 2007 through December 31, 2008, Plaintiff Ashleigh Baldwin was employed by GLG in the position of Research Associate. *See* Baldwin Dep. at 46:24-47:9.

28.     In the position as a Research Associate on the Boston HealthCare team, Ms. Baldwin reported directly to Todd Schaefer, who was employed as a Research Manager and then a Senior Research Manager. In these positions, Mr. Schaefer reported Kate Tschudy, who was employed as a Senior Research Manager then a Vice President on the HealthCare team. *See* Baldwin Dep. at 62:2-11; 62:24-65:2.

29.     Effective January 1, 2009, Ms. Baldwin was promoted from Research Associate to Research Manager. *See* Baldwin Dep. at 47:4-9; 333:4-6.

30.     At the time that she was interviewed for the position, Ms. Baldwin was told that her duties as a Research Associate would be to support the Health Care team and to execute on the requests that were given to her. *See* Baldwin Dep. at 39:24-40:5.

31.   At the that she interviewed for the position, Ms. Baldwin was also told that as a Research Associate she would work long hours and that the position would be repetitive. *See* Baldwin Dep. at 41:7-23.

32.   During the period of time that she was employed as a Research Associate, it was Ms. Baldwin's understanding that clients would come to GLG when they wanted to communicate with an expert and learn about a particular subject and that the clients paid GLG to put them in touch with experts. *See* Baldwin Dep. at 91:17-93:3.

33.   As a Research Associate, Ms. Baldwin did not have any understanding as to why GLG's clients wanted assistance from GLG's Council Members or how the information that they received impacted the clients' daily activities. *See* Baldwin Dep. at 164:9-24.

34.   During the period of time that she was employed as a Research Associate, the majority of Ms. Baldwin's time was spent executing basic research projects. *See* Baldwin Dep. at 108:12-15; 141:15-16; 140:20-22; 393:14-16.

35.   In fact, within a month of beginning her employment as a Research Associate, Ms. Baldwin was executing hundreds of projects a month. *See* Baldwin Dep. at 110:12-111:4.

36.   As a Research Associate, Ms. Baldwin's primary goal was to execute on a high volume of projects that provided the clients with what they asked for. *See* Baldwin Dep. at 174:19-23.

37.   As a Research Associate, Ms. Baldwin's understanding of her position within the HealthCare team was to perform (or execute) on a large number of projects on

8

behalf of her supervisors so that Ms. Baldwin's supervisors could focus on building clients relationships and growing accounts. See Baldwin Dep. at 175:7-11; 175:23-176:9.

38. Most of the client requests that Ms. Baldwin executed as a Research Associate were pretty straightforward and did not require follow-up with the client; instead Ms. Baldwin "just did the project." See Baldwin Dep. at 131:19-132:20.

39. The vast majority of the clients' requests that Ms. Baldwin received from clients were for phone consultations with experts, to the extent that the work was very repetitive. See Baldwin Dep. at 138:9-139:3.

40. When she received a request for a phone consultation, Ms. Baldwin's role was to search for Council Members who may be appropriate for a research project and present them to the client. See Baldwin Dep. at 143:23-144:3; Schaefer Dep. at 55:12-56:20.

41. In searching for which Council Members might be appropriate to present to clients, Ms. Baldwin would run searches in GLG's internal database using keywords based on the client's request. See Baldwin Dep. at 144:4-10.

42. Because many of the clients that Ms. Baldwin performed research requests for asked the same things, the work became very repetitive, such that approximately 70% of the projects that Ms. Baldwin performed were the same as projects that she had done before. See Baldwin Dep. at 144:13-16; 147:11-148:1.

**Defendant's Efforts To Track Productivity**

43. Defendant tracked the productivity of the members of the Research Management Department, which included Plaintiffs. See Final Assault PowerPoint Presentation, attached as Exhibit AA to the Filosa Decl., at 5.

9

44. These metrics were also used by the Research Associates to compare and rank associates with respect to the work that they performed, as well as by Plaintiffs' supervisors in their end of year performance reviews. *See* Baldwin Dep. at 199:6-13.

