**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY COHEN, on behalf of himself and on behalf of all similarly situated employees,<br><br>     Plaintiff,<br><br>   v.<br><br>GERSON LEHRMAN GROUP, INC.,<br><br>     Defendant. | Civil Action No.<br>09-CV-04352 (PKC) |

## DEFENDANT'S RULE 56.1(b) STATEMENT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S LIABILITY

Defendant Gerson Lehrman Group, Inc. ("GLG"), by its attorneys, pursuant to Rule

56.1(b) of the Local Rules for the United States District Court for the Southern District of New

York, submits the following Statement in Opposition to the Statement of Undisputed Material

Facts submitted by Plaintiffs Jeffrey Cohen ("Cohen"), Matthew Ronen ("Ronen"), and Ashleigh

Baldwin ("Baldwin") in support of their Motion for Summary Judgment.

## RESPONSES TO PLAINTIFFS' RULE 56.1(a) STATEMENT OF FACTS

1.  Defendant Gerson Lehrman Group ("Defendant," "GLG" or the "Company") characterizes itself as a "global marketplace for expertise" that "help[s] the world's leading institutions find, engage, and manage experts across a broad range of industries and disciplines." See About Us — Gerson Lehrman Group, www.glgroup.com/about.html (last visited February 18, 2011), attached as Exhibit M to the Declaration of Gregory Filosa ("Filosa Decl.").

**Response:**  GLG does not dispute this paragraph, but avers that the quoted language is

incomplete and also states:  "Group Councils are networks of consultants, physicians, scientists,

engineers, attorneys, market researchers, and other professionals from around the world.  Council

Members leverage GLG's sophisticated proprietary systems to categorize their experience and

expertise.  GLG research professionals use these systems to quickly provide relevant Council

Members who can help clients better understand products, services, companies, issues, and

industries." <u>See</u> About Gerson Lehrman Group, <u>http://www.glgroup.com/about.html</u> (last visited

Mar. 8, 2011), attached as Exhibit ("Exh.") 93 to the Declaration of Michael J. Puma ("Puma

Decl.") filed herewith.

2.  GLG is, at its core, an expert network — essentially a virtual rolodex — that sold access to
    its network of more than 200,000 experts (or Council Members) to its clients. See Deposition
    of Matthew Ronen ("Ronen Dep."), attached as Exhibit F to the Filosa Decl., at 81:5-16;
    82:1-4; see also Deposition of Ashleigh Baldwin ("Baldwin Dep."), attached as Exhibit E to
    the Filosa Decl., at 90:4-11; see also Deposition of Todd Schaefer (Schaefer Dep."), attached
    as Exhibit I to the Filosa Decl., at 44:3-20.

**Response:**  Except to admit that GLG has a network of over 200,000 Council Members, GLG

denies the supposedly undisputed facts set forth in paragraph 2; avers that such facts are

immaterial to the application of the administrative exemption to Plaintiffs, which turns on the

Plaintiffs' actual job duties that are addressed in paragraphs 60-332 of GLG's 56.1(a) Statement

of Undisputed Facts submitted in support of its Motion for Summary Judgment ("GLG 56.1"),

and not on Plaintiffs' characterization of GLG's business as a "virtual rolodex" or their

subjective impression of the nature of GLG's business "at its core"; and refers to paragraphs 1-

14 of GLG's 56.1 for an appropriate description of GLG's business.

3.  The Job Description for the Research Associate position provided that "Research Associates
    are responsible for managing and executing primary research deliverables to add value to
    Gerson Lehrman Group's client." See Research Associate Job Description, attached as
    Exhibit N to the Filosa Decl.

**Response:**  GLG does not dispute this paragraph, but avers that this is an incomplete statement

of the content of the job description.  <u>See</u> Filosa Decl., Exh. N.  GLG further avers that this job

description is immaterial to the application of the administrative exemption to Plaintiffs, which

turns on the actual duties performed by the Plaintiffs, which are addressed at paragraphs 60-332

of GLG's 56.1(a) Statement.  In contrast, the job description "is, essentially, a marketing

document for people who are thinking about applying to a position at Gerson Lehrman Group."

Transcript of Deposition of Dmitri Mehlhorn, dated Sept. 10, 2009 ("Mehlhorn Dep."), pertinent

portions of which are attached as Exh. 7 to the Puma Decl., at 131:10-13.  The job description is

"an appropriate starting point for someone beginning to understand" the Research Associate

position, but it is not comprehensive.  (Mehlhorn Dep. at 137:20-22, Exh. 7).  GLG further avers

that both Mr. Mehlhorn and GLG Human Resources Director Deborah Barker testified that they

neither reviewed nor approved this job description.  (Mehlhorn Dep. at 142:22-24, Exh. 7;

Transcript of the Deposition of Deborah Barker, dated October 28, 2010 ("Barker Dep."),

pertinent portions of which are attached as Exh. 94 to the Puma Decl. at 59:23-60:7).

4.   In the context of the Research Associate position, this meant that Research Associates were
     responsible for "taking a client interview, panel assembly, matchmaking between clients and
     experts, follow-up afterwards to make sure that the client had received the insights they
     needed." See Deposition of Dmitri Mehlhorn ("Mehlhorn Dep."), attached as Exhibit L to the
     Filosa Decl., at 141:20-142:9.

**Response:**  GLG does not dispute that Mehlhorn gave the testimony quoted in paragraph 4, but

avers that this job description is immaterial to the application of the administrative exemption to

Plaintiffs as more fully explained in its response to paragraph 3 above, and refers to the more

complete description of Plaintiffs' actual job duties set forth in paragraphs 60-332 of GLG's

56.1.

5.   The Job Description for the Research Associate position lists the following responsibilities:
        •Learning Gerson Lehrman Group's underlying business processes and assisting senior
        team members with high-level product execution, and developing a fundamental
        understanding of their practice area's industries;
        •Fulfilling time-sensitive research requests delegated by senior team members on behalf
        of Gerson Lehrman Group clients by analyzing client requests, and building and
        qualifying primary populations of topic experts;
        •Assisting senior team members with high-level service fulfillment by managing
        premium products including Market and Custom Surveys, Education Seminars,
        Roundtable luncheons and Custom Research Trips; and
        •Develop a working knowledge of the practice area's core industries to improve project
        and product service quality.
        See Exhibit N.

