**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY COHEN, on behalf of himself and on behalf of all similarly situated employees, <br><br> Plaintiff, <br><br> v. <br><br> GERSON LEHRMAN GROUP, INC., <br><br> Defendant. | Civil Action No. <br> 09-CV-04352 (PKC) |

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT**

Andrew J. Schaffran
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178-0060
(212) 309-6000
(212) 309-6001 (fax)

Michael J. Puma
Blair J. Robinson (*admitted pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
(215) 963-5000
(215) 963-5001 (fax)

Counsel for Defendant
Gerson Lehrman Group, Inc.

Pursuant to Local Rule 56.1, Defendant Gerson Lehrman Group ("GLG" or "the Company") provides this Statement of Undisputed Material Facts[1] in Support of Its Motion for Summary Judgment:

## I.       GERSON LEHRMAN GROUP'S BUSINESS

1.       Plaintiff Jeffrey Cohen ("Cohen") describes GLG as "the world's largest and best qualified marketplace for subject matter expertise."[2]

2.       GLG's clients seek to communicate with experts to gain expertise on particular subjects.[3]

3.       GLG provides expert advisory services to clients in the financial services industry and various other industries through a network of over 200,000 subject matter experts known as GLG Council Members.[4]

4.       GLG connects its clients with experts who can provide knowledge and discuss an industry, company or core topic.[5]

---

[1]    The parties are in the process of conferring about the necessity of seeking leave of Court to file certain exhibits under seal, consistent with the Stipulation of Confidentiality that the parties filed and the Court approved. Because those discussions are ongoing, Defendant has served complete copies of its exhibits on Plaintiffs, but has not filed those exhibits electronically.

[2]    Cohen's Essay for Admission to the Cornell MBA Program (bates-labeled COHEN 0108-0110), attached as Exhibit ("Exh.") 1 to the Declaration of Michael J. Puma (all references herein to "Exh." are to Exhibits to this Declaration), at 108; Cohen's Essay One for Admission to the Georgetown MBA Program (bates-labeled COHEN 0118-0119), attached as Exh. 2, at COHEN 0118; Transcript of the Deposition of Plaintiff Jeffrey Cohen, dated August 28, 2009 ("Cohen Dep."), pertinent portions of which are attached as Exh. 4, at 334:15-22 (confirming that COHEN 0118-19 is truthful, accurate and relates to Cohen's duties as a Research Associate); Cohen's Essay One for Admission to the Babson MBA Program (bates-labeled COHEN 0132-0134), attached as Exh. 3, at COHEN 0132; Cohen Dep. at 320:12-321:21 (confirming that COHEN 0132-34 is truthful, accurate and relates to Cohen's duties as a Research Associate);

[3]    Transcript of the Deposition of Ashleigh Baldwin, dated December 7, 2010 ("Baldwin Dep."), pertinent portions of which are attached as Exh. 5, at 92:5-8.

[4]    Transcript of the Deposition of Cohen's former supervisor, Todd Johnson, dated December 7, 2009 ("Johnson Dep."), pertinent portions of which are attached as Exh. 6, at 27:24-28:12; Transcript of the Deposition of GLG's Federal Rule 30(b)(6) witness Dmitri Mehlhorn, dated September 11, 2009 ("Mehlhorn Dep."), pertinent portions of which are attached as Exh. 7 at 77:24-84:2.

[5]    Baldwin Dep. at 90:7-10.

5.  GLG's Council Members, who perform research and provide expertise for GLG's clients, include former CEOs, former government officials, economists, physicians, scientists, engineers, and academics.[6]

6.  GLG's Council Members have "signed [GLG's] terms and conditions and agreed to participate in [GLG's] network according to [its] terms.  [The Council Members] still have to give additional approval every time they agree[ ] to a specific project."[7]

7.  GLG's clients paid GLG for services provided by GLG's Council Members (subject matter experts).[8]

8.  In contrast, GLG's clients were not invoiced for a Research Associate's time or services.[9]

9.  GLG's services agreements with clients and pricing guidelines for clients provide for pricing based upon the research and other expert services provided by GLG's Council Members, not the clients' interactions with research management professionals.[10]

10.  GLG's clients typically have paid for the research by Council Members through a bi-annual subscription fee, the amount of which has varied based on the level of services requested.[11]

11.  Most GLG clients were on an "OSP" subscription plan during the pertinent time period, meaning that they paid a flat fee per month rather than for each interaction with a Council

---

[6]  Declaration of Samuel Jacobs ("Jacobs Decl.") at ¶ 6.

[7]  Mehlhorn Dep. at 173:5-11.

[8]  Jacobs Decl. ¶ 5.

[9]  Jacobs Decl. ¶ 6.

[10]  Jacobs Decl. ¶ 7.

[11]  Cohen Dep. at 248:24-249:11.

Member.[12]

12.　　　Clients of GLG can select among various subscription levels, and the number of phone consultations with Council Members and other services to which a client is entitled varies depending on the subscription level.[13]

13.　　　GLG's Council Members, not Research Associates, are the individuals who have conducted the research and other services being purchased by GLG's clients.[14]

14.　　　GLG offers its clients phone consultations with Council Members as well as more complex services, including Live Meetings (in-person meetings with one or more Council Members), Surveys (expert analysis in the aggregate based on feedback from a pool of GLG Council Members), Market Studies (surveys of consumers), Research Trips (site tours by Council Members), and Written Reports (specifically commissioned research reports).[15]

## II.　PLAINTIFFS' COMPENSATION AND DUTIES AS RESEARCH ASSOCIATES FOR GLG SATISFIED THE ADMINISTRATIVE EXEMPTION TO THE FAIR LABOR STANDARDS ACT AND THE NEW YORK LABOR LAW.

### A.　Background Information

#### (i)　Plaintiff Cohen's Employment by GLG

15.　　　Cohen worked for GLG in its New York City office from April 10, 2007 until he resigned effective April 24, 2009.[16]

16.　　　Cohen served in the position of Research Associate in GLG's Technology, Media

---

[12]　Jacobs Decl. ¶ 7.

[13]　Johnson Dep. at 35:8-20.

[14]　Baldwin Dep. at 92:16-18; Cohen Affidavit (Docket No. 13) at ¶¶ 4-5; Complaint ¶ 15; Memorandum of Law in Support of Cohen's Motion for Preliminary Certification (Docket No. 11) at 4-5.

[15]　Mehlhorn Dep. at 316:15-321:22; Jacobs Decl. ¶ 10.

[16]　Complaint (Docket No. 1.) ¶¶ 10, 14.  Following his resignation from GLG, Cohen started attending the MBA Program at Georgetown's McDonough's School of Business.  Cohen Dep. at 73:24-74:3.

and Telecom ("TMT") group from April 10, 2007 until December 31, 2008.[17]

17.    Effective January 1, 2009, GLG promoted Cohen to the position of Research Manager.[18]

18.    Todd Johnson was Cohen's supervisor.[19]

**(ii)    Plaintiff Ronen's Employment by GLG**

19.    Plaintiff Matthew Ronen ("Ronen") worked for GLG as a Research Associate from March 2007 through December 31, 2008.[20]

20.    Ronen worked as a Research Associate at GLG's New York City office.[21]

21.    Effective January 1, 2009, GLG promoted Ronen to the position of Research Manager.[22]

22.    Jacqueline Dille was Ronen's supervisor.[23]

**(iii)    Plaintiff Baldwin's Employment by GLG**

23.    After graduating from Wellesley College, Baldwin joined GLG on September 11, 2007.[24]

24.    Baldwin worked as a Research Associate on the Boston Healthcare team.[25]

---

[17]    Complaint ¶ 14.

[18]    Complaint ¶ 14.

[19]    Johnson Dep. at 28:5-29:20.

[20]    Transcript of the Deposition of Matthew Ronen, dated October 2, 2010 ("Ronen Dep."), pertinent portions of which are attached as Exh. 9, at 16:9-15.

[21]    Ronen Dep. at 25:16-19.

[22]    Ronen Dep. at 16:21-17:2.

[23]    Transcript of the Deposition of Jacqueline Dille ("Dille Dep."), pertinent portions of which are attached as Exh. 10, at 41:10-14; 53:16-19.

[24]    Baldwin Dep. at 26:22-27:6; Baldwin's 2007 Self-Evaluation (bates-labeled GLG00004658), attached as Exh. 11.

[25]    Baldwin Dep. at 62:2-11; Declaration of Todd Schaefer ("Schaefer Decl.") at ¶ 1.

25.     Effective January 1, 2009, GLG promoted Baldwin to the position of Research Manager.[26]

26.     Baldwin's supervisor was Todd Schaefer.[27]

**B.      Plaintiffs Were Each Paid A Salary In Excess of $455 Per Week.**

     **(i)      Plaintiff Cohen Was Paid A Salary In Excess of $455 Per Week.**

27.     As a Research Associate, Cohen was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of the work he performed each week.[28]

28.     As a Research Associate, Cohen always received the same salary amount each week regardless of how many hours he worked.[29]

29.     Cohen understood that his salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate him for all hours worked each week, even if they exceeded 40 hours per week.[30]

30.     Cohen understood that he would not be paid overtime for weeks when he worked over 40 hours per week.[31]

31.     Cohen understood that he was not expected to work a fixed number of hours per week.[32]

32.     Cohen understood that the number of hours he worked fluctuated from week to week, and that his salary was fixed and remained the same regardless of how many hours he

---

[26]   Baldwin Dep. at 47:4-9; 333:4-6.

[27]   Baldwin Dep. at 62:2-11.

[28]   Cohen Dep. at 22:6-12, 23:3-7, 28:4-29:24; GLG Compensation Summary for Cohen (bates-labeled GLG00000062), attached as Exh. 12 (confirming that Cohen's gross pay was over $1,972 per month).

[29]   Cohen Dep. 29:16-24.

[30]   Cohen Dep. at 29:1-24.

[31]   Cohen Dep. at 30:1-24.

[32]   Cohen Dep. at 29:1-24.

worked each week.[33]

33.	Cohen understood that he was expected to sometimes work through lunch and that he was expected to sometimes work evenings or weekends, and that he would not be paid overtime for working through lunch or on evenings or weekends.[34]

34.	Cohen understood that GLG's policy was that he would not be paid overtime for hours worked over 40 per week.[35]

35.	During his employment with GLG, Cohen never once complained to his manager or anyone in human resources or management that he should have been paid overtime.[36]

(ii)	**Plaintiff Ronen Was Paid A Salary In Excess of $455 Per Week.**

36.	As a Research Associate, Ronen was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of his work.[37]

37.	Ronen received the same salary amount each week regardless of how many hours he worked**.**[38]

38.	Ronen understood that his salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate him for all hours worked each week, even if they exceeded 40 hours per week.[39]

---

[33]	Cohen Dep. at 29:1-24.

[34]	Cohen Dep. at 35:17-36:13.

[35]	GLG Employee Polices Manual (bates-labeled Cohen 0029-0063), attached as Exh. 13 at COHEN 0041-0042 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch break); Cohen's Handbook Acknowledgment Form (bates-labeled GLG000000074) attached as Exh. 14 (verifying that Cohen received GLG's Employee Policies Manual).

[36]	Cohen Dep. at 37:17-38:1.

[37]	Ronen Dep. at 17:22-18:13; 19:8-20:5; GLG Compensation Summary for Ronen (bates-labeled RONEN_000000941), attached as Exh. 15 (confirming that Ronen's gross pay was over $2,291 per pay period).

[38]	Ronen Dep. at 19:14-21:6; 27:20-28:1.

[39]	Ronen Dep. at 20:13-20:20.

39.      Ronen understood that he would not be paid overtime for weeks when he worked over 40 hours per week.[40]

40.      Ronen understood that he was not expected to work a fixed number of hours per week.[41]

41.      Ronen understood that the number of hours he worked fluctuated from week to week, and that his salary was fixed and remained the same regardless of how many hours he worked each week.[42]

42.      Ronen never once complained to his manager or anyone in human resources or management that he should have been paid overtime.[43]

### (iii)   Plaintiff Baldwin Was Paid A Salary In Excess of $455 Per Week.

43.      As a Research Associate, Baldwin was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of her work.[44]

44.      Baldwin always received the same salary amount each week regardless of how many hours she worked.[45]

45.      Baldwin understood that her salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate her for all hours worked each week, even if they exceeded 40 hours per week.[46]

---

[40]   Ronen Dep. at 30:1-14.

[41]   Ronen Dep. at 22:10-23:16; Exh. 13 at COHEN 0041-42 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch break); Ronen's Handbook Acknowledgment Form (bates-labeled RONEN_00000079) attached as Exh. 16 (verifying that Ronen received GLG's Employee Policies Manual).

[42]   Ronen Dep. at 20:7-12.

[43]   Ronen Dep. at 348:6-9.

[44]   Baldwin Hiring and Payroll Information (bates-labeled BALDWIN 0000000022), attached as Exh. 17 (showing that Baldwin's base salary was $50,000 per year).

[45]   Baldwin Dep. at 33:10-14; 34:7-10; 34:19-23.

[46]   Baldwin Dep. at 33:10-14.