45. One of these metrics was Member Program Transaction Dollar Volume ("MPTDV"). MPTDV measured the amount of money that was paid to GLG's Council Members that participated in GLG's Member Programs for consultation with clients during a particular time period and was regularly tracked by Defendant. *See* Johnson Dep. at 142:2-143:7.

46. MPTDV was also referred to "gold" and "bling." *See* Johnson Dep. at 142:11-13.

47. Another metric utilized by GLG was Active Users. Active Users measured the number of unique clients at a given firm that utilized GLG's services during a given period of time. *See* Schaefer Dep. at 150:6-151:6.

48. Defendant included "Productivity" as one of three attributes that it considered in reviewing Plaintiffs' annual performance. *See generally* Jeff Cohen 2008 Performance Review, attached as Exhibit Q to the Filosa Decl.; Matthew Ronen 2008 Performance Review, attached as Exhibit R to the Filosa Decl.; Ashleigh Baldwin 2007 Performance Review, attached as Exhibit S to the Filosa Decl.; Ashleigh Baldwin 2008 Performance Review, attached as Exhibit T to the Filosa Decl.

49. On Plaintiff Cohen's 2008 Performance Review, with respect to his "Productivity," his supervisors noted:

> Jeff's strongest suit is his ability to deliver a high level of production. He can be counted on to pull projects from clients and is also effective in pulling survey work out of the client base on a consistent basis. He has a competitive streak in him that drives him to succeed and that is noticed.

> He produced 64K of gold a month in 2008 which was above the NYC team average of 54.5K and the GLG average of 59K. He produced a [Total Project Volume] of 211 a month which far exceeds the GLG average of 127 and clearly illustrates his ability to produce. . . . On a relative basis Jeff ranks in the top 20% of the NY based team in production.

See Exhibit Q, at 4.

50. On Plaintiff Ronen's 2008 Performance Review, his supervisor rated him "Far Exceeds Expectations" and "Exceeds Expectations" with respect to "Productivity" stating:

> "Matt exceeded expectation in terms of his productivity this year; his [Total Project Volume] came out to an average of ~ 180 projects/month an this puts him in the very top tier of [Total Project Volume] Performers on the [Multi-Sector Research] team this year. Matt also outperforms not only the average at GLG, but on the [Multi-Sector Research] team, win an average monthly 'Gold' number of over 80K (firm average is ~$50K and team average is ~$57K). . . . Matt's productivity and ability to manage his time is something that we worked on quite a bit at the start of this year. Matt took all the advice and structure he was provided to heart and rapidly turned around his performance in this area. Matt now manages his time very well and this is apparent through his consistent completion of the calling plan, along with his other responsibilities . . ."

See Exhibit R, at 3; Dille Dep. at 175:18-176:11.

51. Mr. Ronen's supervisor also stated in his 2008 Performance Review, "Matt ... is now one of the most productive and respected members of the [Multi-Sector Research] team. This is evidenced by the fact that Matt outperforms not only the [Multi-Sector Research] team average, but most firm-wide averages, in almost all metrics . . . and his outperformance is usually by some margin."

52. On Ms. Baldwin's 2007 Performance Review, in assessing Ms. Baldwin's quality of service, her supervisor noted that Ms. Baldwin "routinely set up over 10 projects a day and exceeded 280 member program projects (297 total projects including 4 surveys) in her first full month at GLG." See Exhibit S, at 2.

11

53. On Ms. Baldwin's 2007 Performance Review, in assessing Ms. Baldwin's performance with respect to productivity and usage volume, Ms. Baldwin's supervisor noted that Ms. Baldwin "led the Boston [HealthCare] team in [Member Program Transaction Dollar Volume] in October, her first full month at GLG." *See* Exhibit S, at 2.

54. In her goals for 2008, Ms. Baldwin was encouraged to "continue to be productive" and to "aim to execute ~ 200-250 Member Program Projects per month. *See* Exhibit S, at 3.

55. On Ms. Baldwin's 2008 Performance Review, Ms. Baldwin's supervisor noted that "[h]er work ethic is unquestionable, routinely arriving early, stay late or working on the weekends to ensure that client's needs are met." *See* Exhibit T, at 2.