**Response:**  GLG does not dispute that the Job Description includes this information, but avers

that this job description is immaterial to the application of the administrative exemption to

Plaintiffs as more fully explained in its response to paragraph 3 above, and refers to the more

complete description of Plaintiffs' actual job duties set forth in paragraphs 60-332 of GLG's

56.1.

6.  The Research Associate position was launched in early 2007 and the purpose of the position
    was to: "support [GLG's] undergraduate recruiting efforts . . . by creating an opportunity for
    undergraduates to be employed . . . with GLG" and "was intended to work closely with the
    rest of the research organization." See Deposition of Samuel Jacobs ("Jacobs Dep."), attached
    as Exhibit K to the Filosa Decl., at 30:22-31:18; 36:3-8; Mehlhorn Dep. at 86:16-22; 114:17-
    117:11.

**Response:**  Except to admit that Jacobs gave the quoted testimony, GLG denies the supposedly

undisputed facts set forth in Paragraph 6, there is no record evidence that the Research Associate

position was created only for this stated reason; avers that there were already job opportunities

for "people right out of school to be employed with GLG" (Mehlhorn Dep. at 31:15-18, Exh. 7);

and avers that the reasons for the creation of the Research Associate position is immaterial to the

application of the administrative exemption to Plaintiffs, which turns on Plaintiffs' actual job

duties set forth in paragraphs 60-332 of GLG's 56.1.

7.  Research Associates, which were part of the larger Research Management Department,
    served in the following capacities: (i) "as thought partners to client," (ii) "as the front line
    bulwark for the compliance framework," and (iii) "as ambassadors of the GLG brand." See
    Jacobs Dep. at 21:10-22:11; 24:13-16.

**Response:**  Admitted.  By way of further response, GLG refers to the more thorough description

of Plaintiffs' advisory, promotional and compliance duties at paragraphs 60-230 of GLG's 56.1.

8.  The decision was made to eliminate the Research Associate position in late 2008 and
    Defendant decided to phase the position out by promoting some individuals to the Research
    Manager position, moving others laterally and laying others off as part of a reduction in force
    with the last employee being promoted around June or July 2009, which was only a few
    weeks after the Complaint was filed in this matter. See Mehlhorn Dep. at 86:16-87:21; 89:17-
    20; 96:24-97:18.

**Response:**  GLG does not dispute this paragraph, but avers that the stated facts are immaterial to the application of the administrative exemption to Plaintiffs, and avers that there is no record evidence that either the decision in 2008 to eliminate the Research Associate position or the subsequent reduction in force and promotions were in any way related to the filing of the Complaint in this matter several months after the decision to eliminate the Research Associate position was made.

9.  From April 2007 through December 31, 2008, Plaintiff Jeffrey Cohen was employed by GLG in the position of Research Associate, assigned to the Technology Media & Telecommunications ("TMT") team in the New York office. See Deposition of Jeffrey Cohen ("Cohen Dep."), attached as Exhibit D to the Filosa Decl., at 38:8-10; see also Jeffrey Cohen Linkedin Profile, attached as Exhibit 0 to the Filosa Decl.

**Response:**  Admitted.

10. Effective January 1, 2009, Mr. Cohen was promoted from the position Research Associate to the position of Research Manager. See Exhibit 0.

**Response:**  Admitted.

11. Effective April 24, 2009, Mr. Cohen resigned his employment with GLG. See Cohen Dep. at 87:14-16.

**Response:**  Admitted.

12. During the time that he was a Research Associate, Mr. Cohen's primary duty was to serve as a liaison between clients and GLG's network of experts (or Council Members) to facilitate projects, which primarily included facilitating phone conversations for clients. See Cohen Dep. at 164:17-165:1; see also Deposition of Todd Johnson ("Johnson Dep."), attached as Exhibit G to the Filosa Decl., at 101:16-24.

**Response:**  Except to admit that Cohen was a Research Associate, GLG denies that Cohen's characterization of his role as a "liaison" who "facilitated" projects and conversations is (1) material to the application of the administrative exemption to Plaintiffs, which turns on the actual duties they performed rather than a self-serving characterization of such duties, or (2) a complete description of his actual advisory, promotion, and compliance duties, which are described based

on the undisputed record evidence at paragraphs 60-66, 92-114, 141-155, 189-205, 231-257, and

304-317 of GLG's 56.1.  GLG further refers to its response to paragraph 13 below with respect

to Plaintiff's use of the term "conversations" with clients.

13. During the period time that he was employed as a Research Associate, approximately 70% to
    80% of Mr. Cohen's time was spent facilitating phone conversations between GLG's clients
    and its network of experts. See Cohen Dep. at 174:15-19.

**Response:**  Admitted, but GLG avers that Plaintiffs' reference to "conversations" in fact refers

to "consultations" as that term is correctly used in ¶¶ 14 and 15 of Plaintiffs' 56.1(a) Statement,

and further refers to its response to paragraph 12 above with respect to Cohen's conclusory

characterization of his duties as "facilitating" such consultations.

14. Mr. Cohen's duties with respect to phone consultations were to: (i) determine what the client
    was looking to understand, (ii) search GLG's network to identify experts with the relevant
    background, (iii) reach out to the expert to gauge their interest in discussing the particular
    topic with the client and (iv) set up the call between the client and the expert. See Cohen
    Dep. at 164:20-166:15; Johnson Dep. at 79:12-81:8.

**Response:**  GLG admits that these are some of the duties Cohen performed as a Research

Associate, and refers to 60-66, 92-114, 141-155, 189-205, 231-257, and 304-317 of GLG's 56.1,

which provide a more complete description of Cohen's advisory, promotion, and compliance

duties.

15. In addition to Mr. Cohen's primary duties regarding phone consultation, Mr. Cohen also
    performed the following tasks:  (i) trying to facilitate project work other than phone calls, (ii)
    calling current clients to extract additional project work and (iii) reading up on the industry.
    See Cohen Dep. at 174:23-175:9.

**Response:**  Except to admit that these are some of the duties Cohen performed as a Research

Associate, GLG refers to its responses to paragraphs 12-14 above.

16. With respect to outreach to GLG's current clients, on a monthly basis, Mr. Cohen was
    required to contact certain clients of GLG that were on his "call plan" which was assigned by
    GLG in order to pitch upcoming events or conferences or whatever service GLG was
    emphasizing to its clients during that period of time.  See Cohen Dep. at 178:2-17; 180:7-8;
    Johnson Dep. at 134:13-136:24.