46.     Baldwin understood that she would not be paid overtime for weeks when she worked over 40 hours per week.[47]

47.     Baldwin understood that the number of hours she worked fluctuated from week to week, and that her salary was fixed and remained the same regardless of how many hours she worked each week.[48]

48.     Baldwin never once complained to her manager or anyone in human resources or management that she should have been paid overtime.[49]

### C.     Plaintiffs' Performance Was Evaluated Based On Many Factors, Including Qualitative Factors.

49.     Plaintiffs' performance as Research Associates was evaluated based on many factors, including qualitative measures such as quality of work, thoughtfulness of communications with clients, leadership, teamwork, and management of relationships with external clients.[50]

50.     Plaintiffs' Performance Evaluations stated that "[o]ne quarterly score for one category does not tell the full story of someone's performance.  [Rather, GLG is] most interested in overall positive development for every professional in Research Management."[51]

51.     According to Sam Jacobs, GLG's former Managing Director of Global Research Management, metrics were just one small part of how Research Associates were evaluated; other

---

[47]   Baldwin Dep. at 34:4-6.  See also, Exh. 13 at COHEN 0041-42 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch break); Baldwin's Handbook Acknowledgment Form (bates-labeled BALDWIN_00000024) attached as Exh. 18 (verifying that Baldwin received GLG's Employee Policies Manual).

[48]   Baldwin Dep. at 34:19-23; 376:8-377:2.

[49]   Baldwin Dep. at 285:6-13.

[50]   Mehlhorn Dep. at 126:22-127:11; Jacobs Decl. ¶ 14; Cohen's 2007 Performance Evaluation (bates-labeled GLG00000080-82), attached as Exh. 19; Cohen's 2008 Performance Evaluation (bates-labeled COHEN 0025-26), attached as Exh. 20; Ronen's 2007 Performance Evaluation (bates-labeled RONEN_000000050--54), attached as Exh. 21; Ronen's 2008 Performance Evaluation, attached as Exh. 22; Baldwin's 2007 Performance Evaluation (bates-labeled GLG004660), attached as Exh. 23; Baldwin's 2008 Performance Evaluation (bates-labeled GLG00004665), attached as Exh. 24.

[51]   Exh. 19 at GLG00000080; Exh. 21 at RONEN_000000050; Exh. 23 at GLG00004660).

factors, including client feedback, sales team feedback, peer feedback, the quality of their work, and their commitment to teamwork, were important in evaluating Research Associates.[52]

52.     According to Mr. Jacobs, metrics were not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates; rather, metrics were only a small part of those decisions.[53]

53.     According to Mr. Jacobs, while the Active Users and Total Project Volume Metrics were considered one very rough proxy for a Research Associate's success in his or her promotional duties, as in increase in these metrics suggested that the Research Associate was expanding and/or deepening client relationships, they were not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates.[54]

54.     According to Mr. Jacobs, while the Member Programs Transaction Volume metric was considered one very rough proxy for a Research Associate's commitment to compliance because there was a benefit to GLG's compliance goals associated with clients using Council Members who were part of "Member Programs," this metric was not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates.[55]

55.     Although GLG had available to it Total Project Volume data, this information "was only a fraction of [Cohen's] overall evaluation."[56]

56.     Ronen's supervisor did not view the Member Programs Transaction Volume

---

[52]     Jacobs Decl. ¶ 14.

[53]     Jacobs Decl. ¶ 15.

[54]     Jacobs Decl. ¶ 16.

[55]     Jacobs Decl. ¶ 17.

[56]     Johnson Dep. at 138:14-23, 141:3-142:11 (explaining that although Total Project Volume data was available to GLG, it was not determinative of a Research Associate's success and, therefore, it was just one of many factors considered in evaluating a Research Associate), 173:3-20 (same), 174:2-17 (discussing what was important in evaluating Cohen's performance and the minimal role that total project volume data played in that assessment); Mehlhorn Dep. at 62:7-66:14 (same).

metric as a major factor in her evaluation of Ronen's performance.[57]

57.     Ronen is "not sure" how GLG used metrics.[58]

58.     Significant factors in Baldwin's performance and promotion assessments were client feedback, sales feedback, peer feedback, the quality of Baldwin's work, and her teamwork.[59]

59.     Client feedback was among the factors assessed when generating year-end evaluations for Research Associates.[60]

**D.     Plaintiffs' Primary Duties Included Advising GLG's Clients With Respect To Research Services To Be Performed By Council Members.**

**(i)     Plaintiff Cohen's Research and Advisory Duties.**

60.     Cohen had significant responsibilities relating to GLG's relationships with its clients, including those clients for which he was assigned primary responsibility.[61]

61.     Cohen characterizes his primary duty as a Research Associate as "facilitating" research projects for GLG's clients.[62]

62.     Cohen was responsible for "facilitating projects, in a strategic manner, [for] some of the most difficult professionals on Wall Street."[63]

---

57     Dille Dep. at 157:22-159:17; 163:7-24.

58     Ronen Dep. at 458:22-459:3.

59     Schaefer Decl. at ¶ 13; Baldwin Dep. at 204:10-18 (stating that she did not know how much weight was give to factors such as client feedback).

60     Baldwin Dep. at 204:10-15.

61     Points of Emphasis document (sent by Cohen to Brad Spiegel for Spiegel to draft business school recommendation letters) (bates-labeled GLG00002052-59), attached as Exh. 25, at GLG00002055 ("The role of a Research Associate is one of the most integral responsibilities over the course of a relationship with each client at Gerson Lehrman Group."); Cohen Dep. at 286:7-287:3 (confirming that the Points of Emphasis document is a truthful and accurate representation of Cohen's duties as a Research Associate); Cohen Letter to Goldman Sachs (seeking consideration for Financial Analyst position) (bates-labeled COHEN 0144), attached as Exh. 28; Cohen Letter to Kingsley Associates (seeking consideration for Real Estate Analyst position) (bates-labeled COHEN 0147), attached as Exh. 26; Cohen Letter to Sverica International (seeking consideration for Financial Analyst position) (bates-labeled COHEN 0154), attached as Exh. 27.

62     Cohen Dep. at 164:17-18; June 2007 Cohen Resume (bates-labeled GLG00000001) attached as Exh. 29.

63     Exh. 25 at GLG00002055; Cohen Letter Seeking Consideration for Search Associate position (bates-labeled

63.     Cohen's duties as a Research Associate included "manag[ing] primary research projects throughout various deal stages and diligence periods [for investment clients such as] private equity [firms], venture capital [firms], hedge fund[s] and long-only asset managers," as well as "[p]roprietary [t]rading [d]esks" and "[a]sset [m]anagement [c]ompanies."[64]

64.     As a Research Associate, Cohen was responsible for "provid[ing] primary research solutions for investment analysts looking to further develop their investment thesis."[65]

65.     Cohen was responsible for advising clients as to which Council Members "might have the experience and information that the client is looking for" and otherwise "fulfilling time-sensitive research requests" for clients on a regular basis throughout the day, every day (or almost every day), during the time he was employed as a Research Associate.[66]

66.     Cohen provided value to GLG's clients as a Research Associate, in part, by analyzing client requests for research services and then advising them as to which of GLG's Council Members were best qualified for the work.[67]

(ii)     **Plaintiff Ronen's Research and Advisory Duties.**

67.     Ronen's job duties included "deliver[ing] relevant and timely primary market research solutions to [his] clients at hedge funds, investment banks, and PE/VC [private equity/venture capital] firms."[68]

---

COHEN 0151), attached as Exh. 30 ("I actively engage members of our network to determine their knowledge base in order to facilitate diligence work between investment analysts and said subject matter experts. I really enjoy my daily work flow consisting of having high level discussions with incredibly bright individuals.").

[64]   Cohen Resume (bates-labeled COHEN 0083) attached as Exh. 31; Exh. 29 at GLG000000001.

[65]   Cohen Dep. at 328:23-329:7; Exh. 1 at COHEN 0108; Cohen Dep. at 327:22-24, 328:10-11 (confirming that Exh. 7 is truthful, accurate and relates to Cohen's tenure as a Research Associate); Mehlhorn Dep. at 166:2-172:12 (describing Cohen's duties in advising GLG's clients).

[66]   Cohen Dep. at 164:20-166:7.

[67]   Jacobs Decl ¶ 4; Johnson Dep. at 174:2-175:22.

[68]   Ronen's Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled RONEN 01127-73), Exh. 32, at RONEN 01138; Ronen Dep. at 217:10-20 (confirming that the contents of Exh. 32 are true and accurate); 220:12-22 (confirming that the statement in RONEN_0000138 of Exh. 32 is true and

68.     According to David Temple, Ronen had an "[e]xcellent grasp of [a] very broad set of topics/industries that help[ed] him deliver first rate research on all his projects."[69]

69.     As a Research Associate, Ronen collaborated directly with analysts and industry experts to provide consultations and customized reports to clients.[70]

70.     Ronen viewed himself as an "outsourced qualitative analyst" who worked "on the front lines at a firm that has revolutionized investment research . . . ."[71]

71.     Ronen's duties as a Research Associate were "extremely analytical."[72]

72.     Ronen was expected to review Council Members' profiles carefully when making recommendations to clients.[73]

73.     According to Ronen, GLG was "not a call center" and "provide[s] solutions, not phone calls."[74]

74.     Ronen's position as a Research Associate taught him a "great deal about qualitative research."[75]

---

accurate).

[69]   David Temple's Recommendation Letter in Support of Ronen's Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled GLG00004677-4680), attached as Exh. 33, at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).

[70]   Ronen's Resume Submitted in Support of His Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled RONEN01127-73), Exh. 32, at RONEN 01154; Ronen Dep. at 222:3-14 (confirming that his resume accurately describes his job duties as a Research Associate).

[71]   Ronen's Application to the Columbia Business School, Exh. 37, at RONEN 01101-2; Ronen Dep. at 204:13-205:7 (confirming that these statements are true and accurate).

[72]   Exh. 37, at RONEN 01105; Ronen Dep. at 210:7-17 (confirming that this statement is true and accurate).

[73]   September 2008 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG000000763-776), Exh. 38, at GLG000000764; Ronen Dep. at 328:17-329:19.

[74]   Ronen's Presentation Entitled "Intro to GLG Products, Beyond Phone Calls" (bates-labeled RONEN_0000001284-1300), attached as Exh. 39, at RONEN_0000001290-1300; Ronen Dep. at 335:10-336:9; 338:14-23 (confirming that he authored the presentation to train Research Associates and that the statement at RONEN_00001300 of Exh. 39 is true and accurate).

[75]   Ronen's Application for Admission to Cornell University's Johnson School of Business (bates-labeled RONEN01109-1126), attached as Exh. 40, at RONEN 01115; Ronen Dep. at 213:4-6 (confirming the accuracy of the statement in Exh. 40).

75.     In order to identify one or more Council Members who would be appropriate to assist a client with their project, Ronen typically analyzed the client's proposed research inquiry, searched GLG's proprietary information systems, identified individuals with the relevant background, and then independently determined each Council Member's fit for the project based on an analysis of, for instance, their experiences and any comments previously recorded in GLG's proprietary information systems.[76]

76.     Ronen understood GLG's "The Greenies" as instructing Research Associates to explain to clients why they were selecting specific Council Members, and to provide clients with characteristics and attributes which helped provide a rationale for their Council Member recommendations.[77]

### (iii)     Plaintiff Baldwin's Research and Advisory Duties.

77.     Baldwin proactively contacted clients to inquire into their current research projects and needs.[78]

78.     When Baldwin received a client research project, she entered a description for that project into GLG's computer system called Vega.[79]

79.     Baldwin entered potential research projects into Vega and stated them in a way that would attract qualified Council Members.[80]

80.     Each time Baldwin received a client's research request she assessed whether a phone call was appropriate and the best product or whether another GLG product would better suit

---

[76]     Ronen Dep. at 353:18-354:19.

[77]     September 2007 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG00000730-749), Exh. 41, at GLG00000731; Ronen Dep. at 325:13-326:17.

[78]     Baldwin Dep. at 118:7-17.

[79]     Baldwin Dep. at 134:1-4.

[80]     Baldwin Dep. at 134:21-24.

the client's needs.[81]

81.     Baldwin analyzed client requests for research services and then advised them as to which of GLG's Council Members were best qualified to provide the services requested. [82]

82.     Baldwin recommended Council Members to clients based on their research needs, while advising clients as to the relevancy of each Council Member's experience and expertise to the proposed research project.[83]

83.     Baldwin communicated with clients about the strengths and weaknesses of Council Members for research projects in order to let the client know why Baldwin was recommending particular Council Members.[84]

84.     Baldwin searched for Council Members who might be most appropriate to present to specific clients.[85]

85.     Baldwin researched for Council Members, in part, by reviewing answers given by them to prior questions directed to them about client projects.[86]

86.     Baldwin researched for Council Members, in part, by using publicly available research tools to collect information.[87]

87.     Baldwin researched for Council Members, in part, by preparing and directing questions to Council Members.[88]

---

[81]     Baldwin Dep. at 136:22-137:7.

[82]     Baldwin Dep. at 396:6-17.

[83]     Baldwin Dep. at 160:21-161:5; July 2007 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG00000721-729) attached as Exh. 42 at GLG00000722.

[84]     Baldwin Dep. at 160:21-161:5.

[85]     Baldwin Dep. at 144:4-7.

[86]     Baldwin Dep. at 145:1-4.

[87]     Baldwin Dep. at 145:8-16.

[88]     Baldwin Dep. at 144:4-145:23.

88.     At times, if Baldwin was dissatisfied with the selection of Council Members for a particular project, she placed a request for new Council Members.[89]

89.     Baldwin was commended for taking time to fully understand client's needs.[90]

90.     Baldwin exhibited the ability to find the most appropriate expert, even when faced with difficult requests.[91]

91.     When Baldwin did not believe that a phone consultation was the right product for a client, she would offer another suggestion.[92]

      a.    **Plaintiffs Served As Thought Partners and Trusted Advisors In Developing Or Refining Research Projects For GLG's Clients And Advising Them As To Which Council Members Would Meet Their Needs.**

      (1)    **Plaintiff Cohen Served As A Thought Partner And Trusted Advisor for GLG Clients.**

92.     Cohen's responsibilities with respect to GLG's clients' research requests "require[d] [him] to work with clients to develop primary research resources that help investment analysts make more informed decisions."[93]

93.     According to Cohen, his "work experience [at GLG was] particularly valuable in cultivating skills as a trusted advisor and a leader with clients and [his] team internally."[94]

94.     "A major part of [Cohen's Research Associate] role [was] researching the value

---

[89]   Baldwin Dep. at 151:9-152:13.