56. On Ms. Baldwin's 2008 Performance Review, her supervisor noted:

> With regard to productivity, Ashleigh has proven the ability to execute and manage an exceedingly high number of client requests without sacrificing quality. Ashleigh is routinely the top ranking Research Professional in Healthcare, and likely the firm, when examining Member Program Projects and Total Projects performed. In fact, for 2008 Ashleigh has averaged the most projects performed by any RA or RM in our Healthcare group on a monthly basis (294 Member Program Projects per month) and completed an astonishing 450 Total Projects in July (Firm high).

*See* Exhibit T, at 3.

**Incentives to Increase Production**

57. During the course of her employment as a Research Associate, Ms. Baldwin was told by her direct supervisor that the biggest factor in her end of year bonus compensation would be her project volume and that the hours that she was putting in executing on client requests would be reflected in her bonus. *See* Baldwin Dep. at 193:6-22.

58. Defendant regularly provided financial incentives to its Research Management employees to increase their performance with respect to these metrics. For example:

   a. In May 2007, Defendant held a financial award competition known as "Magnificent May" where Defendant's Research Management employees were encouraged to increase: (i) Member Program Project Volume (which included Consultations and Surveys), (ii) Active Users, (iii) Quality, and (iv) Completion of the Call Plan. Defendant offered the top ten performing employees in these three areas cash incentives ranging from $1000 to $4000. *See* May 22, 2007 Email from Sam Jacobs to Research Management, attached as Exhibit U to the Filosa Decl.

   b. During the Summer of 2007, Defendant held a "usage focused competition" among its Research Management employees known as "Summer Smackdown which focused on the following production-based metrics: (i) total number of Member Program consultation, (ii) total number of Active Users, (iii) total number of surveys and single author reports and (iv) completion of the call plan.

**Interactions With Management**

59. Sam Jacobs served as Managing Director of Global Research Management from April 2007 until the second half of 2008, at which point he served as Managing Director of Americas Research. *See* Jacobs Dep. at 16:15-18; 17:16-18:5; 19:17-22.

60. As Managing Director of Global Research Management, Mr. Jacobs was responsible for the entire Research Management Department, but he did not work closely

13

with any of the Plaintiffs because, during the period of time that he served in this position, the Research Associate position was not intended to work closely with him in this position. *See* Jacobs Dep. at 20:12-14; 36:3-18.

61. Instead, Mr. Jacobs' interactions with Plaintiffs Cohen and Ronen was limited to passing them in the hallways and never worked with them on any specific projects. *See* Jacobs Dep. at 38:19-39/39:19; 39:20-41:9. With respect to Ms. Baldwin, Mr. Jacobs only had "cursory interaction" with her, none of which were substantive. *See* Jacobs Dep. at 41:20-42:2.

62. Plaintiff Cohen was generally not advised or consulted with respect to decisions made by Senior Management, including the decision to reclassify the Research Associate position effective January 1, 2009. *See* Cohen Dep. at 65:22-23.

**The Final Assault**

63. In September 2008, the Company began a time period known as the "Final Assault." The purpose of the Final Assault was to encourage Plaintiffs and the other members of the Research Management Department to put in extra effort "to help GLG hit its revenue target" and "drive revenue." *See* Sept. 12, 2008, Email from Sam Jacobs, attached as Exhibit W to the Filosa Decl.; Exhibit AA, at 26.

64. As Mr. Jacobs instructed, "driving revenue, and solving how to drive revenue, is the most useful organizing principle we can incorporate, in any department or team within GLG." *See* Sept. 30, 2008 Email from Sam Jacobs, attached as Exhibit X to the Filosa Decl.

65. During the Final Assault, GLG placed a particular emphasis on 3 metrics: (i) Total Project Volume (also know as "TPV"), (ii) Major Project Revenue (also known

as ("MPR"), and (iii) Active Council Members (also known as "ACM"). *See* Exhibit AA, at 23-43.

66. Total Project Volume equaled the total number of projects during a particular period of time, which included phone consultations, surveys and attendance at GLG-sponsored events and was a metric that tried to capture all of the work that an employee was doing. *See* Exhibit AA at 30; Deposition of Michael Dzik ("Dzik Dep."), attached as Exhibit J to the Filosa Decl., at 140:20-25; Schaefer Dep. at 144:9-11.