**Response:**  Except to admit that Cohen was required to contact certain clients of GLG as part of his "call plan," that these clients sometimes were assigned to him by GLG, and that, in communications with clients, he would promote GLG products and services, including upcoming events or conferences, GLG denies that the supposedly undisputed facts set forth in paragraph 16 are a complete description of what Cohen was expected to do, or did, in calling clients as part of his call plan, and refers to paragraphs 141-155 of GLG's 56.1 for a complete statement of the undisputed facts concerning Cohen's promotion duties, including those relating to his "call plan."

17. As a Research Associate, Mr. Cohen was not involved in sales or negotiating contracts with GLG's client, instead he executed the clients' project work. See Cohen Dep. at 193:17-194:8.

**Response:**  Except to admit that Cohen was not engaged in sales, as described in paragraph 141 of GLG's 56.1(a) Statement, GLG denies that the remaining supposedly undisputed facts set forth in paragraph 17 have an evidentiary basis because Cohen concedes that his promotional duties furthered the efforts of GLG's Sales Department (see paragraphs 141, 146 and 150, and 152 of GLG's 56.1(a) Statement) and also concedes that it was Council Members rather than Research Associates who completed clients' projects (see Cohen Affidavit, Dkt. No. 13, ¶¶ 4-5); avers that such remaining supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on the actual duties they performed rather than a self-serving characterization of such duties as, for instance, "execution"; and refers to paragraphs 60-66, 92-114, 141-155, 189-205, 231-257, and 304-317 of GLG's 56.1 for a description of Cohen's actual duties associated with what Plaintiffs characterize as "executing" projects.

18. While Mr. Cohen did perform a compliance function, which included monitoring communications between clients and experts for potential compliance concerns, in doing so he followed GLG's extensive compliance policies.  See Cohen Dep. at 221:21-222:12.

**Response:**  Except to admit that Cohen performed compliance functions and monitored

communications and interactions between clients and Council Members for potential compliance

concerns and potential violations of GLG's compliance policies (GLG 56.1 ¶¶ 189-205, 231-

257), GLG denies the characterization of GLG's compliance policies as "extensive" and avers

that such supposedly undisputed fact has no evidentiary basis and is immaterial to the application

of the administrative exemption to Plaintiffs.

19. However, most of Mr. Cohen's [sic] did not involve compliance issues, but if a compliance issue came up he would address the concern with GLG's Compliance Department. See Cohen Dep. at 223:5-224:7.

**Response:**  GLG admits that although Cohen monitored for compliance issues as to all client

research projects, he did not identify such issues on most of the research projects he was

involved with, but denies the remaining supposedly undisputed facts set forth in Paragraph 19 as

incomprehensible, avers that whether Cohen reported to GLG's Compliance Department some or

all of the compliance issues identified by him is immaterial to the application of the

administrative exemption to Plaintiffs, and avers that monitoring for compliance issues was a

critical part of Cohen's daily activities on all research projects (GLG 56.1 ¶¶ 189-205, 231-257).

20. From March 2007 through December 31, 2008, Plaintiff Matthew Ronen was employed by GLG in the position of Research Associate. See Ronen Dep. at 16:9¬15.

**Response:**  Admitted.

21. Effective January 1, 2009, Mr. Ronen was promoted from the position Research Associate to the position of Research Manager. See Ronen Dep. at 16:21-17:2.

**Response:**  Admitted.

22. As a Research Associate, Mr. Ronen's primary role was to assist GLG in providing its clients access to its network of experts. Specifically, it was Mr. Ronen's role to respond to requests

from GLG's clients by searching GLG's network of experts using a variety of keywords (i.e. a "Google search") to locate potential experts and then "invite" them to consult with GLG's clients. See Ronen Dep. at 82:8-83:8; 83:17-85:11.

**Response:**  Except to admit that Ronen was a Research Associate, assisted clients with

appropriately accessing GLG's network of Council Members, responded to requests from GLG's

clients by, among other things, searching GLG's network of Council Members, identifying

potentially appropriate Council Members, and recommending Council Members to GLG's

clients, GLG denies as not supported by record evidence Ronen's characterizations of his

"primary role" and of searching for experts as a "Google search"; denies that Cohen's primary

"role" or his characterizations are material to the application of the administrative exemption to

Plaintiffs, which turns on the actual duties they performed rather than a self-serving

characterization of such duties; and denies that Ronen's characterizations are a complete

description of Ronen's actual advisory, promotion, and compliance duties, which are described

based on the undisputed record evidence at paragraphs 67-76, 115-130, 156-167, 189-196, 206-

211, 258-262 and 318-328 of GLG's 56.1.

23. In order to do this, Mr. Ronen frequently relied on prior research requests that he or other Research Associates executed on behalf of clients and simply copied these projects and re-executed them.  See Ronen Dep. at 100:2-8.

**Response:**  Except to admit that Ronen's advisory duties included reviewing the results of any

relevant prior search, GLG denies that the remaining supposedly undisputed facts set forth in

paragraph 23 have an evidentiary basis in the cited testimony or otherwise; avers that such

remaining supposedly undisputed facts are immaterial to the application of the administrative

exemption to Plaintiffs, which turns on the actual duties they performed rather than a self-serving

characterization of such duties as, for instance, "execution"; and refers to paragraphs 67-76, 115-

130, 156-167, 189-196, 206-211, 258-262 and 318-328 of GLG's 56.1 for a description of

Ronen's actual duties associated with what Plaintiffs characterize as "executing" projects.

24. During the period of time that he was employed as a Research Associate, Mr. Ronen's primary goal was "getting projects out the door" and "cranking out a greater volume of projects." See Ronen Dep. at 87:20-23; 90:4-13; 100:21-24; 105:3-4.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 24 have an

evidentiary basis in the cited testimony (which says nothing of Ronen's "primary goal") or

otherwise; avers that such supposedly undisputed facts are immaterial to the application of the

administrative exemption to Plaintiffs, which turns on the actual duties they performed rather

than a self-serving characterization of a "primary goal"; and refers to paragraphs 67-76, 115-130,

156-167, 189-196, 206-211, 258-262 and 318-328 of GLG's 56.1 for a description of Ronen's

actual duties associated with client projects.