[90]   Exh. 23 (bates-labeled GLG00004660).

[91]   Exh. 23 (bates-labeled GLG00004660).

[92]   Baldwin Dep. at 138:13-20.

[93]   Cohen's Essay Three for Admission to the Georgetown MBA Program (bates-labeled COHEN 0124-26), attached as Exh. 43, at COHEN 0124; Exh. 1 at COHEN 0108 ("I work[ed] to provide primary research solutions for investment analysts looking to further develop their investment thesis."); Johnson Dep. at 66:22-63:5, 63:10-21, 163:4-11, 168:4-25, 175:8-15 (discussing Cohen's role as a trusted advisor to GLG's clients).

[94]   Cohen's Essay Three for Admission to the Babson MBA Program (bates-labeled COHEN 0138-39), attached as Exh. 44, at COHEN 0138 ("My work experience has been particularly valuable in cultivating my skills as a trusted resource and advisor to those facing key business and investment decisions."); Cohen Dep. at 330:6-12 (confirming that this statement to Babson was truthful and accurate).

chain and find[ing] the best way to uncover key data and work[ing] interactively with the client to get them this information."[95]

95.    On a regular basis, Cohen spent time interacting with some of the world's most sophisticated investors to develop and/or refine research plans for them, which he accomplished by using his understanding of each client's unique business needs and goals.[96]

96.    Cohen's role as a Research Associate "included working daily with analysts and partners at major hedge funds and private equity firms to identify solutions to their investment questions with primary research resources.  [He spoke] with Analysts, Portfolio Managers, and Sr. Partners at these firm everyday and [learned] not only to help provide unique industry expertise by leveraging [GLG's] resources, but also to earn their trust in handling highly sensitive and confidential information.  Developing these relationships taught [him] how to ask the right questions in order to best position [himself] as a highly valuable part of their investment process."[97]

97.    Cohen's role as a Research Associate "provide[d] [him the] freedom to push [him]self creatively and analytically by being involved in new and valuable approaches to research, value chain analysis, and investment decisions."[98]

98.    Cohen worked regularly to improve his role as a "research partner" with GLG's clients.[99]

---

[95]    Exh. 43 at COHEN 0124; Cohen Dep. 344:11-20; Exh. 31 at COHEN 0083) ("Perform value chain analysis of [TMT] companies based on client investment targets to engage appropriate subject matter expertise.").

[96]    Cohen Dep. at 164:22-165:1; Exh. 25 at GLG00002055; Mehlhorn Dep. at 48:16-49:2.

[97]    Exh. 44 at COHEN 0138; Exh. 1 at COHEN 0109 (same).

[98]    Cohen's Essays for Admission to the USC, Marshall School of Business (bates-labeled COHEN 0084-90), attached as Exh. 45, at COHEN 0085; Cohen Dep. at 305:18-306-3, 309:16-310:2; Exh. 2 at COHEN 0118 (indicating same); Exh. 3 at COHEN 0132 (indicating same).

[99]    Cohen's 2007 Self-Evaluation (bates-labeled GLG00001981-85), attached as Exh. 46, at GLG00001983 ("Goals for continued improvement [include] becom[ing] a better research partner.").

99.     Cohen's research and advisory duties included "[p]artner[ing] with clients and team members for forward looking idea generation."[100]

100.    On occasion, based on his independent assessment of projects that might advance a client's investment objectives, Cohen created his own research projects for clients and then proactively reached out to clients to present his ideas.[101]

101.    Serving as a "thought partner" with clients, Cohen recommended Council Members to clients based on their research needs, while advising clients as to the relevancy of each Council Member's skills to the proposed research project.[102]

102.    As part of advising clients with respect to their proposed research projects, Cohen spent about 70-80% of his day speaking with clients about their research questions, identifying which Council Members may be appropriate to perform the work, communicating with and analyzing those Council Members, and then following-up with the client to provide recommendations.[103]

103.    To determine clients' research needs, Cohen interviewed and otherwise communicated with clients and conducted independent research on their industries, businesses, and/or relevant market trends.[104]

104.    Cohen advised clients as to their proposed research projects by aligning their needs with the skills and experience of appropriate Council Members, which he accomplished by "gaug[ing] [the Council Members'] level of knowledge based on what the client is looking to

---

[100]    Exh. 29 (bates-labeled GLG00000001).

[101]    Cohen Dep. at 174:4-178:17.

[102]    Cohen Dep. at 233:19-235:24; Johnson Dep. at 77:11-18; Exh. 42 (bates-labeled GLG00000721-29), at 722.

[103]    Cohen Dep. at 173:21-174:19.

[104]    Cohen Dep. at 166:16-167:5.

learn."[105]

105.     In order to identify one or more Council Members who would be appropriate to assist a client with their project, Cohen typically first analyzed the client's proposed research inquiry, searched GLG's proprietary information systems, identified individuals with the relevant background, and then independently determined each Council Member's fit for the project based on an analysis of their experiences and any comments previously recorded in GLG's proprietary information systems.[106]

106.     In order to be able to advise his clients and recommend Council Members for research projects, Cohen analyzed and maintained an in-depth knowledge of a broad array of Council Members and how each individual's knowledge and skills could contribute to a client's research needs.[107]

107.     Cohen independently developed questions to test Council Members' subject matter expertise, and then developed follow-up inquiries as needed depending on the responses.[108]

108.     After Council Members responded to Cohen's inquiries, he then analyzed the responses to determine which Council Member(s) would be suitable for the research project.[109]

109.     In order to advise clients as to their research projects, Cohen devoted considerable time to developing, maintaining and expanding expertise with respect to the needs of, and developments in, the particular industry that he serviced – Technology, Media and Telecom.[110]

---

[105]    Cohen Dep. at 165:2-167:1; Mehlhorn Dep. at 307:14-308:19.

[106]    Cohen Dep. at 165:2-167:1.

[107]    Cohen Dep. at 173:2-13.

[108]    Cohen Dep. at 170:19-172:14.

[109]    Cohen Dep. at 164:14-168:11.

[110]    Cohen Dep. at 175:9-176:7; Johnson Dep. at 63:10-21; Letter from Cohen to Robert K. Futterman & Associates (seeking consideration for Research Analyst position) (bates-labeled COHEN 0150), attached as Exh. 47 ("[M]y . . . current position at [GLG] [has] provide[d] me with a breadth of analytical and market understanding."); Johnson Dep. at 63:10-21 ("[Cohen] was responsible – he was a good advisor and he knew

110.     Cohen worked on developing, maintaining and expanding his subject matter expertise on a regular basis during the time that he was employed as a Research Associate.[111]

111.     Cohen was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[112]

112.     In order to better understand his clients' needs, Cohen conducted independent research on the Technology, Media and Telecom industry for which he was responsible, as well as for his specific clients within the industry.[113]

113.     Cohen often studied professional trade journals and other industry-specific news to identify new developments that he could then use to anticipate his clients' research needs.[114]

114.     Cohen acknowledges that he made meaningful contributions to developing GLG's overall marketplace of subject matter expertise during his tenure as a Research Associate.[115]

### (2)     Plaintiff Ronen Served As A Thought Partner And Trusted Advisor.

115.     Ronen was responsible for working with approximately thirty (30) different clients as an "indispensable resource," and added value in his role as a Research Associate.[116]

116.     As a Research Associate, Ronen's job duties included "[b]uild[ing] professional relationships with portfolio managers and buy-side analysts at leading hedge funds, private

---

he had to get to the point when he was talking to clients.  And they seemed to respond to that positively and that led them to call on Jeff when they had research projects that they were working on and they needed help on.  And I think that he did a good job of understanding what they were looking for and connected them with counsel members in a network group.  He could provide that expertise.").

[111]   Cohen Dep. at 185:1-4.

[112]   Cohen Dep. at 183:7-184:6; Mehlhorn Dep. at 173:12-175:20.

[113]   Cohen Dep. at 175:10-176:7.

[114]   Cohen Dep. at 175:13-23.

[115]   Exh. 2 at COHEN 0118.

[116]   Exh. 2 at COHEN 0118.

equity/venture capital firms and investment banks."[117]

117.     According to Ronen, he collaborated on a "daily basis" with some of the "most legendary investors at the world's largest hedge funds, providing them with crucial primary research."[118]

118.     As a Research Associate and "thought partner" to his clients, Ronen was "constantly working to introduce, formulate, and test investment hypotheses that consistently [led] to returns that outperform[ed] the competition, while mitigating risk."[119]

119.     While working as a Research Associate, Ronen "always deliberately and proactively [thought] about ways to add value."[120]

120.     Ronen's job duties as a Research Associate included "critical thinking that went into providing multiple products and solutions to clients while strengthening the GLG relationship a whole."[121]

121.     According to Ronen, his "key strengths" included an "[a]wareness and

---

[117]   Ronen's Application to the Columbia Business School (bates-labeled RONEN01088-1108), attached as Exh. 37 at RONEN 01095-96; Ronen Dep. at 199:12-200:1 (authenticating Exh. 37 and confirming that its contents are true and accurate), 200:4-23 (explaining that he would build professional relationships by frequently speaking with clients and taking them to lunches and dinners); Ronen's Application for Admission to Cornell University's Johnson School of Business, attached as Exh. 40, at RONEN01114; Ronen Dep. at 212:10-16 (confirming that the statement on RONEN 01114 of Exh. 40 is true and accurate).

[118]   Exh. 37 at RONEN 01101-2; Ronen's Application for Admission to the Stern School of Business at NYU (bates-labeled RONEN 01203-1233), attached as Exh. 48, at RONEN 01217 (same); Ronen Dep. at 225:12-19; 232:10-17 (confirming that the contents of Exh. 48 and the statement on page RONEN 01208 of Exh. 48 are true and accurate).

[119]   Exh. 37 at RONEN 01095-96; Ronen Dep. at 201:6-24 (confirming that the statement at RONEN 01095-96 of Exh. 37 is true and accurate); Exh. 48 (bates-labeled RONEN 01203-1233), at RONEN 01217 (same); Ronen Dep. at 231:22-232:9 (confirming that the content at RONEN 01217 of Exh. 48 is a true and accurate statement of Ronen's responsibilities as a Research Associate).

[120]   Ronen's GLG Management Self Evaluation for 2008 (bates-labeled GLG0004926-4930), attached as Exh. 49, at GLG00004929; Ronen Dep. at 139:16-140:13 (confirming that this statement was true and accurate).

[121]   Ronen's 2007 Self-Evaluation (bates labeled RONEN_00000968-971), attached as Exh. 50 at RONEN_00000971.

anticipation of client needs," and an "[a]bility to provide creative and holistic client solutions."[122]

122.     Ronen was a "trusted advisor" to the clients he worked with, and "one of [his] favorite aspects of the [R]esearch [Associate] position [was] building and maintaining strong relationships with [his] clients."[123]

123.     Ronen believes he was able to "stand out in the quality of service [he] provide[d] because of the high level of thoughtfulness and consideration that [was] the hallmark of [his] every interaction."[124]

124.     As a Research Associate, Ronen "[s]erved as a thought partner with clients to design and deliver proprietary primary market research analysis to address challenging capital market questions at all stages of the investment cycle."[125]

125.     Ronen was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[126]

126.     Ronen understood that it was management's expectation that he "work diligently to provide thoughtful, creative recommendations to the clients and to stand by those recommendations as a way of helping [GLG's] clients make better, more effective decisions."[127]

127.     While working as a Research Associate, Ronen developed a strong understanding of the distinctions between hedge funds and mutual funds, which Ronen found to be helpful in

---

[122]   Ronen Dep. at 101:7-104:19.

[123]   Ronen's 2008 GLG Research Management Self-Evaluation for 2008 (bates-labeled RONEN_000000955-958), Exh. 51, at RONEN_000000956; Ronen Dep. at 140:16-141:8 (confirming that he authored Exh. 51 and that its contents are true and accurate).

[124]   M. Ronen's 2008 GLG Research Management Self-Evaluation for 2008 (bates-labeled RONEN_000000955-958), attached as Exh. 51 at RONEN_000000956.

[125]   Exh. 37 at RONEN 01095-96; Ronen Dep. at 201:6-24 (confirming that the statement at RONEN 01095 of Exh. 37 is true and accurate).

[126]   Mehlhorn Dep. at 173:17-175:20.

[127]   Exh. 41 at GLG00000731; Ronen Dep. at 327:18-328:13.

meeting the needs of the clients he serviced.[128]

128.     Ronen understood GLG's communications to Research Associates called "the Greenies" to emphasize the relevancy of each Research Associates' duty to "serve as a vital thought partner to [clients'] work."[129]

129.     According to David Temple, Ronen's former colleague at GLG who Ronen had submit recommendation letters to graduate schools on his behalf, Ronen's "ability to become a highly trusted partner for his client-base has caused [Ronen's] clients to rely on him more frequently . . . ."[130]

130.     According to Mr. Temple, Ronen "differentiated himself by proactively going above and beyond the call of duty to help clients make difficult decisions."[131]

      **(3)     Plaintiff Baldwin Served As A Thought Partner And Trusted Advisor.**

131.     As a Research Associate, Baldwin communicated with clients about drug trials, new medical devices and new pharmaceuticals.[132]

132.     Baldwin's efforts to advise clients as a Research Associate were a critical part of

---

[128]   Ronen Dep. at 444:7-445:6; E-mail Correspondence from Robert Matule to Ronen (bates-labeled RONEN 01518-1520), attached as Exh. 52.