67. Total Project Volume was used as a metric for purposes of the Final Assault because it could be tracked on daily basis using the Company's analytics and correlated closely with revenue, meaning that "clients that used the service more tended to have an ability or interest in paying more." *See* Exhibit AA, at 32; Jacobs Dep. at 80:25-81:14.

68. Major Project Revenue was used as a metric for purposes of the Final Assault because it equaled revenue for GLG and would help GLG hit its revenue targets. *See* Exhibit AA, at 38.

69. The goals of the Final Assault were to (i) beat all time highs for Total Project Volume by 30%, (ii) drive $4 million in Major Project Revenue over the three months of the Final Assault, and (iii) drive a 10% increase in year-over-year Active Council Members. *See* Exhibit AA, at 44-47.

70. During the time period known as the Final Assault, Plaintiffs were expected to work harder and longer hours, with a particular emphasis on "picking up the phone and calling clients." *See* Sept. 9, 2008 Email Chain from Sam Jacobs, attached as Exhibit V to the Filosa Decl., at 2.

71.     During the Final Assault, Plaintiffs and other members of the Research Management Department were expected to put in "extra effort" and "extra commitment" "over the next three months – picking up the phone and calling clients, working later, taking a regular phone call and turning it into something more" and were promised that they would "be able to take a breath in the post-Thanksgiving period, take a rest and enjoy a well-deserved holiday period." *See* Exhibit V at 5; Exhibit AA, at 63-64.

72.     While GLG encouraged Plaintiffs and the other members of the Research Management Department to "give it 110% and take a breath over the holidays," Mr. Jacobs testified that he realized it was not possible to actually give 110%, but he wanted Plaintiffs and the other members of the Research Management Department to give "as much as they were capable of giving . . . because it was a critical time for the firm." *See* Exhibit AA, at 64; Jacobs Dep. at 86:10-87:3.

73.     The goal of the Final Assault was to motivate Plaintiffs and the other members of the Research Management Department to work harder because "if our clients were delighted as much as possible, the sales team would be more likely to collect revenue based on that delight." *See* Jacobs Dep. at 87:8-23.

74.     Plaintiffs and the other members of the Research Management Department were encouraged to work harder during this time period with the promise of increased compensation if GLG hit its revenue goals. As Mr. Jacobs noted in his attempts to "motivate people:" "[s]mall variations in our year end revenue have very large impacts on our enterprise valuation and, correspondingly, firm profitability and, correspondingly, accrued firm compensation and, correspondingly individual compensation." *See* Nov. 19,

2010 Email from Sam Jacobs, attached as Exhibit Y to the Filosa Decl., at 1; Jacobs Dep. at 103:1-24.

75.     During this period of time, the expected start time for Plaintiffs and other members of the Research Management Department was moved forward to 8:20 a.m. *See* Exhibit V, at 3.

**<u>Reclassification of the Research Associate Position</u>**

76.     Effective January 1, 2009, Defendant reclassified the FLSA exemption status of the Research Associate position. *See* Template Reclassification Memorandum, attached as Exhibit Z to the Filosa Decl.

77.     The Reclassification Memorandum, which was provided to employees that remained in the Research Position following the reclassification, stated, in relevant part:

> We recently completed a review of the Company's compensation structure and have determined that employees in certain positions will be eligible for overtime compensation (meaning that those employees will be classified as "non-exempt" from the overtime provisions of the Fair Labor Standards Act). Effective January 1, 2009, your current position will be reclassified as non-exempt and going forward, you will be entitled to overtime pay if you are required to work in excess of 40 hours per week.

*See* Exhibit Z.

Dated: February 18, 2011           Respectfully submitted,
      New York, New York

THOMPSON WIGDOR & GILLY LLP

By: _____
     Douglas H. Wigdor
     Gregory N. Filosa

85 Fifth Avenue
New York, New York 10003
Tel. (212) 257-6800
Fax (212) 257-6845
dwigdor@twglaw.com
gfilosa@twglaw.com

*Attorneys for Plaintiffs*