25. At the end of calendar year 2008, Plaintiff Ronen's supervisor recommended that he be promoted from the Research Associate position to the Research Manager position. In her recommendation, Plaintiffs Ronen's supervisor noted that, "Matt's most visible key accomplishment lies in his stellar performance.  He outperforms not only the [Multi-Sector Research] team average but most firm wide averages in almost all metrics . . . and this out performance is by some margin.  Matt has successfully managed over 30 client accounts this year, quite a feat considering he is responsible for all practice areas for these accounts and they represent[] a significant piece of the [Multi-Sector Research] team's overall hedge fund business in New York." See Matt Ronen Year End Promotion Recommendation, attached as Exhibit P to the Filosa Decl; see also Deposition of Jacqueline Dille, attached as Exhibit H to the Filosa Decl., at 190:3-22.

**Response:**  Admitted, but GLG further avers that this is an incomplete recitation of the

promotion recommendation and that Ronen's performance was assessed based on many factors,

including qualitative factors (GLG 56.1 ¶¶ 49-51).

26. Plaintiff's Ronen's supervisor also noted that, "Matt's addition to revenue can be seen most directly in his 'Gold' number, which outperforms both the GLG and MSR team averages, with an average monthly 'Gold' number of $80K (firm average is —$50K and team average is —$57K)." See Exhibit P.

**Response:**  Admitted, but GLG refers to its response to paragraph 25 above.

27. From September 11, 2007 through December 31, 2008, Plaintiff Ashleigh Baldwin was employed by GLG in the position of Research Associate. See Baldwin Dep. at 46:24-47:9.

**Response:** Admitted.

28. In the position as a Research Associate on the Boston HealthCare team, Ms. Baldwin reported directly to Todd Schaefer, who was employed as a Research Manager and then a Senior Research Manager.  In these positions, Mr. Schaefer reported Kate Tschudy, who was employed as a Senior Research Manager then a Vice President on the HealthCare team. See Baldwin Dep. at 62:2-11; 62:24-65:2.

**Response:** Admitted.

29. Effective January 1, 2009, Ms. Baldwin was promoted from Research Associate to Research Manager.  See Baldwin Dep. at 47:4-9; 333:4-6.

**Response:** Admitted.

30. At the time that she was interviewed for the position, Ms. Baldwin was told that her duties as a Research Associate would be to support the Health Care team and to execute on the requests that were given to her. See Baldwin Dep. at 39:24-40:5.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 30 have an evidentiary basis, as Baldwin went on to testify that she could not recall what she was told in her interview (Filosa Decl., Exh. E, at 40:6-7) but that it was "probably not" the language alleged in paragraph 30 (Filosa Decl., Exh. E, at 40:8-12); avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on the actual duties they performed rather than what they were told in an interview about their *anticipated* duties; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of Baldwin's actual duties.

31. At the[sic] she interviewed for the position, Ms. Baldwin was also told that as a Research Associate she would work long hours and that the position would be repetitive. See Baldwin Dep. at 41:7-23.

**Response:** GLG denies the supposedly undisputed facts set forth in Paragraph 31, as they are incomprehensible and immaterial to the application of the administrative exemption to Baldwin,

which turns on the duties actually performed by Baldwin as set forth at paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1, and further avers that Baldwin testified in her deposition that "the hours were longer."  (Filosa Decl., Exh. E, at 41:21).

32. During the period of time that she was employed as a Research Associate, it was Ms. Baldwin's understanding that clients would come to GLG when they wanted to communicate with an expert and learn about a particular subject and that the clients paid GLG to put them in touch with experts.  See Baldwin Dep. at 91:17-93:3.

**Response:**  Admitted, but GLG refers to paragraphs 1-15 of GLG's 56.1 for an undisputed description of GLG's business and what its clients paid for and also refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for an accurate description of Baldwin's duties with respect to those clients.

33. As a Research Associate, Ms. Baldwin did not have any understanding as to why GLG's clients wanted assistance from GLG's Council Members or how the information that they received impacted the clients' daily activities. See Baldwin Dep. at 164:9-24.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 33 have an evidentiary basis, as Baldwin went on to testify that she understood that clients sought assistance from Council Members in connection with investment decisions (Puma Decl., Exh. 5, at 165:15-20) and that clients communicated with experts to gain expertise on a particular subject (Filosa Decl., Exh. E, at 92:5-8); avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties and paragraphs 1-14, 64, 67, 69-71, 73, 92, 94, 95-99, 101, 115, 121-126, 128-130, 132, and 189-196 of GLG's 56.1 for a description of the undisputed records evidence as to the value of GLG's services to its clients.

34. During the period of time that she was employed as a Research Associate, the majority of Ms. Baldwin's time was spent executing basic research projects. See Baldwin Dep. at 108:12-15; 141:15-16; 140:20-22; 393:14-16.

**Response:**   Except to admit that, as a Research Associate, Baldwin devoted the majority of her time to her various duties with respect to clients' research projects, GLG denies that the characterizations of those projects as "basic" and of Baldwin "executing" those projects have an evidentiary basis, as, for instance, it is undisputed that Council Members rather than Research Associates completed the projects for clients (GLG's 56.1 ¶ 13); avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on their actual duties rather than self-serving characterizations of projects as "basic" or duties as "execution"; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties associated with what Baldwin now characterizes as "executing" projects.

35. In fact, within a month of beginning her employment as a Research Associate, Ms. Baldwin was executing hundreds of projects a month. See Baldwin Dep. at 110:12-111:4.

**Response:**   Except to admit that, within a month of joining GLG as a Research Associate, Baldwin was performing her various duties with respect to over 200 client research projects each month, GLG denies that the characterization of Baldwin's duties as "executing" those projects has an evidentiary basis, as it is undisputed that Council Members rather than Research Associates completed the projects for clients (GLG 56.1 ¶ 13); avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on their actual duties rather than self-serving characterizations of duties as "execution"; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284,

298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties associated with what Baldwin now characterizes as "executing" projects.

36. As a Research Associate, Ms. Baldwin's primary goal was to execute on a high volume of projects that provided the clients with what they asked for. See Baldwin Dep. at 174:19-23.

**Response:** GLG denies that the supposedly undisputed facts set forth in paragraph 36 have an evidentiary basis in the cited testimony, which makes no mention of Baldwin's "primary goal," or otherwise; avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on their actual duties rather than self-serving characterizations of their "primary goal"; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties associated with what Baldwin now characterizes as "executing" projects.