[129]   Ronen Dep. at 324:2-10; Exh. 42 at GLG00000722.

[130]   David Temple's October 6, 2008 Recommendation Letter in Support of Ronen's Application for Admission to the Johnson School of Business at Cornell (bates-labeled RONEN 01312-1316) attached as Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Ronen Dep. at 239:4-8 (confirming that Ronen worked as a Research Associate at the time Mr. Temple submitted this recommendation letter on Ronen behalf); Exh. 33 (bates-labeled GLG004677-4680), at GLG004678-79; Temple Dep. at 87:18-88:17; (confirming that the contents of Exh. 33 are true and accurate); David Temple's Recommendation Letter in Support of Ronen's Application for Admission to Yale University (bates-labeled RONEN_0000000133-136), attached as Exh. 54, at RONEN_000000134; Temple Dep. at 102:13-22..

[131]   Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Exh. 54 at RONEN_000000134; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 54 are true and accurate).

[132]   Baldwin Dep. at 28:12-14.

GLG's effort to promote its brand and distinguish itself from competitors.[133]

133.     Baldwin was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[134]

134.     If Baldwin was working on a project similar to one she had done before, she would rely on portions of the prior project but also made modifications as necessary and searched for new Council Members as needed.[135]

135.     After placing clients in contact with Council Members, Baldwin worked with the client to make sure that the client was satisfied with the recommendation and offered additional solutions when necessary.[136]

136.     By 2008, most clients came directly to Baldwin with their requests, rather than being referred to her by a supervisor.[137]

137.     Baldwin worked on surveys as a Research Associate, which sometimes accounted for 30 to 40 percent of her time.[138]

138.     As a Research Associate, Baldwin would sometimes create the survey itself or write questions for it.[139]

139.     Baldwin researched and identified appropriate Council Members to respond to the

---

[133]   Schaefer Decl. ¶ 8; Baldwin Dep. at 127:11-129:20 (admitting that she was unaware of Schaefer's confidence in her ability and had no basis to dispute his representations about the extent to which he accepted her recommendations).

[134]   Mehlhorn Dep. at 173:17-175:20.

[135]   Baldwin Dep. at 149:4-23.

[136]   Transcript of the Deposition of Todd Schaefer, dated November 5, 2010 ("Schaefer Dep."), pertinent portions of which are attached as Exh. 55, at 79:3-80:11.

[137]   Baldwin Dep. at 123:9-14; 130:10-13.

[138]   Baldwin Dep. at 141:7-9; 17-24.

[139]   Baldwin Dep. at 221:21-222:1.

client survey.[140]

140.    Baldwin understood GLG's "The Greenies" as instructing Research Associates to explain to clients why they were selecting specific Council Members, and to provide clients with characteristics and attributes which helped provide a rationale for their Council Member recommendations.[141]

**E.    Plaintiffs' Primary Duties Did Not Include Selling, But Did Include Promoting And Marketing GLG's Research Services To Existing And Prospective Clients To Advance The Efforts Of GLG's Sales Team.**

**(i)    Cohen's Promotional And Marketing Job Duties**

141.    As a Research Associate, Cohen was not himself engaged in sales, as GLG employed other individuals in its Sales Department to sell subscriptions and services to GLG's clients.[142]

142.    Cohen's primary duty included promoting and marketing GLG's research services to existing and prospective clients to advance the efforts of GLG's sales team.[143]

143.    Cohen engaged in marketing and promotion activities on a regular basis during the time he was employed as a Research Associate.[144]

144.    Cohen's promotion and marketing duties involved promoting sales of GLG's services by others (i.e. GLG's sales force), not his own direct sales:

> Q:    And how were you involved in getting [your clients] to renew [their subscriptions]?
>
> A:    I am not in charge of sales or contracts.
>
> Q:    I understand that. . . .  but sometimes, as a Research Associate, you would collaborate with people in sales to

---

[140]    Baldwin Dep. at 225:5-11.

[141]    Exh. 41 at GLG00000731; Baldwin Dep. at 233:22-234:6.

[142]    Cohen Dep. at 248:24-249:20, 250:10-17.

[143]    Cohen Dep. at 176:8-13, 194:10-16, 250:12-20.

[144]    Cohen Dep. at 176:14-177:10.

24

> promote the relationship hoping that the sales people could
> then execute a sale; is that right?
>
> A:      That is fair.[145]

145.    Cohen was responsible for putting Council Members in a position to provide

appropriate services to GLG's clients, developing and expanding long-term relationships with

clients, and helping to grow GLG's business.[146]

146.    Cohen's promoting and marketing duties involved developing and deepening

relationships with existing and prospective clients to increase their use of GLG's services.[147]

147.    Cohen educated clients with respect to GLG's services and proposed ideas for

new projects.[148]

148.    Cohen promoted GLG's services by anticipating clients' research needs and

studying their individual businesses and relevant market trends.[149]

149.    In promoting GLG, Cohen made his own decisions about which clients to call and

when and which ideas to propose to a particular client.[150]

150.    In deciding which clients to call, Cohen conducted his own research and

considered information provided by the Sales Department regarding a client's expressed or

---

[145]   Cohen Dep. at 193:11-194:16.

[146]   Johnson Dep. at 150:13-151:5, 158:8-13; 160:8-161:5 (discussing Cohen's job responsibilities).

[147]   Cohen Dep. at 174:23-176:13.

[148]   Cohen Dep. at 176:8-13, 177:1-6; Johnson Dep. at 160:8-161:5, 129:7-20 ("[The purpose of Cohen's call plan]
        was [ ] to keep in touch with the clients and to gain more knowledge about what their interests were . . . . [T]he
        job is very much [a] relationship business.  So we wanted to reach out to our [Technology, Media &
        Telecommunications ("TMT")] contacts every month and check in with them, see how things were going, see
        if they were still covering the [TMT] space, educate them on any new initiatives that GLG had that might be
        relative to their research process.  And to really – to educate them and promote the use of [GLG] within their
        organization.").

[149]   Cohen Dep. at 174:23-176:13, 334:16-22, 335:18-21 ("[As an example,] [s]everal clients would make
        investments outside the United States.  So in order to provide Council Members that would be able to comment
        on that, it required me to learn about the industry and some of the dynamics abroad."); Exh. 2 at COHEN 0118;
        Johnson Dep. at 129:7-20; Cohen Dep. at 334:19-22 & 335:14-17 (confirming that this document is truthful,
        accurate, and relates to Cohen's duties as a Research Associate).

[150]   Cohen Dep. at 179:5-180:19.

assumed interests and analyzed that client's past project work, and he then used that information to recommend GLG services that he believed would suit the client.[151]

151.    Cohen's "abilit[y] to increase usage, interest and demand with [GLG's] accounts … had a direct positive impact on [the Sales Department's] ability to upgrade clients and produce higher revenues for the firm."[152]

152.    Cohen's promotion of Council Members' services advanced the efforts of GLG's sales team to encourage clients to upgrade their subscription levels or retain GLG's Council Members for more complex projects.[153]

153.    Cohen also collaborated with the Sales Department to analyze client usage and research preferences that could then be used by the Sales Department to pitch upgrades to premium services.[154]

154.    Cohen's promotional efforts assisted the Sales Department in increasing subscriptions and the use of specialized services such as Surveys or Market Studies and in pitching upcoming events or relevant conferences.[155]

155.    Cohen's promotional work included making calls to existing clients as part of his "calling plan" each month in which he discussed services that GLG could provide and making suggestions and recommendations about which GLG services could assist clients with their needs.[156]

---

[151]    Cohen Dep. at 179:5-180:19.

[152]    Brad Spiegel Recommendation Letter for Cohen's Admission to the Babson MBA Program (bates-labeled GLG00002011-13) attached as Exh. 56 at GLG00002012.

[153]    Cohen Dep. at 193:11-195:1.

[154]    Exh. 29 at GLG00000001.

[155]    Cohen Dep. at 196:13-197:11.

[156]    Cohen Dep. at 176:8-177:10; Exh. 46 at GLG00001982-83 ("I made a large amount of calls per month due to assisting on Todd's massive call sheet.  It was mentioned as an area for improvement in June, and I feel like I've become more thoughtful and effective on the phone pulling projects, explaining our service, etc.").

### (ii)     Ronen's Promotional And Marketing Job Duties

156.     As a Research Associate, Ronen was not engaged in sales, as GLG had a separate sales force.[157]

157.     In his role as a Research Associate, Ronen regularly supported the sales force's efforts to increase sales.[158]

158.     According to David Temple, Ronen played an "active role" in "improv[ing] [GLG's] product offerings."[159]

159.     Ronen's duties included promoting GLG's research services to the clients with whom he worked.[160]

160.     Ronen would propose to clients that they consider using additional GLG products and services, and his purpose in engaging in such discussions was to "promote" GLG's services to those clients.[161]

161.     According to Ronen, a "proactive RM/RA can make a big difference," so he "always concentrated on pushing [his] clients to try an initial survey, private visit, or other non-consultation project."[162]

162.     According to David Temple, as a Research Associate Ronen "[d]emonstrated

---

[157]   Ronen Dep. at 112:24-113:4; 116:14-19.

[158]   Ronen Dep. at 116:14-19; 128:8-15; Exh. 49, at GLG00004927 (identifying example of type of information Ronen "regularly provide[d] to sales").

[159]   Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Exh. 33, at GLG00004679; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 53 are true and accurate).

[160]   Ronen Dep. at 111:21-112:5.

[161]   Ronen Dep. at 113:5-15; 116:6-13.

[162]   Exh. 250 at RONEN00250; Ronen Dep. at 144:19-146:13 (confirming that he wrote this email and that its contents were true and accurate).

sales/marketing ability" and was "a natural in pitching [GLG]s product to new clients."[163]

163.      Ronen's job duties included promoting Red Flag Reviews and Consumer Market Studies to clients.[164]

164.      GLG expected Ronen to promote GLG's products and services to clients, including surveys and market studies.[165]

165.      Ronen's job duties as a Research Associate included solidifying and expanding market share.[166]

166.      Ronen understood GLG's "The Greenies" to set forth GLG's goal of "articulat[ing] the value of Research Management in every single interaction with a client."[167]

167.      According to David Temple, Ronen "[p]roactively look[ed] for ways to improve [GLG's] value proposition."[168]

## (iii)      **Baldwin's Promotional And Marketing Job Duties**

168.      Baldwin did not sell products to clients because GLG had a separate Sales Department engaged in sales.[169]

169.      With respect to clients Baldwin covered, there was a benefit to GLG to expanding relationships with those clients.[170]

---

[163]   Exh. 33 at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).

[164]   Ronen Dep. at 366:11-367:22.

[165]   November 19, 2008 e-mail correspondence from Sam Jacobs (bates-labeled RONEN00112-114), attached as Exh. 58, at RONEN00113; Ronen Dep. at 162:20-163:12.

[166]   Ronen Dep. at 367:10-13.

[167]   Exh. 41 at GLG00000731; Ronen Dep. at 327:10-17.

[168]   Exh. 33 at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).

[169]   Baldwin Dep. at 178:10-18.

[170]   Baldwin Dep. at 172:7-19.

170.     If Baldwin was speaking with a client at a firm she covered, she would let them know about other products and services offered by GLG.[171]

171.     GLG encouraged Baldwin to educate clients about other products and encourage them to take advantage of other products .[172]

172.     Baldwin stated that one of the goals of satisfying client requests was to have the clients work with GLG again.[173]

173.     It was Baldwin's belief that by doing good work on client projects as a Research Associate, clients would increase their usage of GLG services and products.[174]

174.     One of GLG's goals for research professionals was to maximize its work with clients so that the clients would not work with competitors.[175]

175.     Baldwin's supervisors advised her that if she did excellent work for clients, the client would prefer to use her, which would expand and deepen the client relationship.[176]

176.     Baldwin had a list of clients with whom she was working that she was expected to call periodically, which eventually developed into a "call plan."[177]

177.     There was no policy as to how much time Baldwin was to spend calling the individuals on her call plan.[178]

178.     Baldwin understood that the call plan was designed to remind clients that

---

[171]    Baldwin Dep. at 169:5-170:6

[172]    Baldwin Dep. at 170:1-6.

[173]    Baldwin Dep. at 171:6-172:19.

[174]    Baldwin Dep. at 173:5-13.

[175]    Baldwin Dep. at 173:18-174:5.

[176]    Baldwin Dep. at 174:6-16.

[177]    Baldwin Dep. at 235:18-21; 236:1-3.

[178]    Baldwin Dep. at 236:11-14.

Research Associates were available to help them and to increase usage with the clients.[179]

179.     Calling clients served several purposes, including client relationship development.[180]

180.     During calls to clients, Baldwin introduced herself to clients, inquired into their research needs, and followed up on requests to ensure the client's needs were met.[181]

181.     One of Baldwin's goals while speaking on the phone with clients was to develop a personal relationship or rapport with a client contact.[182]

182.     The call plan was designed to remind GLG clients that Research Associates were available to assist them.[183]

183.     The ultimate goal of the call plan was to increase usage by clients.[184]

184.     Baldwin took clients out to lunch or for drinks.[185]

185.     In her 2007 performance evaluation, Baldwin was encouraged to strive to become the primary point of contact for a focused number of client accounts by mid-year.[186]

186.     Building deeper client relationships was identified as one of Baldwin's performance goals in 2008.[187]

187.     Baldwin discussed with others at GLG her relationships with clients and the value

---

[179]   Baldwin Dep. at 237:13-23.