37. As a Research Associate, Ms. Baldwin's understanding of her position within the HealthCare team was to perform (or execute) on a large number of projects on behalf of her supervisors so that Ms. Baldwin's supervisors could focus on building clients relationships and growing accounts. See Baldwin Dep. at 175:7-11; 175:23-176:9.

**Response:** GLG denies that the supposedly undisputed facts set forth in paragraph 37 are a complete description of Baldwin's "understanding" of her position, and avers that Baldwin's claimed "understanding of her position" is immaterial to the application of the administrative exemption to Baldwin, which turns on the duties actually performed by Baldwin; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties.

38. Most of the client requests that Ms. Baldwin executed as a Research Associate were pretty straightforward and did not require follow-up with the client; instead Ms. Baldwin "just did the project." See Baldwin Dep. at 131:19-132:20.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 38 have an evidentiary basis in the cited testimony, which refers only to the first step of advising a client as to a research project rather than the entire process of advising as to the project, or otherwise, as it is undisputed that Council Members rather than Research Associates completed ("did") the projects for clients (GLG 56.1¶ 13); avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on their actual duties rather than self-serving characterizations of clients' projects; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties.

39. The vast majority of the clients' requests that Ms. Baldwin received from clients were for phone consultations with experts, to the extent that the work was very repetitive. See Baldwin Dep. at 138:9-139:3.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 39 have an evidentiary basis in the cited testimony, which does not refer to the "vast majority" of client requests and does not refer to Baldwin's work as "repetitive," or otherwise; avers that such supposedly undisputed facts are immaterial to the application of the administrative exemption to Plaintiffs, which turns on their actual duties rather than self-serving characterizations of their work as "repetitive"; and refers to paragraphs 77-91, 131-140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a description of the undisputed record evidence as to Baldwin's actual duties.

40. When she received a request for a phone consultation, Ms. Baldwin's role was to search for Council Members who may be appropriate for a research project and present them to the client. See Baldwin Dep. at 143:23-144:3; Schaefer Dep. at 55:12¬56:20.

**Response:**  Admitted that paragraph 40 describes one aspect of Baldwin's duties, but GLG denies that this is a complete recitation of her duties with respect to clients and phone

consultations; GLG refers to its responses to paragraphs 34-39 above and paragraphs 77-91, 131-

140, 168-188, 189-196, 212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for a

description of the undisputed record evidence as to Baldwin's actual duties.

41. In searching for which Council Members might be appropriate to present to clients, Ms.
Baldwin would run searches in GLG's internal database using keywords based on the client's
request. See Baldwin Dep. at 144:4-10.

**Response:**  Admitted that paragraph 41 describes one aspect of Baldwin's duties, but GLG

denies that this is a complete recitation of her duties with respect to clients and phone

consultations, and GLG refers to paragraphs 77-91, 131-140, and 168-188 of GLG's 56.1 for a

more complete description of Baldwin's duties associated with determining which Council

Members to recommend to clients.

42. Because many of the clients that Ms. Baldwin performed research requests for asked the
same things, the work became very repetitive, such that approximately 70% of the projects
that Ms. Baldwin performed were the same as projects that she had done before. See Baldwin
Dep. at 144:13-16; 147:11-148:1.

**Response:**  GLG denies the supposedly undisputed facts set forth in paragraph 42, refers to its

response to paragraph 39 above, and refers to paragraphs 77-91, 131-140, 168-188, 189-196,

212-236, 263-284, 298-303, and 329-332 of GLG's 56.1 for an accurate description of Baldwin's

duties associated with what Baldwin now characterizes as "repetitive" work.

43. Defendant tracked the productivity of the members of the Research Management
Department, which included Plaintiffs. See Final Assault PowerPoint Presentation, attached
as Exhibit AA to the Filosa Decl., at 5.

**Response:**  Except to admit that GLG used certain metrics as one part of evaluating the work of

Research Associates, GLG denies that the supposedly undisputed characterization in paragraph

43 of the use of those metrics as "track[ing] the productivity" of Plaintiffs has any evidentiary

basis in the cited evidence or otherwise; avers that such supposedly undisputed characterization

is immaterial to the application of the administrative exemption to Plaintiffs, which turns on their

actual duties rather than self-serving characterizations; and refers to paragraphs 49-59 of GLG's

56.1, which describe GLG's limited reliance on metrics and their purpose and GLG's evaluation

of Baldwin's job performance as a Research Associate.

44. These metrics were also used by the Research Associates to compare and rank associates
with respect to the work that they performed, as well as by Plaintiffs' supervisors in their end
of year performance reviews. See Baldwin Dep. at 199:6-13.

**Response:**   Except to admit that metrics were referenced in some portions of some performance

evaluations, GLG denies the supposedly undisputed facts set forth in paragraph 44; refers to

paragraphs 49-59 of GLG's 56.1, which describe the many factors considered in assessing

Plaintiffs' performance; and avers that GLG's actual use of metrics was such that they are

immaterial to the application of the administrative exemption to Plaintiffs.

45. One of these metrics was Member Program Transaction Dollar Volume ("MPTDV").
MPTDV measured the amount of money that was paid to GLG's Council Members that
participated in GLG's Member Programs for consultation with clients during a particular time
period and was regularly tracked by Defendant. See Johnson Dep. at 142:2-143:7.

**Response:**   Admitted, and GLG refers to paragraphs 49-59 of GLG's 56.1, which describe

GLG's limited reliance on this and other metrics and their purpose.  GLG further avers that its

actual use of metrics was such that they are immaterial to the application of the administrative

exemption to Plaintiffs.

46. MPTDV was also referred to "gold" and "bling." See Johnson Dep. at 142:11-13.

**Response:**   GLG does not dispute this paragraph, but avers that it is immaterial to the application

of the administrative exemption to Plaintiffs, and refers to its response to paragraph 45 above.

47. Another metric utilized by GLG was Active Users. Active Users measured the number of
unique clients at a given firm that utilized GLG's services during a given period of time. See
Schaefer Dep. at 150:6-151:6.

**Response:**   GLG does not dispute this paragraph, but avers that it is immaterial to the application

of the administrative exemption to Plaintiffs, and refers to its response to paragraph 45 above.