[180]   Schaefer Dep. at 126:17-127:15.

[181]   Schaefer Dep. at 126:17-127:15.

[182]   Baldwin Dep. at 182:17-24.

[183]   Baldwin Dep. at 237:13-17.

[184]   Baldwin Dep. at 237:18-23.

[185]   Baldwin Dep. at 102:8-10.

[186]   Exh.23 at GLG00004660.

[187]   Baldwin Dep. at 422:16-423:1.

of such relationships to the firm.[188]

188.    Baldwin often discussed the significance of GLG's relationship with a particular

consulting firm and how GLG had done everything it could to build personal and work

relationships with that firm to build a deeper relationship.[189]

## F.   Plaintiffs' Primary Duties Included Monitoring For, And Advising Clients Regarding, Compliance Issues.

189.    Compliance was a fundamental part of GLG's business strategy and value

proposition.[190]

190.    GLG prided itself on its compliance responsibilities and promoted it as a key

differentiator between GLG and its competitors.[191]

191.    Research Associates' compliance responsibilities were critical to GLG's clients

and they were one reason clients chose GLG over its competitors.[192]

192.    Compliance failures could have legal consequences for GLG and/or its clients.[193]

193.    A clear message was delivered to Research Associates that there were no fixed

compliance guidelines that could address the multitude of compliance risks and, therefore,

Research Associates were directed to use their own best judgment to address compliance issues.[194]

194.    Most of a Research Associate's daily duties were expected to involve this

---

[188]   Baldwin Dep. at 423:2-6.

[189]   Baldwin Dep. at 423:7-19.

[190]   Jacobs Decl. ¶ 12.

[191]   Jacobs Decl. ¶ 12.

[192]   Mehlhorn Dep. at 73:6-76:10, 98:7-106:18; GLG Compliance Rules & Practices for Managers and Associates, (bates-labeled GLG00000541-0629) attached as Exh. 59 at GLG00000546 ("Compliance . . . is not only vital to the protection of [GLG's] business model and corporate values, it is also a key component of our client service and market differentiator."); Jacobs Decl., ¶ 11 (describing the critical nature of Research Associates' compliance job duties).

[193]   Exh. 59 at GLG00000567-569; Mehlhorn Dep. at 49:21-53:4 (explaining that a Research Associate could put the entire company at risk if they overlooked a compliance risk).

[194]   Jacobs Decl. ¶ 13.

compliance responsibility.[195]

195.     The compliance duty included assessing projects that might be suitable to propose

to clients, analyzing projects proposed by clients and appropriately describing client projects in

GLG's database that was used to track and provide advice as to clients' proposed research

inquiries.[196]

196.     Plaintiffs were responsible for "help[ing] clients and Council Members [ ] avoid

inappropriate interactions in projects that [GLG] arrange[d] or facilitate[d]" by "review[ing] and

act[ing] upon information supplied by [Council Members' and clients that raise[d] potential

compliance issues."[197]

### (i)     Plaintiff Cohen Monitored For, And Advised Clients Regarding, Compliance Issues.

197.     Cohen acknowledges that compliance rules were "very important" to GLG's

business.[198]

198.     Cohen was responsible for monitoring clients' research projects and interactions

with Council Members for potential compliance problems that could create a regulatory risk for a

client or GLG, and seeking to prevent situations in which there could be an improper exchange of

information in violation of securities laws and regulations.[199]

199.     Cohen monitored for, and advised clients regarding, compliance issues that might

arise between clients and Council Members on a regular basis during the time he was employed as

---

[195]   Jacobs Decl. ¶ 11.

[196]   Jacobs Decl. ¶ 10

[197]   Exh. 59 at GLG00000546-547 ("It is therefore important to GLG's interests and values, and a core job requirement, that [Research Associates] play an active compliance role in any project they touch.").

[198]   Exh. 59 at GLG00000567-569; Mehlhorn Dep. at 49:21-53:4 (explaining that a Research Associate could put the entire Company at risk if they overlooked a compliance risk).

[199]   Cohen Dep. at 221:21-222:6, 223:18-224:7, 225:4-13.

a Research Associate.[200]

200.     Cohen advised both clients and Council Members in a way that intended to limit regulatory risks for the clients and GLG.[201]

201.     Cohen's job duties including being alert for red flags regarding compliance rules.[202]

202.     Cohen was required to be alert for red flags regarding compliance rules in many contexts, including when he communicated with Council Members' regarding their responses to questions testing their expertise for a particular project and their comments in response to invitations to consult for a client.[203]

203.     Cohen also performed his compliance duties (e.g., monitored for compliance issues and risks) in live meetings with clients and Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[204]

204.     At Roundtables and Seminars, Cohen was expected to redirect the conversation if a client posed a question to a Council Member that Cohen identified as raising a compliance-related issue or violating GLG's compliance rules.[205]

205.     At Roundtables and Seminars, Cohen was expected to interrupt and end a discussion if necessary to prevent compliance problems and, following the event, report the issue to GLG's Compliance Escalation Department.[206]

---

[200]   Cohen Dep. at 221:21-222:6, 223:18-224:7, 225:4-13; Johnson Dep. at 74:19-75:17.

[201]   Cohen Dep. at 224:1-224:7, 225:4-13; Johnson Dep. at 74:11-75:17.

[202]   Exh.59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules.").

[203]   Cohen Dep. at 226:19-227:10; Exh. 59 at GLG00000567.

[204]   Cohen Dep. at 229:17-230:19; Exh. 60 (bates-labeled GLG00001182-1263), at 1228-31.

[205]   Exh. 60 at GLG00001230; Cohen Dep. at 229:17-230:19; Johnson Dep. at 194:12-21.

[206]   Exh. 60 at GLG00001230; Cohen Dep. at 229:17-230:19 ("Q: [Referring to Section 17(c)(iv) on GLG00001230] Did you understand [this] to be the policy?  A: I did.   Q: And did you host Round Tables and Seminars?  A: I did.   Q: And did you fulfill this duty when you hosted those events?  A: I believe I did. . . .

### (ii)    Plaintiff Ronen Monitored For, and Advised Clients Regarding, Compliance Issues.

206.    In Ronen's view, "[o]ne of the biggest legal challenges faced by expert network operators is legal compliance in regards to information passed from information provider to researcher."[207]

207.    Ronen understood that his job responsibilities as a Research Associate included monitoring interactions for potential compliance issues.[208]

208.    Ronen reviewed GLG's compliance manuals and took their contents seriously.[209]

209.    According to Ronen, he "always adhere[d] to the standards outlined in [GLG's] 'Compliance Rules & Practices Guide For Research Managers'" and would "proactively educate [his] clients on the rules to stem potential violations."  This included working with compliance officers of the clients with whom he worked.[210]

210.    Ronen's job duties including being alert for red flags regarding compliance rules.[211]

211.    Ronen monitored for compliance issues during live meetings with clients and

---

Q: Where you mindful of the [compliance responsibilities] when you were [hosting Round Tables and Seminars?]   A: Absolutely.  Very mindful.").

[207]    Exh. 39 at RONEN_0000001287; Ronen Dep. at 336:11-337:5 (confirming that it was his decision to include the statement on RONEN_0000001287 of Exh. 39 in the Research Associate training because he thought it was important).

[208]    Ronen Dep. at 119:2-10; 122:12-123:6.

[209]    Ronen Dep. at 125:7-126:6.

[210]    Exh. 49 at GLG000000497; Ronen Dep. at 125:7-126:6 (confirming that he authored Exh. 49 , that its contents are true and accurate, and that he reviewed GLG's compliance manuals and took their contents seriously); 129:12-130:15 (confirming that he would proactively educate GLG clients to avoid potential violations).

[211]    GLG Compliance Rules and Practices Guide for Research Managers and Associates, last updated July 15, 2008 (bates labeled GLG00000541-629) attached as Exh. 59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules."); Ronen Dep. at 358:2-6.

Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[212]

      (iii)    **Plaintiff Baldwin Monitored For, and Advised Clients Regarding, Compliance Issues.**

212.      According to Baldwin, the negative consequences of compliance failures could include a Council Member sharing information he does not have permission to share or that is non-public.[213]

213.      Another negative consequence of a compliance failure could be a client having to freeze all action on a proposed investment.[214]

214.      The legal consequences of compliance failures could involve investigations, newspaper articles in the Wall Street Journal, and possibly SEC action.[215]

215.      Baldwin performed a compliance role as a Research Associate.[216]

216.      Baldwin's job duties included being alert for red flags regarding compliance rules.[217]

217.      According to Baldwin, the purpose of the compliance function performed by Research Associates was to ensure that client/Council Member interactions complied with GLG's compliance framework.[218]

218.      Baldwin's compliance responsibilities were critical to GLG and GLG's clients, and they were one reason clients chose GLG over its competitors.[219]

---

[212]    Ronen Dep. at 358:7-17; GLG Compliance Rules and Practices Guide for Research Managers and Associates, last updated March 13, 2008 (bates labeled GLG00001182-1263) attached as Exh. 60 at GLG00001228-31.

[213]    Baldwin Dep. at 185:15-186:5.

[214]    Baldwin Dep. at 185:15-186:5.

[215]    Baldwin Dep. at 186:12-17.

[216]    Baldwin Dep. at 184:18-20.  See also Exh. 59 at GLG00000567.

[217]    Exh. 59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules.").

[218]    Baldwin Dep. at 185:6-10.

[219]    Mehlhorn Dep. at 73:6-76:10, 98:7-106:18; Exh. 59 at GLG00000546 ("Compliance . . . is not only vital to the

219.     Baldwin understood that GLG's clients valued her compliance role.[220]

220.     Baldwin understood that GLG's legal and compliance teams generally only became aware of potential compliance issues if the research team identified them.[221]

221.     According to Baldwin, it was the Research Associate's duty to screen Council Members about what they could and could not discuss.[222]

222.     Baldwin assessed the topics and questions proposed by clients for potential compliance issues.[223]

223.     At the conclusion of a Council Member's work for a client, Baldwin reviewed the reported scope of the project to make a final assessment for compliance issues.[224]

224.     There were compliance concerns associated with the nature of questions Research Associates posited to Council Members.[225]

225.     If a Council Member's feedback in response to her questions raised a compliance issue in Baldwin's mind, she would ask follow-up questions.[226]

226.     When adding questions to a survey based on client feedback, Baldwin assessed them for compliance issues before allowing the inclusion of the question in the survey.[227]

---

protection of [GLG's] business model and corporate values, it is also a key component of our client service and market differentiator.").  See also Jacobs Decl. ¶ 11 ("One of the most critical duties performed by Research Associates was their monitoring of the nature of client requests and client interactions with Council Members for compliance concerns.").

[220]  Baldwin Dep. at 183:16-24; Jacobs Decl. at ¶ 12 ("Through hundreds of discussions with clients, it was my clear understanding that clients deeply valued GLG's compliance function and saw it as a fundamental part of GLG's value proposition.").

[221]  Baldwin Dep. at 136:16-21.

[222]  Baldwin Dep. at 217:3-14.

[223]  Baldwin Dep. at 222:18-21.

[224]  Baldwin Dep. at 219:8-15.

[225]  Baldwin Dep. at 217:3-14.

[226]  Baldwin Dep. at 217:15-20.

[227]  Baldwin Dep. at 228:4-7.

227.     According to Baldwin, it would be inappropriate for certain Council Members, depending on their background, to respond to a survey for a client.[228]

228.     Three to four times each month Baldwin monitored compliance issues during live meetings with clients and Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[229]

229.     At these meetings, Baldwin sometimes made an effort to develop personal relationships with clients and she was required to intervene in the discussion at a client event if it presented compliance concerns.[230]

230.     Research Associates were responsible for jumping in and stopping live event discussions if they violated GLG compliance rules.[231]

G.     **Plaintiffs' Primary Duties Included The Exercise Of Discretion and Independent Judgment With Respect To Matters Of Significance.**

231.     GLG expected Plaintiffs to customize and tailor communications to meet clients' particular needs.[232]

232.     Plaintiffs exercised independent judgment and discretion in advising Council Members and clients as to compliance issues.[233]

233.     GLG provided Plaintiffs with a Compliance Guide that they were expected to read, understand, and use as a resource or learning tool.[234]

234.     Given the variety of projects that clients and Council Members engaged in, it was

---

[228]   Baldwin Dep. at 225:19-22.

[229]   Baldwin Dep. at 181:20-182:22; Exh. 60 at GLG00001228-31.

[230]   Baldwin Dep. at 182:12-16; Exh. 60 at GLG00001230.

[231]   Baldwin Dep. at 183:4-13; Exh. 60 at GLG00001230.

[232]   Exh. 42 at GLG00000722; Ronen Dep. at 324:11-23.

[233]   Mehlhorn Dep. at 49:21-53:4; Cohen Dep. at 222:2-6, 223:18-224:7, 225:4-13.