48. Defendant included "Productivity" as one of three attributes that it considered in reviewing Plaintiffs' annual performance. See generally Jeff Cohen 2008 Performance Review, attached as Exhibit Q to the Filosa Decl.; Matthew Ronen 2008 Performance Review, attached as Exhibit R to the Filosa Decl.; Ashleigh Baldwin 2007 Performance Review, attached as Exhibit S to the Filosa Decl.; Ashleigh Baldwin 2008 Performance Review, attached as Exhibit T to the Filosa Decl.

**Response:**  GLG does not dispute this paragraph, but avers that this is immaterial to the application of the administrative exemption to Plaintiffs, avers that Plaintiffs' performance evaluations assessed many other factors (GLG 56.1 ¶¶ 49-59), and refers to its response to paragraph 45 above.

49. On Plaintiff Cohen's 2008 Performance Review, with respect to his "Productivity," his supervisors noted:

> Jeff s strongest suit is his ability to deliver a high level of production. He can be counted on to pull projects from clients and is also effective in pulling survey work out of the client base on a consistent basis. He has a competitive streak in him that drives him to succeed and that is noticed.

> He produced 64K of gold a month in 2008 which was above the NYC team average of 54.5K and the GLG average of 59K. He produced a [Total Project Volume] of 211 a month which far exceeds the GLG average of 127 and clearly illustrates his ability to produce. . . . On a relative basis Jeff ranks in the top 20% of the NY based team in production.

See Exhibit Q, at 4.

**Response:**  Admitted, but GLG avers that this is immaterial to the application of the administrative exemption to Cohen, and that Cohen's performance evaluations also assessed many other factors.  (GLG 56.1 ¶¶ 49-59).

50. On Plaintiff Ronen's 2008 Performance Review, his supervisor rated him "Far Exceeds Expectations" and "Exceeds Expectations" with respect to "Productivity" stating:

> "Matt exceeded expectation in terms of his productivity this year; his [Total Project Volume] came out to an average of — 180 projects/month and this puts him in the very top tier of [Total Project Volume] Performers on the [Multi-Sector Research] team this year. Matt also outperforms not only the average at GLG, but on the [Multi-Sector Research] team, win an average monthly 'Gold' number of over 80K (firm average is —$50K and team average is —$57K). . . . Matt's productivity and ability to manage

> his time is something that we worked on quite a bit at the start of this year.
>
> Matt took all the advice and structure he was provided to heart and rapidly turned around his performance in this area. Matt now manages his time very well and this is apparent through his consistent completion of the calling plan, along with his other responsibilities . . ."

See Exhibit R, at 3; Dille Dep. at 175:18-176:11.

**Response:**   Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Ronen, and that Ronen's performance evaluations also assessed

many other factors.  (GLG 56.1 ¶¶ 49-59).

51. Mr. Ronen's supervisor also stated in his 2008 Performance Review, "Matt ... is now one of the most productive and respected members of the [Multi-Sector Research] team. This is evidenced by the fact that Matt outperforms not only the [Multi-Sector Research] team average, but most firm-wide averages, in almost all metrics . . . and his out performance is usually by some margin."

**Response:**   Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Ronen, and that Ronen's performance evaluations also assessed

many other factors.  (GLG 56.1 ¶¶ 49-59).

52. On Ms. Baldwin's 2007 Performance Review, in assessing Ms. Baldwin's quality of service, her supervisor noted that Ms. Baldwin "routinely set up over 10 projects a day and exceeded 280 member program projects (297 total projects including 4 surveys) in her first full month at GLG." See Exhibit S, at 2.

**Response:**   Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Baldwin, and that Baldwin's performance evaluations also assessed

many other factors.  (GLG 56.1 ¶¶ 49-59).

53. On Ms. Baldwin's 2007 Performance Review, in assessing Ms. Baldwin's performance with respect to productivity and usage volume, Ms. Baldwin's supervisor noted that Ms. Baldwin "led the Boston [HealthCare] team in [Member Program Transaction Dollar Volume] in October, her first full month at GLG." See Exhibit S, at 2.

**Response:**  Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Baldwin, and that Baldwin's performance evaluations also assessed

many other factors.  (GLG 56.1 ¶¶ 49-59)

54. In her goals for 2008, Ms. Baldwin was encouraged to "continue to be productive" and to
"aim to execute — 200-250 Member Program Projects per month. See Exhibit S, at 3.

**Response:**  Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Baldwin, and that Baldwin's performance evaluations also assessed

many other factors and encouraged other activities.  (GLG 56.1 ¶¶ 49-59).

55. On Ms. Baldwin's 2008 Performance Review, Ms. Baldwin's supervisor noted that "[h]er
work ethic is unquestionable, routinely arriving early, stay late or working on the weekends
to ensure that client's needs are met." See Exhibit T, at 2.

**Response:**  Admitted, but GLG avers that Baldwin's "work ethic" and hours are immaterial to

the application of the administrative exemption to Baldwin, and avers that Baldwin's

performance evaluations also assessed many other factors.  (GLG 56.1 ¶¶ 49-59).

56. On Ms. Baldwin's 2008 Performance Review, her supervisor noted:
> With regard to productivity, Ashleigh has proven the ability to
> execute and manage an exceedingly high number of client requests
> without sacrificing quality. Ashleigh is routinely the top ranking
> Research Professional in Healthcare, and likely the firm, when
> examining Member Program Projects and Total Projects
> performed. In fact, for 2008 Ashleigh has averaged the most
> projects performed by any RA or RM in our Healthcare group on a
> monthly basis (294 Member Program Projects per month) and
> completed an astonishing 450 Total Projects in July (Firm high).

See Exhibit T, at 3.

**Response:**  Admitted, but GLG avers that this is immaterial to the application of the

administrative exemption to Baldwin, and that Baldwin's performance evaluations also assessed

many other factors.  (GLG 56.1 ¶¶ 49-59).

57. During the course of her employment as a Research Associate, Ms. Baldwin was told by her
direct supervisor that the biggest factor in her end of year bonus compensation would be her

project volume and that the hours that she was putting in executing on client requests would be reflected in her bonus. See Baldwin Dep. at 193:6- 22.