[234]   Exh. 59 at GLG00000546 ("This Guide is intended as a desktop compliance resource for . . . Research Associates."); Cohen Dep. at 225:14-227:10, 228:8-13, 229:1-7, 230:20-231:2.

impossible to include in the Compliance Manual a comprehensive list of all information or situations that could raise potential compliance concerns.[235]

235.    GLG's "The Greenies" specifically emphasized that Research Associates should not use template communications with clients (called a "one click give"), but rather should carefully craft "natural" and "thoughtful" communications "tailored" to each client.[236]

236.    The Greenies emphasized that, instead of simply listing out the names of recommended Council Members, Research Associates "should endeavor to explain why they made a specific selection and chose a specific Council Member" and, if a Research Associate is providing a client with recommendations for Council Members, the Research Associate should "distinguish broad characteristics or population attributes which help provide a rationale for selection."[237]

   **(i)**  **Plaintiff Cohen's Primary Duty Included The Exercise Of Discretion and Independent Judgment With Respect To Matters Of Significance.**

237.    Except for a short period when he first began his employment, Cohen worked with clients independently in order to ascertain their research needs and then determined and advised clients as to the appropriate Council Member(s) to complete their research project(s).[238]

238.    Cohen typically made independent judgments by himself throughout the day without having to seek or obtain his manager's approval.[239]

239.    Cohen acknowledges that his responsibilities in connection with facilitating

---

235 Jacobs Decl. ¶ 10; Exh. 59 at GLG00000567; Cohen Dep. at 227:11-227:22.

236 Exh. 42 at GLG00000722 (indicating that it was Research Associates' responsibility "to customize [his] communication thoughtfully [such] that each message [was] tailored to the client, thoughtful and natural"); Cohen Dep. at 237:8-11, 243:17-244:5, 245:23-246:11; Ronen Dep. at 324:11-23;

237 Exh. 41 at GLG00000731; Cohen Dep. at 244:17-245:14.

238 Cohen Dep. at 166:16-167:5; Johnson Dep. at 98:13-99:6, 114:4-10.

239 Cohen Dep. at 165:24-167:9.

research projects typically "did not require communication with [his] manager."[240]

240.    Cohen's duties in advising clients as to research projects involved devising high-level, creative solutions for clients by using his own independent judgment and discretion to develop Market Studies, Surveys, and Factual Operating Agreements in order to provide access to a breadth of perspectives on trends in each client's industry.[241]

241.    Cohen "thrived in [GLG's] fast-paced environment, having learned to communicate effectively and to devise creative solutions for clients."[242]

242.    Cohen typically conducted calls with clients without his manager on the phone.[243]

243.    Cohen's manager typically did not provide guidance on Cohen's e-mails to clients.[244]

244.    Although Cohen kept his manager informed about his communications with clients, he typically did not discuss with his manager the content of his communications with clients.[245]

245.    Most of the research projects that Cohen received came from clients directly, not through his manager or any other intermediary.[246]

246.    Cohen typically exercised independent judgment without a manager's approval in

---

[240]    Cohen Dep. at 168:12-169:7 ("Q: So the functions you described so far [regarding your primary duty of acting as a liaison between clients and Council Members to facilitate project work] you would perform without communicating with your manager?   A: Yes."); Johnson Dep. at 98:13-99:6, 114:4-10 (describing limited supervision of Cohen).

[241]    Cohen Dep. at 269:6-270:1; Johnson Dep. at 114:4-10 ("I would give him the project in person or over e-mail and let him run with the whole thing, which is more often the case where he would be responsible for creating the description, finding the counsel members.  Essentially going from start to finish.").

[242]    Cohen Dep. at 269:6-12, 255:24-256:7; Exh. 56 at GLG00002013.

[243]    Cohen Dep. at 169:9-20.

[244]    Cohen Dep. at 191:13-20.

[245]    Cohen Dep. at 180:20-181:1.

[246]    Cohen Dep. at 210:3-11.

responding to clients' research requests.[247]

247.    On those occasions when Cohen's manager, Todd Johnson, assigned him a new research project, he typically did so with little to no instruction on how to perform or complete the project.[248]

248.    On a regular basis, Cohen evaluated multiple options for research projects and then (with little to no input from supervisors) used his independent judgment and discretion to formulate the best course of action to recommend to the client.[249]

249.    Cohen was responsible for deciding which of GLG's thousands of Council Members to recommend for each client project.[250]

250.    On a regular basis, Cohen identified on his own (without a manager's guidance) one or more Council Members that would have the experience and information the client was looking for.[251]

251.    Even when clients already had a research topic in mind, Cohen typically used creativity and an array of research tools to study the client, the competition, and market trends to refine each client's research inquiry in order to be able to identify and recommend appropriate Council Members for their projects.[252]

---

[247]    Cohen Dep. at 187:15-189:8, 201:23-202:3.

[248]    Cohen Dep. at 189:4-8 (discussing T. Johnson Email to Cohen dated 04/25/2007 (bates-labeled GLG00001845-53), attached as Exh. 61); T. Johnson Email to Cohen dated 11/13/2007 (bates-labeled GLG00001907), attached as Exh. 62.

[249]    Cohen Dep. at 169:9-20, 167:10-21 ("Q: Now, if there were multiple potential Council Members, how would you select which ones to then recommend to the client?   A: Based on their experience and availability would be the primary factors to determine whether I would recommend them or add them to the project.   Q: And when you say "their experiences," can you explain that or provide an example of that?   A: If a client is looking to do research on a topic, certain people with certain experiences are best suited to address that topic.  So that would be how I would determine whether they were relevant or not."); Exh. 61 at GLG00001845-53); Exh. 62 at GLG00001907).

[250]    Cohen Dep. at 234:14-20, 236:9-16; 245:9-22.

[251]    Cohen Dep. at 165:24-166:7.

[252]    Cohen Dep. at 170:5-18.

252.     Cohen had the discretion to decide when to seek out new subject-matter experts for GLG's Council Member Network to meet any given client's needs.[253]

253.     In performing his promotional and marketing duties, Cohen individually decided which clients to call and when, as well as which ideas to propose to a particular client.[254]

254.     Although GLG had training materials called Greenies that highlighted some best practices for communicating effectively with clients and Council Members, they primarily focused on examples that other RAs had encountered and Cohen decided for himself which if any of the best practices included in the Greenies to use in any given situation.[255]

255.     Cohen decided for himself in each instance whether to follow or deviate from the guidance in GLG's training materials on client communications, based on whether he thought the guidance was necessary or relevant to each particular communication.[256]

256.     Cohen decided for himself in each instance whether or not it made sense for him to follow the guidance in the Greenies when communicating with a client.[257]

257.     Cohen independently determined which materials and sources to consult in maintaining his subject-matter expertise regarding the TMT industry, his clients, and Council Members in his industry.[258]

---

[253]     Cohen Dep. at 260:8-261:17; Exh. 56 at GLG00002011-12; Exh. 3 at COHEN 0132; Cohen Dep. at 321:3-11 (confirming that this document is truthful, accurate and relates to Cohen's duties as a Research Associate).

[254]     Cohen Dep. at 180:9-19, 196:18-197:11.

[255]     Cohen Dep. at 233:11-18, 235:7-236:16, 237:8-238:5, 242:9-243:21, 244:17-245:22.

[256]     Cohen Dep. at 235:7-236:16, 237:8-238:5, 233:1-18 ("Q: Is what he is saying there [in the Greenies] consistent with your understanding of how you performed your job?   A: Sometimes I would do this, other times I wouldn't.  Depending on if I felt it was necessary or relevant.");  Q: And whose decision was it as to whether it was necessary or relevant in each case?   A: Usually mine."); Exh. 42 at GLG00000722.

[257]     Cohen Dep. at 238:3-5 ("Q: And it was your decision in each instance [to decide] which was a better approach?   A: Yeah."), 245:9-22 ("Q: Do you agree that that is the appropriate way to communicate with a client?   A: I think that's relevant in some cases.   Q: But not in others?   A: That [] level of communication is not always the best, depending on the client.   Q: And was it your judgment as to whether that level of communication was required or appropriate for each client that you dealt with?   A: Yeah.").

[258]     Cohen Dep. at 176:2-7.

**(ii)**     **Plaintiff Ronen's Primary Duty Included The Exercise Of Discretion and Independent Judgment With Respect To Matters Of Significance.**

258.     Except for a period of a few weeks when he first began his employment, Ronen worked independently to respond to client inquiries and advise clients as to the appropriate Council Members to complete their research project(s).[259]

259.     Ronen had the discretion to determine which clients he would call or write on a given day.[260]

260.     Ronen had the discretion to advise clients, without first having to discuss his advice with his manager, to undertake additional research projects using experts across different disciplines.[261]

261.     Ronen had the discretion to recommend to clients that they engage in surveys, private visits and other non-consultation projects without first running his recommendations by his supervisor.[262]

262.     Ronen had the discretion to deviate from GLG's training materials when communicating with Council Members and clients.[263]

**(iii)**     **Plaintiff Baldwin's Primary Duty Included The Exercise Of Discretion and Independent Judgment With Respect To Matters Of Significance.**

263.     With respect to the clients with whom she interacted, Baldwin took over primary responsibility for some of them.[264]

---

[259]   Ronen Dep. at 92:15-94:23; 353:1-355:14; Dille Dep. at 100:12-18; 101:14-17 (stating that Ronen did not need his supervisor's approval to advise clients' regarding their research requests).

[260]   Ronen Dep. at 356:8-19.

[261]   Ronen Dep. at 109:15-110:18.

[262]   Ronen Dep. at 145:24-147:12.

[263]   Ronen Dep. at 358:18-359:7.

[264]   Baldwin Dep. at 107:16-21.

264.     Baldwin had primary responsibility for approximately six clients in 2008.[265]

265.     Based on conversations with clients, Baldwin used her judgment to identify Council Members that were best suited to provide advice on specific client research request.[266]

266.     Baldwin's supervisor encouraged her to be independent in performing her job duties.[267]

267.     Baldwin's supervisor relied heavily on her input in deciding how to describe a client's project in GLG's computer system to attract qualified Council Members.[268]

268.     When Baldwin had a new client project, she often discussed with her supervisor her ideas about how to proceed, whether a survey was an appropriate product, or the best way to describe the project in Vega.[269]

269.     Although her supervisor generally communicated with Baldwin daily as a partner in their efforts to advise clients, he had great confidence in her from early on and deferred to her judgment regularly when they discussed her work for clients.[270]

270.     Baldwin's supervisor relied heavily on her input in deciding with her what products to recommend to clients.[271]

---

[265]   Baldwin Dep. at 108:1-6.

[266]   Schaefer Dep. at 63:24-65:3.

[267]   Baldwin Dep. at 129:8-13.  See also Baldwin 2008 Promotion Recommendation, Exh. 63 at Baldwin_00000924 ("Ashleigh was given the responsibility to assist her manager on managing the relationship with a client.  GLG's deal with **REDACTED** represents the largest in firm history.  To date, Ashleigh has executed on a number of requests and has received excellent feedback, including this from one of **REDACTED** analysts: 'Well organized, very efficient, and great service by Ashleigh and Todd.'").

[268]   Schaefer Decl. ¶ 6; Baldwin Dep. at 127:11-129:20 (admitting that she was unaware of Schaefer's confidence in her ability and had no basis to dispute his representations about the extent to which he accepted her recommendations).

[269]   Baldwin Dep. at 126:14-127:15.

[270]   Schaefer Decl. ¶ 3; Baldwin Dep. at 127:16-19; 129:4-20 (stating that she does not remember how often she had discussions with Schaefer but did not have grounds to dispute his representation of his reliance on her judgment).

[271]   Schaefer Decl. ¶ 2.

271.     Baldwin cannot recall ever proposing the use of a recruiting associate being rejected by her supervisor or by anyone else.[272]

272.     Baldwin's supervisor heavily relied on her input in deciding with her which Council Members to recommend to clients.[273]

273.     When Baldwin received client requests directly, she would let her supervisor know about it.[274]

274.     In some cases, her supervisor would just respond, "that's great."[275]

275.     In other cases, Baldwin would discuss with her supervisor the nature of the request and which Council Members might be appropriate for it.[276]

276.     Baldwin's supervisor relied heavily on her input in deciding with her how to define a project for a client and what products to recommend.[277]

277.     Baldwin did not need permission from her supervisor to select Council Members for survey participation, although she may have discussed selections with her supervisor.[278]

278.     When Baldwin's supervisor discussed with her how to design a survey or which Council Members to invite as respondents, he relied heavily on her input in making his ultimate recommendation.[279]

279.     Even when she was not creating a survey, Baldwin remained involved in the

---

[272]    Baldwin Dep. at 153:2-11.

[273]    Schaefer Decl. ¶ 4.

[274]    Baldwin Dep. at 123:21-124:8.

[275]    Baldwin Dep. at 124:9-13.

[276]    Baldwin Dep. at 124:9-12.

[277]    Schaefer Decl. ¶ 5; Baldwin Dep. at 120:5-11 (stating that she did not know the extent to which Schaefer relied on her suggestions for product recommendations to the client).

[278]    Baldwin Dep. at 229:17-22.

[279]    Schaefer Decl. ¶ 9; Baldwin Dep. at 228:22-229:1 (stating that she did now know to what extent her supervisor relied upon her proposed survey).

development process as the point person the survey team would come back to for follow-up that she would then communicate to the client and then again with the survey team.[280]

280.     Baldwin read the New York Times and Wall Street Journal to help her learn about the healthcare industry, better understand her clients' businesses, and speak intelligently with clients.[281]

281.     Baldwin does not believe there was a manual or guideline about how to perform the Research Associate job.[282]

282.     Although GLG had training materials called Greenies that highlighted some best practices for communicating effectively with clients and Council Members, they primarily focused on examples that others had encountered and Baldwin decided for herself which if any of the best practices included in the Greenies to use in any given situation.[283]

283.     Baldwin is not aware of manuals or other forms of written guidelines for Research Associates to use in selecting Council Members to recommend to clients.[284]

284.     There were no written guidelines or policies that advised Baldwin to seek a supervisor's approval in selecting Council Members.[285]

---

[280]   Baldwin Dep. at 223:15-22.

[281]   Baldwin Dep. at 359:4-23.

[282]   Baldwin Dep. at 153:17-154:1.

[283]   Baldwin Dep. at 153:12-157:20; Exh. 42 at GLG00000722.

[284]   Baldwin Dep. at 153:17-154:1.