**Response:**  GLG denies that the supposedly undisputed facts set forth in paragraph 57 have

evidentiary support in the cited testimony, as Baldwin went on to confirm that she does not recall

what her supervisor said to her (Puma Decl., Exh. 5, at 193:24-194:4), or otherwise; avers that

these alleged statements by Baldwin's supervisor are immaterial to the application of the

administrative exemption to Baldwin, which turns on the duties that she performed as confirmed

by the undisputed record evidence set forth at paragraphs 77-91, 131-140, 168-188, 189-196,

212-236, 263-284, 298-303, and 329-332 of GLG's 56.1; and refers to the undisputed record

evidence set forth at paragraphs 43-52 and 58-59 of GLG's 56.1 regarding the actual

determination of Baldwin's compensation.

58. Defendant regularly provided financial incentives to its Research Management employees to increase their performance with respect to these metrics. For example:
   a. In May 2007, Defendant held a financial award competition known as "Magnificent May" where Defendant's Research Management employees were encouraged to increase: (i) Member Program Project Volume (which included Consultations and Surveys), (ii) Active Users, (iii) Quality, and (iv) Completion of the Call Plan. Defendant offered the top ten performing employees in these three areas cash incentives ranging from $1000 to $4000. See May 22, 2007 Email from Sam Jacobs to Research Management, attached as Exhibit U to the Filosa Decl.
   b. During the Summer of 2007, Defendant held a "usage focused competition" among its Research Management employees known as "Summer Smackdown which focused on the following production-based metrics: (i) total number of Member Program consultation, (ii) total number of Active Users, (iii) total number of surveys and single author reports and (iv) completion of the call plan.

**Response:**  GLG does not dispute that paragraph 58 generally states the content of the cited e-

mail messages, but GLG avers that paragraph 58 is immaterial to the application of the

administrative exemption to Plaintiffs; disputes that the characterization of the metrics discussed

in paragraph 58 as "production based" has any evidentiary support in the cited e-mails or

otherwise; disputes that the referenced "competitions" were a regular practice, as, for instance,

among the hundreds of thousands of Plaintiffs' e-mails produced by GLG in this action, these

two are the only evidence of supposed "competitions" identified by Plaintiffs; and refers to

paragraphs 27-52 of GLG's 56.1 for a discussion of Plaintiffs' compensation.

59. Sam Jacobs served as Managing Director of Global Research Management from April 2007
    until the second half of 2008, at which point he served as Managing Director of Americas
    Research. See Jacobs Dep. at 16:15-18; 17:16-18:5; 19:17-22.

**Response:**  GLG does not dispute this paragraph, but avers that it is immaterial to the application

of the administrative exemption to Plaintiffs.

60. As Managing Director of Global Research Management, Mr. Jacobs was responsible for the
    entire Research Management Department, but he did not work closely with any of the
    Plaintiffs because, during the period of time that he served in this position, the Research
    Associate position was not intended to work closely with him in this position. See Jacobs
    Dep. at 20:12-14; 36:3-18.

**Response:**  GLG does not dispute this paragraph, but avers that it is immaterial to the application

of the administrative exemption to Plaintiffs.

61. Instead, Mr. Jacobs' interactions with Plaintiffs Cohen and Ronen was limited to passing
    them in the hallways and never worked with them on any specific projects. See Jacobs Dep.
    at 38:19-39:39:19; 39:20-41:9. With respect to Ms. Baldwin, Mr. Jacobs only had "cursory
    interaction" with her, none of which were substantive. See Jacobs Dep. at 41:20-42:2.

**Response:**  GLG does not dispute this paragraph, but avers that it is immaterial to the application

of the administrative exemption to Plaintiffs and further avers that Jacobs and Baldwin did not

work in the same office.  (Filosa Decl., Exh. K, at 41:20-42:6).

62. Plaintiff Cohen was generally not advised or consulted with respect to decisions made by
    Senior Management, including the decision to reclassify the Research Associate position
    effective January 1, 2009. See Cohen Dep. at 65:22-23.

**Response:**  Admitted, but GLG avers that whether or not Cohen was "generally" advised or

consulted with respect to such decisions is immaterial to the application of the administrative

exemption to him, and refers to paragraphs 304-317 of GLG's 56.1 regarding Cohen's

development and implementation of management policies and operating practices.

63. In September 2008, the Company began a time period known as the "Final Assault." The purpose of the Final Assault was to encourage Plaintiffs and the other members of the Research Management Department to put in extra effort "to help GLG hit its revenue target" and "drive revenue." See Sept. 12, 2008, Email from Sam Jacobs, attached as Exhibit W to the Filosa Decl.; Exhibit AA, at 26.

**Response:**  GLG does not dispute this paragraph, but GLG avers that it is both an incomplete

description of Mr. Jacobs' e-mail and also immaterial to the application of the administrative

exemption to Plaintiffs.

64. As Mr. Jacobs instructed, "driving revenue, and solving how to drive revenue, is the most useful organizing principle we can incorporate, in any department or team within GLG." See Sept. 30, 2008 Email from Sam Jacobs, attached as Exhibit X to the Filosa Decl.

**Response:**  GLG does not dispute this paragraph, but GLG avers that it is both an incomplete

description of Mr. Jacobs' e-mail and also immaterial to the application of the administrative

exemption to Plaintiffs.

65. During the Final Assault, GLG placed a particular emphasis on 3 metrics: (i) Total Project Volume (also know as "TPV"), (ii) Major Project Revenue (also known as ("MPR"), and (iii) Active Council Members (also known as "ACM"). See Exhibit AA, at 23-43.

**Response:**  GLG does not dispute this paragraph, but GLG avers that it is both an incomplete

description of the cited evidence and also immaterial to the application of the administrative

exemption to Plaintiffs, and also refers to paragraphs 49-57 GLG's 56.1, which describe GLG's

limited reliance on metrics and their purpose.

66. Total Project Volume equaled the total number of projects during a particular period of time, which included phone consultations, surveys and attendance at GLG-sponsored events and was a metric that tried to capture all of the work that an employee was doing. See Exhibit AA at 30; Deposition of Michael Dzik ("Dzik Dep."), attached as Exhibit J to the Filosa Decl., at 140:20-25; Schaefer Dep. at 144:9-11.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph

66 is immaterial to the application of the administrative exemption to Plaintiffs, and refers to

paragraphs 49-57 of GLG's 56.1, which describe GLG's limited reliance on Total Project

Volume and other metrics and their purpose.