[285]   Baldwin Dep. at 157:11-15.

**H.    Plaintiffs Also Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments.**

    **(i)    Plaintiff Cohen Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments.**

285.    Cohen regularly served as the face of the Company and the primary point of contact for the clients with whom he worked, including up to 28 of his own clients for which he had primary responsibility to provide advice on research projects and promote GLG each day.[286]

286.    Cohen had responsibility for facilitating the research projects of those clients for which he had primary responsibility.[287]

287.    Cohen also assisted clients for which his manager, Todd Johnson, or other members of the TMT team had primary responsibility.[288]

288.    Cohen also represented GLG during face-to-face meetings with clients, including meetings that he conducted independently to better understand their investment strategies and to promote GLG's services.[289]

289.    Cohen also represented GLG by interacting directly with clients in hosting

---

[286]    Cohen Dep. at 178:19-179:16, 192:21-195:10, 200:23-201:4; T. Johnson Email to Cohen dated 11/06/2007 (bates-labeled GLG00001879-80), attached as Exh. 64 (referencing a sporting event that Cohen attended with clients); Points of Emphasis document sent by Cohen to Brad Spiegel for purpose of drafting business school recommendation letters (bates-labeled GLG00002006-08), attached as Exh. 75, at 2006 (stating that Cohen covered "way more accounts then [the] avg. RA"); Cohen Dep. at 276:23-277:7, 279:4-17 (confirming that this document is truthful, accurate, and relates to Cohen's duties as a Research Associate).

[287]    Cohen Dep. at 277:13-22, 259:15-260:7.

[288]    Cohen Dep. at 202:10-17, 214:19-22, 218:11-219:3; Exh. 46 at GLG00001982 ("I covered meetings for colleagues at Clients I'm not actively involved with  . . . [and] helped manage the Queue and picked up numerous projects for teammates."); T. Johnson email to Cohen (bates-labeled GLG00001915), attached as Exh. 65 (indicating Cohen covering for his manager T. Johnson); T. Johnson email to Cohen (bates-labeled GLG00001925), attached as Exh. 66 (same); T. Johnson email to Cohen (bates-labeled GLG00001936), attached as Exh. 67 (same).

[289]    Cohen Dep. at 194:17-195:10.

Education Seminars, Roundtable luncheons, and Custom Research Trips.[290]

290.     Cohen sometimes served as the primary host of live meetings between clients and Council Members.[291]

291.     Cohen also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[292]

    (ii)     **Plaintiff Ronen Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments.**

292.     Ronen communicated directly with clients both telephonically and by e-mail.[293]

293.     Ronen had the discretion to entertain clients without the presence of his manager.[294]

294.     Ronen represented GLG by interacting with clients and Council Members in hosting private visits, classes, seminars and roundtables.[295]

295.     Ronen reviewed Council Members' invoices to ensure that they were consistent with project requirements.[296]

296.     Ronen approved payments to GLG Council Members.[297]

297.     Ronen also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[298]

---

[290]   Cohen Dep. at 183:7-184:6, 230:7-8.

[291]   Cohen Dep. at 229:17-230:19, 295:15-296:7; Exh. 29 at GLG00000001.

[292]   Johnson Dep. at 82:22-24; Mehlhorn Dep. at 49:21-53:4.

[293]   Ronen Dep. at 92:15-93:4.

[294]   Ronen Dep. at 200:14-201:5.

[295]   Ronen Dep. at 358:7-11.

[296]   Ronen Dep. 152:24-153:6.

[297]   Ronen Dep. at 152:24-153:6; 359:8-17; Dille Dep. at 101:18-22 (stating that Ronen did not need her approval to approve a Council Member's request for payment for services rendered); Ronen Dep. at 454:4-16.

[298]   Mehlhorn Dep. at 49:21-53:4.

###### (iii)   Plaintiff Baldwin Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments.

298.     Baldwin represented GLG by interacting with clients and Council Members in hosting private visits, classes, seminars and roundtables.[299]

299.     Baldwin reviewed Council Members' invoices to ensure that they were consistent with project requirements.[300]

300.     Within a few weeks of starting a GLG, Baldwin was making what GLG refers to as a "give to clients" – the recommendation to a client as to which Council Members may be most appropriate for their project.[301]

301.     Baldwin appreciated the freedom given to her by her supervisor to do her own "gives" – recommendation to clients as to Council Members – within two weeks after joining GLG.[302]

302.     Baldwin approved payments to GLG Council Members.[303]

303.     Baldwin also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[304]

###### I.   Plaintiffs Also Exercised Independent Judgment And Discretion By Developing or Implementing Management Policies And Operating Practices.

###### (i)   Cohen Exercised Independent Judgment And Discretion By Developing or Implementing Management Policies And Operating Practices.

304.     Cohen's duties also included working on corporate initiatives to develop and

---

[299]   Baldwin Dep. at 181:20-22.

[300]   Baldwin Dep. at 219:8-12.

[301]   Baldwin Dep. at 110:8-11.

[302]   Exh. 11 at GLG00004658.

[303]   Baldwin Dep. at 219:13-15.

[304]   Mehlhorn Dep. at 49:21-53:4.

strengthen GLG's business position, including when he took "the lead in the development of better tools through technology to help service [GLG's] ever-changing client base," and when he assisted GLG in automating its web-based research platform in a manner that assisted clients in drafting certain project descriptions.[305]

305.    Cohen also was responsible for GLG's initiatives in "customiz[ing] Conference marketing template [ ] email," "design[ing] the New Council Member email," and "creat[ing] a recently successful template highlighting Project Specialists for Private Equity."[306]

306.    As part of enhancing GLG's services, Cohen educated his peers through GLG's TMT Knowledge Initiative, which involved researching a technology, preparing a presentation, and presenting his findings to the TMT group.[307]

307.    Cohen participated in GLG's Long Only Working Group ("LOWG") to generate client service initiatives and develop best practices for providing client service specifically to long-only asset managers.[308]

308.    Cohen served as a Multi-Sector Research ("MSR") Liaison, which required him to provide highlights of the TMT industry to help GLG's MSR group manage key information for the TMT industry.[309]

---

[305]   Exh. 44 at COHEN 0139; Cohen Dep. at 152:17-22, 153:15-154:17.

[306]   Exh. 36 at GLG00001983 (Cohen acknowledging that he was responsible for "customiz[ing] Conference marketing template [ ] email," "design[ing] the New Council Member email," and "creat[ing] a recently successful template highlighting Project Specialists for Private Equity").

[307]   Cohen Dep. at 358:21-359:5; Johnson Dep. at 91:6-17; TMT Knowledge Initiative "Middleware" Presentation by Cohen (bates-labeled GLG00000090-100), attached as Exh. 68; TMT Knowledge Initiative "May TMT Wrap Up" Presentation by T. Johnson and Cohen (bates-labeled GLG00000101-29), attached as Exh. 69.

[308]   Cohen Dep. at 264:13-265:20; Johnson Dep. at 69:17-25, 70:12-21; Exh. 56 at GLG00002012; Cohen 2008 Self-Evaluation (bates-labeled GLG000000070-71), attached as Exh. 70, at GLG000000070; Broadening the Product Portfolio document (bates-labeled GLG 1843-44), attached as Exh. 71 (noting Cohen's role in LOWG presentation); R. Matule E-mail to LOWG (bates-labeled GLG00001965-66), attached as Exh. 72 (assigning work to Cohen for the next meeting); P. Sullivan Email to LOWG (bates-labeled GLG00001972-73), attached as Exh. 73 (discussing Cohen's contributions to LOWG meeting).

[309]   Exh. 70 at bates-labeled GLG00000070-71; Cohen Email to I. Islam (bates-labeled GLG00001832), attached

309.    Because of Cohen's demonstrated "management skills," he was given the responsibility to manage the TMT group's only summer intern during the summer of 2008.[310]

310.    Cohen devoted 30 to 45 minutes per day to managing the TMT intern, which included developing projects that were important to the TMT group, meeting with the intern to outline daily tasks, and providing mentoring.[311]

311.    Cohen participated in initiatives within the TMT group to help formulate and implement that group's long- and short-term business objectives, including tracking and aggregating the TMT team's data in order to "generate account balancing reports, client usage breakdowns, and other relevant reports for senior management."[312]

312.    Cohen identified and circulated best practices to GLG's TMT Management for consideration and made recommendations for business initiatives.[313]

313.    Cohen worked on an internal initiative called "Strengths, Weaknesses, Opportunities, and Threats" (or "SWOT") analyses that GLG used to identify optimal experts for various companies within the TMT industry.[314]

---

as Exh. 74 (providing TMT updates for the MSR team); Cohen Dep. at 299:16-17; Exh. 46 at GLG00001982 ("I actively work with Matt Ronen of MSR on his more difficult TMT related projects.").

[310]    Exh.56 at 2013; Cohen Dep. at 266:22-267:7, 278:2-12; Exh. 75 at bates-labeled GLG00002008) ("Managing the summer internship program within TMT and played a leadership role in organizing the entire group [of interns in other GLG groups] . . . ."); Exh. 45 at GLG00000086-87 ("I worked hard to create responsibilities that benefited our team in the short term while teaching the intern about our industry, client base, career search tactics, and resume construction.  By striving to meet our team objectives along with his individual objectives[,] we derived a strong mutual benefit and excellent outcome.").

[311]    Cohen Dep. at 267:10-24, 299:16-17; Cohen's Linked-in Resume (bates-labeled GLG00000010-11), attached as Exh. 76, at GLG00000010 ("Supervised summer internship program, by developing training materials and providing a comprehensive timeline of expected production and contribution."); Exh. 31 at COHEN 0083 (same); Essay Two for Admission to the Georgetown MBA Program (bates-labeled COHEN 0121-23), attached as Exh. 77 (discussing the leadership skills Cohen displayed in managing the internship program).

[312]    Cohen Dep. at 357:23-358:16; Cohen Letter to Park Sutton Advisors (seeking consideration for Analyst position) (bates-labeled COHEN 0149), attached as Exh. 78.

[313]    T. Johnson E-mail to Cohen (bates-labeled GLG00002048-50), attached as Exh. 79; T. Johnson E-mail to Cohen (bates-labeled GLG00002060-61), attached as Exh. 80.

[314]    Exh. 29 (bates-labeled GLG00000001).

314.     Cohen developed for GLG an online resource called "Bigdough," which gathered information on individual analysts – including hedge funds, asset managers and private equity firms – to help provide them with better service.[315]

315.     Cohen was "very happy and proud to know that [he] played a part in advancing [GLG's] systems to drive revenue growth for the firm" through the Bigdough idea that he developed.[316]

316.     Cohen helped formulate and implement a new function for GLG's computer systems that integrated information from clients' public filings with the SEC (the "13F" reports) into GLG's client-knowledge database to generate customized recommendations and other valuable information regarding clients' investment positions.[317]

317.     Cohen "led the way" in advocating for and assisting with the 13F project.[318]

**(ii)     Ronen Exercised Independent Judgment And Discretion By Developing or Implementing Management Policies And Operating Practices.**

318.     Ronen took a "proactive role in team and firm wide initiatives," which included being an active member of GLG's Research Management Professional ("RMP") working group and working on company initiatives related to Research Associate call plans and a method for

---

[315]   Cohen Dep. at 345:2-346:15; Exh. 43 at COHEN 0124-26; Exh. 31 at COHEN 0083; Exh. 29 at COHEN 0124-25 ("After a conversation with one of my colleagues I realized that they had been utilizing a resource called Bigdough, which is designed to gather intelligence on individual analysts to help provide them with better service. . . .  I realized this type of information would provide my colleagues and I with better, more actionable data to win bigger projects from our less informed clients.  From there, I began identifying resources within [TMT] that aligned most closely with our client's portfolios.  My boss and I saw immediate returns to this exercise and found our conversations with new and less active clients more productive. . . .  I [met] with our product development team to implement these resources into our growing proprietary software system. . . . [Eventually, my] suggestions ended up being incorporated in the development teams most recent systems update a few moths ago.").

[316]   Cohen Dep. at 349:19-350:1; Exh. 43 at COHEN 0124; Cohen Dep. at 346:2-4 ("Q: So [Bigdough] was an idea that you originated; is that correct?   A: Yes.").

[317]   Cohen Dep. 303:11-304:21, 347:15-18; Exh. 31 at COHEN 0083).

[318]   Exh. 70 at GLG00000070; Exh. 43 at COHEN 0124-25; Johnson Dep. at 90:5-18 (discussing the significance of Cohen's contributions to the 13F project).

systematically identifying Council Members with whom clients did not have positive experiences.[319]

319.     According to David Temple, "[b]ecause of [Ronen's] understanding of [GLG's] products, he was selected to be a member of [GLG's] Research Management Platform working group, which oversees the development of [GLG's] client-facing online system."[320]

320.     Ronen worked on a GLG initiative to "standardize ways to call clients" and improve GLG's business.  In connection with this initiative, Ronen authored a document entitled "Execution: Making the Most of Monthly Client Outreach,"  was circulated to the MSR team and used as a training tool.[321]

321.     According to Ronen, "[m]aximizing the efficacy of client outreach is a function of strategic thinking and diligent processes.  In the end, your efforts will pay dividends and allow you to focus on the main reasons we started the calling plan: to drive usage and build strong, loyal relationships with our clients."[322]

322.     Ronen also formulated and proposed to GLG management an initiative called the Council Member "2-Strike Rule," which was intended to be a process for Research Associates to systematically identify those Council Members with whom clients did not have positive interactions.[323]

323.     Ronen viewed the "2-Strike Rule" as an important concept for GLG to adopt in

---

[319]   Exh. 49 at GLG0004928-29; Ronen Dep. at 131:23-139:15.