67. Total Project Volume was used as a metric for purposes of the Final Assault because it could
   be tracked on daily basis using the Company's analytics and correlated closely with revenue,
   meaning that "clients that used the service more tended to have an ability or interest in
   paying more." See Exhibit AA, at 32; Jacobs Dep. at 80:25-81:14.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph

69 is an incomplete description of the cited evidence and is immaterial to the application of the

administrative exemption to Plaintiffs, and refers to paragraphs 49-57 of GLG's 56.1, which

describe GLG's limited reliance on Total Project Volume and other metrics and their purpose.

68. Major Project Revenue was used as a metric for purposes of the Final Assault because it
   equaled revenue for GLG and would help GLG hit its revenue targets. See Exhibit AA, at 38.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph

68 is an incomplete description of the cited evidence and is immaterial to the application of the

administrative exemption to Plaintiffs, and refers to paragraphs 49-57 of GLG's 56.1, which

describe GLG's limited reliance on metrics and their purpose.

69. The goals of the Final Assault were to (i) beat all time highs for Total Project Volume by
   30%, (ii) drive $4 million in Major Project Revenue over the three months of the Final
   Assault, and (iii) drive a 10% increase in year-over-year Active Council Members. See
   Exhibit AA, at 44-47.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph

69 is an incomplete description of the cited evidence and is immaterial to the application of the

administrative exemption to Plaintiffs, and refers to paragraphs 49-57 of GLG's 56.1, which

describe GLG's limited reliance on metrics and their purpose.

70. During the time period known as the Final Assault, Plaintiffs were expected to work harder
   and longer hours, with a particular emphasis on "picking up the phone and calling clients."
   See Sept. 9, 2008 Email Chain from Sam Jacobs, attached as Exhibit V to the Filosa Decl., at
   2.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph 70 is an incomplete description of the cited evidence and that whether Plaintiffs were working "harder and longer hours" as alleged in paragraph 70 is immaterial to the application of the administrative exemption to Plaintiffs, and also refers to paragraphs 141-188 of GLG's 56.1 for a more complete description of Plaintiffs' actual promotional job duties.

71. During the Final Assault, Plaintiffs and other members of the Research Management Department were expected to put in "extra effort" and "extra commitment" "over the next three months — picking up the phone and calling clients, working later, taking a regular phone call and turning it into something more" and were promised that they would "be able to take a breath in the post-Thanksgiving period, take a rest and enjoy a well-deserved holiday period." See Exhibit V at 5; Exhibit AA, at 63-64.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the contents of paragraph 71 are immaterial to the application of the administrative exemption to Plaintiffs, and also refers to its response to paragraph 70 above.

72. While GLG encouraged Plaintiffs and the other members of the Research Management Department to "give it 110% and take a breath over the holidays," Mr. Jacobs testified that he realized it was not possible to actually give 110%, but he wanted Plaintiffs and the other members of the Research Management Department to give "as much as they were capable of giving . . . because it was a critical time for the firm." See Exhibit AA, at 64; Jacobs Dep. at 86:10-87:3.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph 72 is immaterial to the application of the administrative exemption to Plaintiffs.

73. The goal of the Final Assault was to motivate Plaintiffs and the other members of the Research Management Department to work harder because "if our clients were delighted as much as possible, the sales team would be more likely to collect revenue based on that delight." See Jacobs Dep. at 87:8-23.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the Final Assault is immaterial to the application of the administrative exemption to Plaintiffs, and also refers to paragraphs 141-188 of GLG's 56.1 for a more complete description of Plaintiffs' promotion duties (and how they furthered the efforts of GLG's Sales Department) referenced in paragraph

74. Plaintiffs and the other members of the Research Management Department were encouraged to work harder during this time period with the promise of increased compensation if GLG hit its revenue goals. As Mr. Jacobs noted in his attempts to "motivate people:" "[s]mall variations in our year end revenue have very large impacts on our enterprise valuation and, correspondingly, firm profitability and, correspondingly, accrued firm compensation and, correspondingly individual compensation." See Nov. 19, 2010 Email from Sam Jacobs, attached as Exhibit Y to the Filosa Decl., at 1; Jacobs Dep. at 103:1-24.

**Response:**  Except to admit that paragraph 74 states a portion of the content of the cited e-mail message, GLG disputes the characterization of the e-mail as the quoted language is incomplete and because there is no record evidence of any "promise" of increased compensation, GLG avers that the contents of paragraph 74 are immaterial to the application of the administrative exemption to Plaintiffs, and GLG also refers to paragraphs 49-52 of GLG's 56.1 for an accurate description of the factors considered, or not considered, in determining Plaintiffs' compensation.

75. During this period of time, the expected start time for Plaintiffs and other members of the Research Management Department was moved forward to 8:20 a.m. See Exhibit V, at 3.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph 75 is immaterial to the application of the administrative exemption to Plaintiffs.

76. Effective January 1, 2009, Defendant reclassified the FLSA exemption status of the Research Associate position. See Template Reclassification Memorandum, attached as Exhibit Z to the Filosa Decl.

**Response:**  Except to admit that effective January 1, 2009, GLG reclassified certain Research Associates other than Plaintiffs, GLG disputes the contents of this paragraph, and avers that the reclassification of these other Research Associates is immaterial to the application of the administrative exemption to Plaintiffs.

77. The Reclassification Memorandum, which was provided to employees that remained in the Research Position following the reclassification, stated, in relevant part:
> We recently completed a review of the Company's compensation structure and have determined that employees in certain positions will be eligible for overtime compensation (meaning that those employees will be classified as "non-exempt" from the overtime provisions of the Fair Labor Standards Act). Effective January 1,

2009, your current position will be reclassified as non-exempt and
going forward, you will be entitled to overtime pay if you are
required to work in excess of 40 hours per week.

See Exhibit Z.

**Response:**  GLG does not dispute this paragraph, but GLG avers that the content of paragraph

77 contains an incomplete description of the content of the cited Memorandum and is immaterial

to the application of the administrative exemption to Plaintiffs.

BY:  _/s/ Michael J. Puma_____
Andrew J. Schaffran (AS-1236)
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
(212) 309-6001 (fax)

Michael J. Puma (MP-5573)
Blair J. Robinson (*admitted pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5000
(215) 963-5001 (fax)

Counsel for Defendant
Gerson Lehrman Group, Inc.