[320]   Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Exh. 33 at GLG00004679; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 53 are true and accurate).

[321]   Ronen Dep. at 133:7-136:1; 163:15-165:18; August 20, 2008 email correspondence from Ronen attaching document entitled "Execution: Making the Most of Monthly Client Outreach" (bates-labeled RONEN_0000001174-1186), attached as Exh. 81 at RONEN_0000001175.

[322]   Exh. 81 at RONEN_0000001184.

[323]   Ronen Dep. at 136:4-139:4.

that it would add a layer of quality control to clients' interactions with Council Members and assist in the future marketing of GLG's network.[324]

324.    Ronen proposed the "2-Strike Rule" to management and "was soon placed in charge of a working group, a unique and rare responsibility for [his] position, and [was] tasked with testing and implementing [his] solution." [325]

325.    According to Ronen, in the months following his proposal he "imparted his energy and vision on a team of engineers and employees from sales, marketing, and research to successfully implement [his] innovative solution—an automated system that, without disrupting existing research workflows, seamlessly removes poor performing experts from the network."[326]

326.    As a result of this proposal, according to Ronen, "research quality has measurably improved and [GLG] now markets itself not only as the largest expert network on Wall Street, but also the premium expert network, a significant differentiator from [GLG's] competitors."[327]

327.    In support of his application for admission to Cornell University's Johnson School of Business, Ronen wrote an essay regarding the "2 Strike Rule" in response to the following requested topic:  "Describe your greatest professional achievement and how you were

---

[324]    Ronen Dep. at 138:12-139:9, 169:10-172:21; July 30, 2008 e-mail from Ronen setting forth proposal for "2-Strike Rule" (bates-labeled GLG00004931-4934), attached as Exh. 82; August 13, 2008 e-mail correspondence from Ronen (bates-labeled GLG00004935-4939), attached as Exh. 83, at GLG00004936 ("By marketing our Councils as selective and Council membership contingent upon quality, we will be able to better position ourselves as the premium expert network."); Ronen Dep. 179:4-13 (confirming that he authored Exh. 83 and that its contents are true and accurate);

[325]    Ronen's Application for Admission to the Kellogg School of Management (bates-labeled RONEN01174-1202), attached as Exh. 81 at RONEN 01186; Ronen Dep. at 223:7-224:11 (confirming that the contents of Exh. 81 are true and accurate).

[326]    Ronen's Application to the Yale School of Management, Essay #2 (bates-labeled RONEN 01234-1260), Exh. 84 at RONEN 01257-58; Ronen Dep. at 186:17-22 (authenticating Exh. 84, his application to Yale); 179:17-182:23 (confirming that he completed and submitted applications to graduate programs, that the statements in all of his applications and essays are true and accurate, and that if there is a discrepancy between his deposition testimony and the contents of the applications, the contents of the applications are more likely to be accurate); 195:8-14.

[327]    Exh. 84 at RONEN01257-58; Exh. 81 at RONEN 01187 (same); Ronen Dep. at 224:12-23 (confirming that the statement at RONEN 01187 of Exh. 81 is true and accurate).

able to add value to your organization."[328]

328.    Ronen considered the "2 Strike Rule" initiative to be an important achievement

and one that added value to GLG.[329]

> ### (iii)    Baldwin Exercised Independent Judgment And Discretion By Developing or Implementing Management Policies And Operating Practices.

329.    Baldwin expanded her role by collaborating with colleagues to develop a FAQ

sheet for clients.[330]

330.    The sheet was designed to "smooth project starts and communication between

GLG RMs and new [client] analysts who are unsure of how to best use us."[331]

331.    Baldwin participated in managing her team's work flow throughout the day.[332]

332.    Baldwin participated in the training of a new Research Associate, Amy

Ottensmeyer.[333]

## III.    GLG ELIMINATED THE RESEARCH ASSOCIATE POSITION AND TEMPORARILY PAID OVERTIME TO SOME REMAINING RESEARCH ASSOCIATES OTHER THAN THE PLAINTIFFS.

333.    After developing the Research Associate position in 2006, GLG officially

launched the position in 2007.[334]

334.    In the Fall of 2008, as part of a much larger organizational restructuring, GLG

---

[328]    Exh. 40 at RONEN 01113-14; Ronen Dep. at 210:20-211:3 (confirming that the contents of Exh. 40 are true and accurate).

[329]    Ronen Dep. at 211:9-212:6.

[330]    Baldwin's 2008 Self-Evaluation (bates-labeled GLG00004655), attached as Exh. 85.

[331]    Exh. 85 at GLG00004655.

[332]    Exh. 63 at BALDWIN_00000924; Schaefer Dep. at 93:11-96:22

[333]    Exh. 24 at GLG00004665.

[334]    Mehlhorn Dep. at 86:12-20.

decided to phase-out the Research Associate position.[335]

335.    As part of the reorganization, GLG phased-out the Research Associate position in a process that began in the fall of 2008 and ended in July 2009, which included promoting some high performers (including Plaintiffs) into the different position of Research Manager.[336]

336.    Cohen was promoted to a Research Manager position.[337]

337.    Ronen was promoted to a Research Manager position.[338]

338.    Baldwin was promoted to a Research Manager position.[339]

339.    Research Associates who were not promoted by late-2008 either "finish[ed] their predefined career . . . [or] were promoted into research management" in the first half of 2009.[340]

340.    The dozen or so individuals who were not promoted or laid off at the end of 2008 remained in the temporary position of Research Associate for several months in 2009.[341]

## IV.    COHEN'S "MASS DELETION" CONSTITUTED SPOLIATION OF EVIDENCE.

341.    During his employment with GLG, Cohen was provided access to and use of one of GLG's computers for performing his job duties and responsibilities.[342]

342.    Cohen received, read, understood, and agreed to comply with GLG's policies concerning access to and use of GLG information technology assets, including those policies that expressly prohibited the destruction of any GLG property, including its network and e-mail systems, and any and all electronic files written, sent, received or stored on GLG's network, hard

---

[335]   Mehlhorn Dep. at 86:12-22, 89:9-90:2, 98:7-106:18, 257:9-18 (further explaining the decision to phase-out the Research Associate position).

[336]   Mehlhorn Dep. at 86:23-88:11, 92:23-94:6, 94:15-95:23, 96:8-106:18.

[337]   Cohen Dep. at 62:4-66:13.

[338]   Ronen Dep. at 56:3-13.

[339]   Baldwin Dep. at 47:7-9.

[340]   Mehlhorn Dep. at 86:23-88:11, 89:9-90:2.

[341]   Mehlhorn Dep. at 256:16-258:12.

[342]   Cohen Dep. at 99:3-12.

drives, and e-mail systems.[343]

343.     Cohen also received, read, understood, and agreed to comply with GLG's policies prohibiting employees from installing personal hardware, software, or data on GLG computers, invading data files, causing harm to GLG's computer systems, or violating computer system security.[344]

344.     Cohen expressly affirmed his understanding of and agreement to comply with these policies in writing on at least two occasions, and he also testified that he understood that the hard drive (and its contents) of the computer that he was assigned at GLG and GLG's network drives and their contents belonged to GLG.[345]

345.     During the course of his employment with GLG, Cohen created Microsoft Word documents, Microsoft Excel documents, Portable Document Format ( "PDF") documents, e-mail messages and other electronic documents (collectively "electronic files") using the GLG computer assigned to him, and he stored these files on both the hard drive inside his assigned computer and on a network drive on GLG's network.[346]

346.     The electronic files that Cohen created included both business-related electronic files and what he characterized as "personal" e-mail messages and electronic files.[347]

347.     The business-related and "personal" electronic files that Cohen created and/or

---

[343]   Cohen Dep. at 97:20-99:12, 101:18-116:20; of GLG's Employee Policies, last updated August 2008 (bates-labeled GLG0000410-49), attached as Exh. 86; GLG End User Computing Policies (bates-labeled GLG00000333-53), attached as Exh. 87; GLG Intellectual Property, Confidentiality, and Non-Competition Agreement signed by Cohen (bates-labeled GLG000000083-88), attached as Exh. 88.

[344]   Cohen Dep. at 97:20-99:12, 101:18-116:20; Exh. 86 at GLG00000410; Exh. 13 at GLG00000029-63;  Exh. 87 GLG00000333-53; Exh. 88 at GLG000000083-88.

[345]   Cohen Dep. at 104:1-105:1; Cohen Signed Verification (bates-labeled GLG00000021), attached as Exh. 89 (acknowledging receipt of and compliance with, inter alia, GLG's computer-related employment policies); Exh. 14 at GLG000000074 (same).

[346]   Cohen Dep. at 99:3-7, 116:5-23.

[347]   Cohen Dep. at 93:10-15, 97:8-12, 99:3-22, 109:8-14, 116:5-23.

stored on the hard drive and on one of GLG's network drives included documents with information relevant to the claims and defenses in this action.[348]

348.     In or about December 2008, Cohen prepared a document on his work computer in which he framed certain questions to discuss with potential counsel concerning the lawsuit that he was thinking about filing against GLG.[349]

349.     Commencing in or about January 2009, Cohen was in discussions with fellow GLG Research Associates Matt Ronen and Rachel Hoffheimer regarding the possibility of pursuing claims against GLG.[350]

350.     By March 2009, Cohen was communicating with his current counsel about potential claims against GLG.[351]

351.     Cohen testified that, before his last day of employment at GLG, he used the GLG computer assigned to him to forward to his personal e-mail account electronic files that he did not want GLG to see and which he wanted to continue to have access to after his employment ended, including files that he believed would support his claims in this action.[352]

352.     After forwarding electronic files from his GLG assigned computer to his personal email account, but before his employment at GLG ended, Cohen performed a "mass deletion" of all the electronic files on the hard drive of his GLG assigned computer and on one of GLG's network drives.[353]

---

[348]   Cohen Dep. at 99:3-101:16. See Questions to Ask document (bates-labeled GLG00002065), attached as Exh. 90.

[349]   Cohen Dep. at 45:17-46:2, 51:11-15; Exh. 90 at GLG00002065.

[350]   Cohen Dep. at 67:1-71:1, 78:17-86:20.

[351]   Cohen Dep. 83:23-84:10.

[352]   Cohen Dep. at 75:15-77:20, 107:14-19.

[353]   Cohen Dep. at 88:15-20 ("Q: Do you remember when you went into your computer and deleted  your – and attempted anyway, to delete your entire memory on your C-drive and your H-drive?   A: . . . Before I left."), 91:12-91:21 ("Q: Did you delete each document one document at a time or did you delete –   A: It was a mass

353.     Cohen performed the "mass deletion" intentionally.[354]

354.     Cohen performed this "mass deletion" with the objective of preventing GLG from having access to the electronic files after his employment ended and he had brought this lawsuit against GLG.[355]

355.     When Cohen executed his "mass deletion," he did not make any effort to limit the scope of his deletion to what he believed to be "personal" e-mail messages, documents or files.[356]

356.     Among the electronic files that Cohen deleted were electronic files containing proprietary business information and data, business records, and other property of GLG.[357]

357.     Cohen performed the "mass deletion" without requesting or receiving authorization from anyone at GLG to do so.[358]

358.     Less than two weeks after completing the "mass deletion" of the electronic files on his hard drive and one of GLG's network drives, Cohen filed this lawsuit against GLG.[359]

359.     GLG has not been able to fully recover or restore the hard drive and the electronic files previously stored therein to their condition prior to the "mass deletion."[360]

360.     Shortly after filing this lawsuit, Cohen revised the information listed on both his

---

deletion.   Q: . . . [W]hat was within the scope of the mass deletion[ ] . . . ?   A: [A]ll files."), 97:8-12 ("Q: Do you know whether in the course of your – on the deletions, you    deleted work-related e-mails?   A: It's possible I did.  Like I said, I don't remember . . . .  It was a mass deletion.").

[354]   Cohen Dep. at 88:15-18, 91:12-22.

[355]   Cohen Dep. at 77:9-20, 88:21-24, 99:3-101:16.

[356]   Cohen Dep. at 93:10-15.

[357]   Cohen Dep. at 93:10-15 ("Q: Among the Word and pdf documents, were there any documents that were GLG documents?   A: More than likely.   Q: Did you make any effort to limit the scope of your deletion to the non-GLG documents?   A: Like I said before, is a mass deletion."), 97:8-12, 99:3-22, 109:8-14, 116:5-23.

[358]   Cohen Dep. at 97:24-98:5, 98:13-99:5.

[359]   Complaint, dated May 5, 2009.

[360]   Declaration of Rudi Peck ("Peck Decl.") at ¶ 3.

Facebook and Linked-In websites, including his descriptions of his employment with GLG.[361]

361. Cohen failed to preserve copies of the information listed on his Facebook and Linked-In websites, including his descriptions of his employment with GLG, before he changed them.[362]

Dated:  March 11, 2011             Respectfully submitted,
        New York, New York

                                   BY:   /s/ Michael J. Puma
                                   Andrew J. Schaffran (AS-1236)
                                   MORGAN, LEWIS & BOCKIUS LLP
                                   101 Park Avenue
                                   New York, New York 10178-0060
                                   (212) 309-6000
                                   (212) 309-6001 (fax)

                                   Michael J. Puma (MP-5573)
                                   Blair J. Robinson (*admitted pro hac vice*)
                                   MORGAN, LEWIS & BOCKIUS LLP
                                   1701 Market Street
                                   Philadelphia, PA 19103-2921
                                   (215) 963-5000
                                   (215) 963-5001 (fax)

                                   Counsel for Defendant
                                   Gerson Lehrman Group, Inc.

---

[361]   Cohen Dep. at 134:21-135:2.

[362]   Cohen Dep. at 135:10-20.