**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------- x
JEFFREY COHEN, on behalf of himself     :
individually, and on behalf of all similarly     :
situated employees,     :
    :
               Plaintiffs,     :       No. 09 Civ. 4352 (PKC)
    :
        v.     :
    :
GERSON LEHRMAN GROUP, INC.,     :
    :
               Defendant.     :
    :
-------------------------------------------------------------- x

**PLATINFF'S LOCAL RULE 56.1 COUNTER-STATEMENT OF MATERIAL FACTS IN**
**OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**THOMPSON WIGDOR & GILLY LLP**

Douglas H. Wigdor
Gregory N. Filosa
85 Fifth Avenue
New York, NY 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@twglaw.com
gfilosa@twglaw.com

*COUNSEL FOR PLAINTIFFS*

Pursuant to Local Rule 56.1 for the Southern District of New York and in response to the

Rule 56.1 Statement of Defendant, Plaintiff Jeffrey Cohen ( "Plaintiff Cohen" or "Mr. Cohen"),

Matthew Ronen ("Plaintiff Ronen" or "Mr. Ronen") and Ashleigh Baldwin ("Plaintiff Baldwin"

or "Ms. Baldwin") (collectively, "Plaintiffs") by their attorneys, Thompson Wigdor & Gilly

LLP, submit the following counter-statement of material facts in dispute, which demonstrates

that there are genuine issues as to material facts, requiring a trial in this matter:

## I.    GERSON LEHRMAN GROUP'S BUSINESS[1]

1.    Plaintiff Jeffrey Cohen ("Cohen") describes GLG as "the world's largest and best

qualified marketplace for subject matter expertise."[2]

**RESPONSE:**    Undisputed for purposes of this motion.[3]

2.    GLG's clients seek to communicate with experts to gain expertise on particular

subjects.[4]

**RESPONSE:**    Undisputed for purposes of this motion.

3.    GLG provides expert advisory services to clients in the financial services industry

and various other industries through a network of over 200,000 subject matter experts known as

GLG Council Members.[5]

---

[1]    For ease of reference, Plaintiffs have duplicated herein the headings used in Defendant's Local Rule 56.1 Statement of Undisputed Material Facts in Support of its Cross-Motion for Summary Judgment, but Plaintiffs do not admit the substance of any headings or agree in that they appropriately characterize the statements in Defendant's Local Rule 56.1 Statement of Undisputed Material Facts.

[2]    Cohen's Essay for Admission to the Cornell MBA Program (bates-labeled COHEN 0108-0110), attached as Exhibit ("Exh.") 1 to the Declaration of Michael J. Puma (all references herein to "Exh." are to Exhibits to this Declaration), at 108; Cohen's Essay One for Admission to the Georgetown MBA Program (bates-labeled COHEN 0118-0119), attached as Exh. 2, at COHEN 0118; Transcript of the Deposition of Plaintiff Jeffrey Cohen, dated August 28, 2009 ("Cohen Dep."), pertinent portions of which are attached as Exh. 4, at 334:15-22 (confirming that COHEN 0118-19 is truthful, accurate and relates to Cohen's duties as a Research Associate); Cohen's Essay One for Admission to the Babson MBA Program (bates-labeled COHEN 0132-0134), attached as Exh. 3, at COHEN 0132; Cohen Dep. at 320:12-321:21 (confirming that COHEN 0132-34 is truthful, accurate and relates to Cohen's duties as a Research Associate).

[3]    All statements of fact not controverted herein are "admitted" solely for purposes of this Counter-Statement of Material Facts in opposition to Defendant's Cross-Motion for Summary Judgment.

[4]    Transcript of the Deposition of Ashleigh Baldwin, dated December 7, 2010 ("Baldwin Dep."), pertinent portions of which are attached as Exh. 5, at 92:5-8.

**RESPONSE:**        Undisputed for purposes of this motion.

4.      GLG connects its clients with experts who can provide knowledge and discuss an industry, company or core topic.[6]

**RESPONSE:**        Undisputed for purposes of this motion.

5.      GLG's Council Members, who perform research and provide expertise for GLG's clients, include former CEOs, former government officials, economists, physicians, scientists, engineers, and academics.[7]

**RESPONSE:**        Undisputed for purposes of this motion.

6.      GLG's Council Members have "signed [GLG's] terms and conditions and agreed to participate in [GLG's] network according to [its] terms. [The Council Members] still have to give additional approval every time they agree[ ] to a specific project."[8]

**RESPONSE:**        Undisputed for purposes of this motion.

7.      GLG's clients paid GLG for services provided by GLG's Council Members (subject matter experts).[9]

**RESPONSE:**        Undisputed for purposes of this motion.

8.      In contrast, GLG's clients were not invoiced for a Research Associate's time or services.[10]

**RESPONSE:**        Undisputed for purposes of this motion.

---

[5]      Transcript of the Deposition of Cohen's former supervisor, Todd Johnson, dated December 7, 2009 ("Johnson Dep."), pertinent portions of which are attached as Exh. 6, at 27:24-28:12; Transcript of the Deposition of GLG's Federal Rule 30(b)(6) witness Dmitri Mehlhorn, dated September 11, 2009 ("Mehlhorn Dep."), pertinent portions of which are attached as Exh. 7 at 77:24-84:2.

[6]      Baldwin Dep. at 90:7-10.

[7]      Declaration of Samuel Jacobs ("Jacobs Decl.") at ¶ 6.

[8]      Mehlhorn Dep. at 173:5-11.

[9]      Jacobs Decl. ¶ 5.

[10]      Jacobs Decl. ¶ 6.

9.      GLG's services agreements with clients and pricing guidelines for clients provide for pricing based upon the research and other expert services provided by GLG's Council Members, not the clients' interactions with research management professionals.[11]

**RESPONSE:**          Undisputed for purposes of this motion.

10.     GLG's clients typically have paid for the research by Council Members through a bi-annual subscription fee, the amount of which has varied based on the level of services requested.[12]

**RESPONSE:**          Undisputed for purposes of this motion.

11.     Most GLG clients were on an "OSP" subscription plan during the pertinent time period, meaning that they paid a flat fee per month rather than for each interaction with a Council Member.[13]

**RESPONSE:**          Undisputed for purposes of this motion.

12.     Clients of GLG can select among various subscription levels, and the number of phone consultations with Council Members and other services to which a client is entitled varies depending on the subscription level.[14]

**RESPONSE:**          Undisputed for purposes of this motion.

13.     GLG's Council Members, not Research Associates, are the individuals who have conducted the research and other services being purchased by GLG's clients.[15]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[11]      Jacobs Decl. ¶ 7.
[12]      Cohen Dep. at 248:24-249:11.
[13]      Jacobs Decl. ¶ 7.
[14]      Johnson Dep. at 35:8-20.
[15]      Baldwin Dep. at 92:16-18; Cohen Affidavit (Docket No. 13) at ¶¶ 4-5; Complaint ¶ 15; Memorandum of Law in Support of Cohen's Motion for Preliminary Certification (Docket No. 11) at 4-5.

14.     GLG offers its clients phone consultations with Council Members as well as more complex services, including Live Meetings (in-person meetings with one or more Council Members), Surveys (expert analysis in the aggregate based on feedback from a pool of GLG Council Members), Market Studies (surveys of consumers), Research Trips (site tours by Council Members), and Written Reports (specifically commissioned research reports).[16]

**RESPONSE:**          Undisputed for purposes of this motion.

## II.     PLAINTIFFS' COMPENSATION AND DUTIES AS RESEARCH ASSOCIATES FOR GLG SATISFIED THE ADMINISTRATIVE EXEMPTION TO THE FAIR LABOR STANDARDS ACT AND THE NEW YORK LABOR LAW

### A.  Background Information

#### (i)  Plaintiff Cohen's Employment By GLG

15.     Cohen worked for GLG in its New York City office from April 10, 2007 until he resigned effective April 24, 2009.[17]

**RESPONSE:**          Undisputed for purposes of this motion.

16.     Cohen served in the position of Research Associate in GLG's Technology, Media and Telecom ("TMT") group from April 10, 2007 until December 31, 2008.[18]

**RESPONSE:**          Undisputed for purposes of this motion.

17.     Effective January 1, 2009, GLG promoted Cohen to the position of Research Manager.[19]

**RESPONSE:**          Undisputed for purposes of this motion.

18.     Todd Johnson was Cohen's supervisor.[20]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[16]     Mehlhorn Dep. at 316:15-321:22; Jacobs Decl. ¶ 10.
[17]     Complaint (Docket No. 1.) ¶¶ 10, 14. Following his resignation from GLG, Cohen started attending the MBA Program at Georgetown's McDonough's School of Business. Cohen Dep. at 73:24-74:3.
[18]     Complaint ¶ 14.
[19]     Complaint ¶ 14.
[20]     Johnson Dep. at 28:5-29:20.

### (ii)   **Plaintiff Ronen's Employment By GLG**

19.     Plaintiff Matthew Ronen ("Ronen") worked for GLG as a Research Associate from March 2007 through December 31, 2008.[21]

**RESPONSE:**          Undisputed for purposes of this motion.

20.     Ronen worked as a Research Associate at GLG's New York City office.[22]

**RESPONSE:**          Undisputed for purposes of this motion.

21.     Effective January 1, 2009, GLG promoted Ronen to the position of Research Manager.[23]

**RESPONSE:**          Undisputed for purposes of this motion.

22.     Jacqueline Dille was Ronen's supervisor.[24]

**RESPONSE:**          Undisputed for purposes of this motion.

### (iii)   **Plaintiff Baldwin's Employment By GLG**

23.     After graduating from Wellesley College, Baldwin joined GLG on September 11, 2007.[25]

**RESPONSE:**          Undisputed for purposes of this motion.

24.     Baldwin worked as a Research Associate on the Boston Healthcare team.[26]

**RESPONSE:**          Undisputed for purposes of this motion.

25.     Effective January 1, 2009, GLG promoted Baldwin to the position of Research Manager.[27]

---

[21]      Transcript of the Deposition of Matthew Ronen, dated October 2, 2010 ("Ronen Dep."), pertinent portions of which are attached as Exh. 9, at 16:9-15.
[22]      Ronen Dep. at 25:16-19.
[23]      Ronen Dep. at 16:21-17:2.
[24]      Transcript of the Deposition of Jacqueline Dille ("Dille Dep."), pertinent portions of which are attached as Exh. 10, at 41:10-14; 53:16-19.
[25]      Baldwin Dep. at 26:22-27:6; Baldwin's 2007 Self-Evaluation (bates-labeled GLG00004658), attached as Exh. 11.
[26]      Baldwin Dep. at 62:2-11; Declaration of Todd Schaefer ("Schaefer Decl.") at ¶ 1.

**RESPONSE:**          Undisputed for purposes of this motion.

26.   Baldwin's supervisor was Todd Schaefer.[28]

**RESPONSE:**          Undisputed for purposes of this motion.

### B. Plaintiffs Were Each Paid A Salary In Excess Of $455 Per Week

### (i) Plaintiff Cohen Was Paid A Salary In Excess Of $455 Per Week

27.   As a Research Associate, Cohen was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of the work he performed each week.[29]

**RESPONSE:**          Undisputed for purposes of this motion.

28.   As a Research Associate, Cohen always received the same salary amount each week regardless of how many hours he worked.[30]

**RESPONSE:**          Undisputed for purposes of this motion.

29.   Cohen understood that his salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate him for all hours worked each week, even if they exceeded 40 hours per week.[31]

**RESPONSE:**          It is disputed that Mr. Cohen understood that his salary "was intended to compensate him for all hours worked each week, even if they exceeded 40 hours per week" as there is no support for this supposedly undisputed fact within the portion of Mr. Cohen's testimony cited by Defendant.  Otherwise the remainder of this statement is undisputed for purposes of this motion.

---

[27]   Baldwin Dep. at 47:4-9; 333:4-6.
[28]   Baldwin Dep. at 62:2-11.
[29]   Cohen Dep. at 22:6-12, 23:3-7, 28:4-29:24; GLG Compensation Summary for Cohen (bates-labeled GLG00000062), attached as Exh. 12 (confirming that Cohen's gross pay was over $1,972 per month).
[30]   Cohen Dep. 29:16-24.
[31]   Cohen Dep. at 29:1-24.

30.     Cohen understood that he would not be paid overtime for weeks when he worked over 40 hours per week.[32]

**RESPONSE:**          Undisputed for purposes of this motion.

31.     Cohen understood that he was not expected to work a fixed number of hours per week.[33]

**RESPONSE:**          Undisputed for purposes of this motion.

32.     Cohen understood that the number of hours he worked fluctuated from week to week, and that his salary was fixed and remained the same regardless of how many hours he worked each week.[34]

**RESPONSE:**          Undisputed for purposes of this motion, however, whether Mr. Cohen "understood that the number of hours he worked fluctuated from week to week" is immaterial to the instant matter.

33.     Cohen understood that he was expected to sometimes work through lunch and that he was expected to sometimes work evenings or weekends, and that he would not be paid overtime for working through lunch or on evenings or weekends.[35]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact as there is no reference to working through lunch or working evenings or weekends within the portion of Plaintiff Cohen's testimony cited by Defendant.

34.     Cohen understood that GLG's policy was that he would not be paid overtime for hours worked over 40 per week.[36]

---

[32]     Cohen Dep. at 30:1-24.
[33]     Cohen Dep. at 29:1-24.
[34]     Cohen Dep. at 29:1-24.
[35]     Cohen Dep. at 35:17-36:13.
[36]     GLG Employee Polices Manual (bates-labeled Cohen 0029-0063), attached as Exh. 13 at COHEN 0041-0042 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact as there is no reference to Plaintiff Cohen's understanding as to Defendant's policies among the evidentiary support cited by Defendant.

35.     During his employment with GLG, Cohen never once complained to his manager or anyone in human resources or management that he should have been paid overtime. [37]

**RESPONSE:**          Undisputed for purposes of this motion.

> **(ii)  Plaintiff Ronen Was Paid A Salary In Excess Of $455 Per Week**

36.     As a Research Associate, Ronen was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of his work.[38]

**RESPONSE:**          Undisputed for purposes of this motion.

37.     Ronen received the same salary amount each week regardless of how many hours he worked.[39]

**RESPONSE:**          Undisputed for purposes of this motion.

38.     Ronen understood that his salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate him for all hours worked each week, even if they exceeded 40 hours per week.[40]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of Plaintiff Ronen's deposition cited by Defendant in support of this statement.

39.     Ronen understood that he would not be paid overtime for weeks when he worked over 40 hours per week.[41]

---

break); Cohen's Handbook Acknowledgment Form (bates-labeled GLG000000074) attached as Exh. 14 (verifying that Cohen received GLG's Employee Policies Manual).
[37]     Cohen Dep. at 37:17-38:1.
[38]     Ronen Dep. at 17:22-18:13; 19:8-20:5; GLG Compensation Summary for Ronen (bates-labeled RONEN_000000941), attached as Exh. 15 (confirming that Ronen's gross pay was over $2,291 per pay period).
[39]     Ronen Dep. at 19:14-21:6; 27:20-28:1.
[40]     Ronen Dep. at 20:13-20:20.

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of Plaintiff Ronen's deposition cited by Defendant in support of this statement.

40.     Ronen understood that he was not expected to work a fixed number of hours per week.[42]

**RESPONSE:**          Undisputed that Plaintiff Ronen testified that "the expectation was that I got my work done," however, there is no support for the statement that Plaintiff Ronen understood that he was not expected to work a fixed number of hours per week in the portion of Plaintiff Ronen's deposition cited by Defendant.

41.     Ronen understood that the number of hours he worked fluctuated from week to week, and that his salary was fixed and remained the same regardless of how many hours he worked each week.[43]

**RESPONSE:**          Disputed.  There is no support for the assertions that Mr. Ronen understood that the number of hours he worked fluctuated from to week within the portion of Mr. Ronen's deposition cited by Defendant.  Otherwise, this statement is undisputed for purposes of this motion, however, this statement of undisputed fact is immaterial to the present motions.

42.     Ronen never once complained to his manager or anyone in human resources or management that he should have been paid overtime.[44]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[41]     Ronen Dep. at 30:1-14.
[42]     Ronen Dep. at 22:10-23:16; Exh. 13 at COHEN 0041-42 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch break); Ronen's Handbook Acknowledgement Form (bates-labeled RONEN_00000079) attached as Exh. 16 (verifying that Ronen received GLG's Employee Policies Manual).
[43]     Ronen Dep. at 20:7-12.
[44]     Ronen Dep. at 348:6-9.

### (iii)   **Plaintiff Baldwin Was Paid A Salary In Excess Of $455 Per Week**

43.     As a Research Associate, Baldwin was always paid a salary in excess of $455 per week, which did not vary based on the quantity or quality of her work.[45]

**RESPONSE:**          Undisputed for purposes of this motion.

44.     Baldwin always received the same salary amount each week regardless of how many hours she worked.[46]

**RESPONSE:**          Undisputed for purposes of this motion.

45.     Baldwin understood that her salary was being provided as compensation for all hours worked each week regardless of the number of hours worked, and that it was intended to compensate her for all hours worked each week, even if they exceeded 40 hours per week.[47]

**RESPONSE:**          Undisputed for purposes of this motion.

46.     Baldwin understood that she would not be paid overtime for weeks when she worked over 40 hours per week.[48]

**RESPONSE:**          Undisputed for purposes of this motion.

47.     Baldwin understood that the number of hours she worked fluctuated from week to week, and that her salary was fixed and remained the same regardless of how many hours she worked each week.[49]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[45]     Baldwin Hiring and Payroll Information (bates-labeled BALDWIN 0000000022), attached as Exh. 17 (showing that Baldwin's base salary was $50,000 per year).
[46]     Baldwin Dep. at 33:10-14; 34:7-10; 34:19-23.
[47]     Baldwin Dep. at 33:10-14.
[48]     Baldwin Dep. at 34:4-6. See also, Exh. 13 at COHEN 0041-42 (stating that GLG's office hours are 8:30 a.m. to 6 p.m., M-F, and that employees are allowed a one-hour lunch break); Baldwin's Handbook Acknowledgement Form (bates-labeled BALDWIN_00000024) attached as Exh. 18 (verifying that Baldwin received GLG's Employee Policies Manual).
[49]     Baldwin Dep. at 34:19-23; 376:8-377:2.

48.     Baldwin never once complained to her manager or anyone in human resources or management that she should have been paid overtime.[50]

**RESPONSE:**          Undisputed for purposes of this motion.

### C.  Plaintiffs' Performance Was Evaluated Based On Many Factors, Including Qualitative Factors

49.     Plaintiffs' performance as Research Associates was evaluated based on many factors, including qualitative measures such as quality of work, thoughtfulness of communications with clients, leadership, teamwork, and management of relationships with external clients.[51]

**RESPONSE:**          Undisputed for purposes of this motion, however, Plaintiffs aver that their productivity was the most important performance criteria.  *See* Pl.'s 56.1 Stmt. ¶¶ 48-56.

50.     Plaintiffs' Performance Evaluations stated that "[o]ne quarterly score for one category does not tell the full story of someone's performance. [Rather, GLG is] most interested in overall positive development for every professional in Research Management."[52]

**RESPONSE:**          Undisputed for purposes of this motion.

51.     According to Sam Jacobs, GLG's former Managing Director of Global Research Management, metrics were just one small part of how Research Associates were  evaluated; other factors, including client feedback, sales team feedback, peer feedback, the quality of their work, and their commitment to teamwork, were important in evaluating Research Associates.[53]

---

[50]     Baldwin Dep. at 285:6-13.
[51]     Mehlhorn Dep. at 126:22-127:11; Jacobs Decl. ¶ 14; Cohen's 2007 Performance Evaluation (bates-labeled GLG00000080-82), attached as Exh. 19; Cohen's 2008 Performance Evaluation (bates-labeled COHEN 0025-26), attached as Exh. 20; Ronen's 2007 Performance Evaluation (bates-labeled RONEN_000000050--54), attached as Exh. 21; Ronen's 2008 Performance Evaluation, attached as Exh. 22; Baldwin's 2007 Performance Evaluation (bates-labeled GLG004660), attached as Exh. 23; Baldwin's 2008 Performance Evaluation (bates-labeled GLG00004665), attached as Exh. 24.
[52]     Exh. 19 at GLG00000080; Exh. 21 at RONEN_000000050; Exh. 23 at GLG00004660).
[53]     Jacobs Decl. ¶ 14.

**RESPONSE:**        Disputed.  While these other performance factors may have been taken into account, it is disputed that performance and productivity metrics were "just one small part of how" Plaintiffs were evaluated.  *See* Pl.'s 56.1 Stmt. ¶¶ 48-56.  Further, the materiality of this statement is disputed given that Mr. Jacobs' testified that he has no personal knowledge of any of Plaintiffs' work performance during the period of time that they were employed as Research Associates.  *See* Deposition of Sam Jacobs, attached to the Declaration of Gregory Filosa ("Filosa Decl.") as Ex. D, at 36:15-37:24, 39:7-42:18.

52.    According to Mr. Jacobs, metrics were not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates; rather, metrics were only a small part of those decisions.[54]

**RESPONSE:**        Disputed.  The materiality of this statement is disputed given that Mr. Jacobs testified that he has no personal knowledge of any of the Plaintiff's work performance during the period of time that they were employed as Research Associates.  *See* Jacobs Dep. at 36:15-37:24, 39:7-42:18.  Further, Mr. Jacobs' testimony in his declaration is contradicted by documents produced in this matter which were created by him and placed a strong emphasis on these performance metrics.  *See* Pl.'s 56.1 Stmt. ¶¶ 58, 63-75.

53.    According to Mr. Jacobs, while the Active Users and Total Project Volume Metrics were considered one very rough proxy for a Research Associate's success in his or her promotional duties, as in increase in these metrics suggested that the Research Associate was expanding and/or deepening client relationships, they were not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates.[55]

---

[54]    Jacobs Decl. ¶ 15.
[55]    Jacobs Decl. ¶ 16.

**RESPONSE:** Disputed. The materiality of this statement is disputed given that Mr. Jacobs testified that he has no personal knowledge of any of the Plaintiff's performance during the period of time that they were employed as Research Associates. *See* Jacobs Dep. at 36:15-37:24, 39:7-42:18.

54. According to Mr. Jacobs, while the Member Programs Transaction Volume metric was considered one very rough proxy for a Research Associate's commitment to compliance because there was a benefit to GLG's compliance goals associated with clients using Council Members who were part of "Member Programs," this metric was not a controlling factor in decisions concerning salary, bonus, or promotions for Research Associates.[56]

**RESPONSE:** Disputed. The materiality of this statement is disputed given that Mr. Jacobs testified that he has no personal knowledge of any of the Plaintiff's performance during the period of time that they were employed as Research Associates. *See* Jacobs Dep. at 36:15-37:24, 39:7-42:18; *See* Pl.'s 56.1 Stmt. ¶¶ 58, 63-75.

55. Although GLG had available to it Total Project Volume data, this information "was only a fraction of [Cohen's] overall evaluation."[57]

**RESPONSE:** Disputed. As Mr. Cohen's 2008 performance evaluation, which was filled out by Mr. Johnson and Mr. Dzik, makes clear: "Jeff's strongest suit is his ability to deliver a high level of production." *See* Pl.'s 56.1 Stmt. ¶ 49.

56. Ronen's supervisor did not view the Member Programs Transaction Volume metric as a major factor in her evaluation of Ronen's performance.[58]

---

[56] Jacobs Decl. ¶ 17.
[57] Johnson Dep. at 138:14-23, 141:3-142:11 (explaining that although Total Project Volume data was available to GLG, it was not determinative of a Research Associate's success and, therefore, it was just one of many factors considered in evaluating a Research Associate); 173:3-20 (same), 174:2-17 (discussing what was important in evaluating Cohen's performance and the minimal role that total project volume data played in that assessment); Mehlhorn Dep. at 62:7-66:14 (same).
[58] Dille Dep. at 157:22-159:17; 163:7-24.

**RESPONSE:**         Disputed.  While Mr. Ronen's supervisor testified in this manner at her

deposition, as Mr. Ronen's 2008 performance evaluation makes clear, his productivity and

production was a key element of his overall performance:

> "Matt exceeded expectation in terms of his productivity this year; his [Total
> Project Volume] came out to an average of ~ 180 projects/month an this puts him
> in the very top tier of [Total Project Volume] Performers on the [Multi-Sector
> Research] team this year.  Matt also outperforms not only the average at GLG, but
> on the [Multi-Sector Research] team, win an average monthly 'Gold' number of
> over 80K (firm average is ~$50K and team average is ~$57K). . . .  Matt's
> productivity and ability to manage his time is something that we worked on quite
> a bit at the start of this year.  Matt took all the advice and structure he was
> provided to heart and rapidly turned around his performance in this area.  Matt
> now manages his time very well and this is apparent through his consistent
> completion of the calling plan, along with his other responsibilities . . ."

*See* Pl.'s 56.1 Stmt. ¶ 50.

57.     Ronen is "not sure" how GLG used metrics.[59]

**RESPONSE:**         Disputed.  Defendant has cited only a portion of Mr. Ronen's deposition

testimony and omitted the portion where Mr. Ronen testified that it was his understanding that

these metrics were used to rank GLG's Research Associates across their group or department.

*See* Deposition of Matthew Ronen ("Ronen Dep."), attached to Filosa Decl. as Ex. B, at 458:22-

549:3.

58.     Significant factors in Baldwin's performance and promotion assessments were

client feedback, sales feedback, peer feedback, the quality of Baldwin's work, and her

teamwork.[60]

**RESPONSE:**         Disputed to the extent that Defendant has omitted Ms. Baldwin's

productivity from among the "significant factors" considered by Ms. Baldwin's supervisor.  As

Ms. Baldwin's performance reviews make clear, the three significant areas of consideration were

---

[59]     Ronen Dep. at 458:22-459:3.
[60]     Schaefer Decl. at ¶ 13; Baldwin Dep. at 204:10-18 (stating that she did not know how much weight was give to factors such as client feedback).

(i) quality of service, (ii) productivity and (iii) usage volume and leadership and teamwork.  *See*

Pl.'s 56.1 Stmt. ¶ 48.

     59.    Client feedback was among the factors assessed when generating year-end

evaluations for Research Associates.[61]

**RESPONSE:**         Undisputed for purposes of this motion that client feedback was a factor

that was considered in the context of evaluating Plaintiffs' performance during the period of time

that they were employed as Research Associates.

     **D.**    **Plaintiffs' Primary Duties Included Advising GLG's Clients With Respect To Services To Be Performed By Council Members**

     **(i)**  **Plaintiff Cohen's Research And Advisory Duties**

     60.    Cohen had significant responsibilities relating to GLG's relationships with its

clients, including those clients for which he was assigned primary responsibility.[62]

**RESPONSE:**         Disputed.  Defendant mischaracterizes as Mr. Cohen testified, he "just

executed [GLG's clients'] project work."  *See* Deposition of Jeffrey Cohen ("Cohen Dep."),

attached to Filosa Decl. as Ex. A, at 193:24.  Mr. Cohen furthers testified at his deposition that

"[t]he majority of my time was spent doing conventional project work, which is facilitating

educational phone conversations for clients based on the Council Members in the network."  *See*

Cohen Dep. at 164:22-165:1.

---

[61]     Baldwin Dep. at 204:10-15.

[62]     Points of Emphasis document (sent by Cohen to Brad Spiegel for Spiegel to draft business school recommendation letters) (bates-labeled GLG00002052-59), attached as Exh. 25, at GLG00002055 ("The role of a Research Associate is one of the most integral responsibilities over the course of a relationship with each client at Gerson Lehrman Group."); Cohen Dep. at 286:7-287:3 (confirming that the Points of Emphasis document is a truthful and accurate representation of Cohen's duties as a Research Associate); Cohen Letter to Goldman Sachs (seeking consideration for Financial Analyst position) (bates-labeled COHEN 0144), attached as Exh. 28; Cohen Letter to Kingsley Associates (seeking consideration for Real Estate Analyst position) (bates-labeled COHEN 0147), attached as Exh. 26; Cohen Letter to Sverica International (seeking consideration for Financial Analyst position) (bates-labeled COHEN 0154), attached as Exh. 27.

61.     Cohen characterizes his primary duty as a Research Associate as "facilitating" research projects for GLG's clients.[63]

**RESPONSE:**          Undisputed for purposes of this motion

62.     Cohen was responsible for "facilitating projects, in a strategic manner, [for] some of the most difficult professionals on Wall Street."[64]

**RESPONSE:**          Undisputed for purposes of this motion

63.     Cohen's duties as a Research Associate included "manag[ing] primary research projects throughout various deal stages and diligence periods [for investment clients such as] private equity [firms], venture capital [firms], hedge fund[s] and long-only asset managers," as well as "[p]roprietary [t]rading [d]esks" and "[a]sset [m]anagement [c]ompanies." [65]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Mr. Cohen testified at his deposition: "The majority of my time was spent doing conventional project work, which is facilitating phone conversations for clients based on the Council Members in the network."  *See* Cohen Dep. at 164:22-165:1.

64.     As a Research Associate, Cohen was responsible for "provid[ing] primary research solutions for investment analysts looking to further develop their investment thesis."[66]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Mr. Cohen stated in his deposition, the majority of his time was spent facilitating phone conversations between GLG's clients and Council Members within its network.  *See* Cohen Dep. at 164:22-165:1.

---

[63]     Cohen Dep. at 164:17-18; June 2007 Cohen Resume (bates-labeled GLG00000001) attached as Exh. 29.

[64]     Exh. 25 at GLG00002055; Cohen Letter Seeking Consideration for Search Associate position (bates-labeled COHEN 0151), attached as Exh. 30 ("I actively engage members of our network to determine their knowledge base in order to facilitate diligence work between investment analysts and said subject matter experts. I really enjoy my daily work flow consisting of having high level discussions with incredibly bright individuals.").

[65]     Cohen Resume (bates-labeled COHEN 0083) attached as Exh. 31; Exh. 29 at GLG000000001.

[66]     Cohen Dep. at 328:23-329:7; Exh. 1 at COHEN 0108; Cohen Dep. at 327:22-24, 328:10-11 (confirming that Exh. 7 is truthful, accurate and relates to Cohen's tenure as a Research Associate); Mehlhorn Dep. at 166:2-172:12 (describing Cohen's duties in advising GLG's clients).

65.     Cohen was responsible for advising clients as to which Council Members "might have the experience and information that the client is looking for" and otherwise fulfilling time-sensitive research requests" for clients on a regular basis throughout the day, every day (or almost every day), during the time he was employed as a Research Associate.[67]

**RESPONSE:**          Undisputed for purposes of this motion.

66.     Cohen provided value to GLG's clients as a Research Associate, in part, by analyzing client requests for research services and then advising them as to which of GLG's Council Members were best qualified for the work.[68]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to admissible evidence as neither Mr. Jacobs nor Mr. Johnson has any personal knowledge of whether Mr. Cohen provided value to any of GLG's clients.

### (ii)   Plaintiff Ronen's Research And Advisory Duties

67.     Ronen's job duties included "deliver[ing] relevant and timely primary market research solutions to [his] clients at hedge funds, investment banks, and PE/VC [private equity/venture capital] firms."[69]

**RESPONSE:**          Undisputed for purposes of this motion.

68.     According to David Temple, Ronen had an "[e]xcellent grasp of [a] very broad set of topics/industries that help[ed] him deliver first rate research on all his projects."[70]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[67]     Cohen Dep. at 164:20-166:7.
[68]     Jacobs Decl ¶ 4; Johnson Dep. at 174:2-175:22.
[69]     Ronen's Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled RONEN 01127-73), Exh. 32, at RONEN 01138; Ronen Dep. at 217:10-20 (confirming that the contents of Exh. 32 are true and accurate); 220:12-22 (confirming that the statement in RONEN_0000138 of Exh. 32 is true and accurate).
[70]     David Temple's Recommendation Letter in Support of Ronen's Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled GLG00004677-4680), attached as Exh. 33, at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).

69.     As a Research Associate, Ronen collaborated directly with analysts and industry experts to provide consultations and customized reports to clients.[71]

**RESPONSE:**     Undisputed for purposes of this motion, however, Mr. Ronen's primary duty as a Research Associate was to assist GLG in providing its clients access to its network of experts.  *See* Ronen Dep. at 82:8-83:8.

70.      Ronen viewed himself as an "outsourced qualitative analyst" who worked "on the front lines at a firm that has revolutionized investment research . . . ."[72]

**RESPONSE:**     Plaintiffs do not dispute that Mr. Ronen made the following statement in the context of his application to business school, however, Mr. Ronen's view of himself is immaterial to the present matter.

71.     Ronen's duties as a Research Associate were "extremely analytical."[73]

**RESPONSE:**     Plaintiffs do not dispute that Mr. Ronen made the following statement in the context of his application to business school, however, Mr. Ronen's view of himself is immaterial to the present matter.

72.     Ronen was expected to review Council Members' profiles carefully when making recommendations to clients.[74]

**RESPONSE:**     Undisputed for purposes of this motion.

73.     According to Ronen, GLG was "not a call center" and "provide[s] solutions, not phone calls."[75]

---

[71]     Ronen's Resume Submitted in Support of His Application for Admission to the Tuck School of Business at Dartmouth (bates-labeled RONEN01127-73), Exh. 32, at RONEN 01154; Ronen Dep. at 222:3-14 (confirming that his resume accurately describes his job duties as a Research Associate).

[72]     Ronen's Application to the Columbia Business School, Exh. 37, at RONEN 01101-2; Ronen Dep. at 204:13-205:7 (confirming that these statements are true and accurate).

[73]     Exh. 37, at RONEN 01105; Ronen Dep. at 210:7-17 (confirming that this statement is true and accurate).

[74]     September 2008 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG000000763-776), Exh. 38, at GLG000000764; Ronen Dep. at 328:17-329:19.

[75]     Ronen's Presentation Entitled "Intro to GLG Products, Beyond Phone Calls" (bates-labeled

**RESPONSE:**          Undisputed for purposes of this motion.

74.     Ronen's position as a Research Associate taught him a "great deal about qualitative research."[76]

**RESPONSE:**          Undisputed for purposes of this motion, however, what Mr. Ronen may have learned is is immaterial to the present motions.

75.     In order to identify one or more Council Members who would be appropriate to assist a client with their project, Ronen typically analyzed the client's proposed research inquiry, searched GLG's proprietary information systems, identified individuals with the relevant background, and then independently determined each Council Member's fit for the project based on an analysis of, for instance, their experiences and any comments previously recorded in GLG's proprietary information systems.[77]

**RESPONSE:**          Undisputed for purposes of this motion.

76.     Ronen understood GLG's "The Greenies" as instructing Research Associates to explain to clients why they were selecting specific Council Members, and to provide clients with characteristics and attributes which helped provide a rationale for their Council Member recommendations.[78]

**RESPONSE:**          Undisputed for purposes of this motion.

       (iii)   **Plaintiff Baldwin's Research And Advisory Duties**

---

RONEN_0000001284-1300), attached as Exh. 39, at RONEN_0000001290-1300; Ronen Dep. at 335:10-336:9; 338:14-23 (confirming that he authored the presentation to train Research Associates and that the statement at RONEN_00001300 of Exh. 39 is true and accurate).

[76]     Ronen's Application for Admission to Cornell University's Johnson School of Business (bates-labeled RONEN01109-1126), attached as Exh. 40, at RONEN 01115; Ronen Dep. at 213:4-6 (confirming the accuracy of the statement in Exh. 40).

[77]     Ronen Dep. at 353:18-354:19.

[78]     September 2007 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG00000730-749), Exh. 41, at GLG00000731; Ronen Dep. at 325:13-326:17.

77.     Baldwin proactively contacted clients to inquire into their current research projects and needs.[79]

**RESPONSE:**     Undisputed for purposes of this motion that, at times, Ms. Baldwin "proactively contacted clients to inquire into their current research projects and needs," however, as Ms. Baldwin testified, this was always done under the close supervision of her supervisor and was infrequent.  *See* Deposition of Ashleigh Baldwin ("Baldwin Dep."), attached to Filosa Decl. as Ex. C, at 118:7-119:10.

78.     When Baldwin received a client research project, she entered a description for that project into GLG's computer system called Vega.[80]

**RESPONSE:**     Undisputed for purposes of this motion.

79.     Baldwin entered potential research projects into Vega and stated them in a way that would attract qualified Council Members.[81]

**RESPONSE:**     Disputed.  Ms. Baldwin actually testified at her deposition that she entered research projects into Vega and stated them in a way that would be viewable by potential Council Members.  *See* Baldwin Dep. at 134:21-24.

80.     Each time Baldwin received a client's research request she assessed whether a phone call was appropriate and the best product or whether another GLG product would better suit client's needs.[82]

**RESPONSE:**     Disputed.  As Ms. Baldwin testified, usually the client would request what type of project they wanted to do and it was almost always a phone call.  *See* Baldwin Dep. at 136:22-137:14.

---

[79]     Baldwin Dep. at 118:7-17.
[80]     Baldwin Dep. at 134:1-4.
[81]     Baldwin Dep. at 134:21-24.
[82]     Baldwin Dep. at 136:22-137:7.

81.     Baldwin analyzed client requests for research services and then advised them as to which of GLG's Council Members were best qualified to provide the services requested.[83]

**RESPONSE:**          Disputed.  The portion of Ms. Baldwin's deposition testimony does not support (or even relate to) the purported statement of undisputed fact asserted by Defendant.

82.     Baldwin recommended Council Members to clients based on their research needs, while advising clients as to the relevancy of each Council Member's experience and expertise to the proposed research project.[84]

**RESPONSE:**          Disputed.  Defendant grossly mischaracterizes Ms. Baldwin's testimony. While Ms. Baldwin testified at her deposition that she prepared a note to the client explaining the strengths and weaknesses of Council Members for particular projects, it was her understanding that most clients did not read her note and just looked at the client biographies which were enclosed with her communication.  *See* Baldwin Dep. at 160:21-161:16.

83.     Baldwin communicated with clients about the strengths and weaknesses of Council members for research projects in order to let the client know why Baldwin was recommending particular Council Members.[85]

**RESPONSE:**          Disputed.  While Ms. Baldwin testified at her deposition that she prepared a note to the client explaining the strengths and weaknesses of Council Members for particular projects, it was her understanding that most clients did not read her note and just looked at the client biographies which were enclosed with her communication.  *See* Baldwin Dep. at 160:21-161:16.

---

[83]     Baldwin Dep. at 396:6-17.
[84]     Baldwin Dep. at 160:21-161:5; July 2007 Edition of GLG Research Management's "The Greenies" (bates-labeled GLG00000721-729) attached as Exh. 42 at GLG00000722.
[85]     Baldwin Dep. at 160:21-161:5.

84.     Baldwin searched for Council Members who might be most appropriate to present to specific clients.[86]

**RESPONSE:**        Undisputed for purposes of this motion, however, as Ms. Baldwin testified at her deposition, this "was very repetitive.  Clients all asked the same things and you did the majority of the same projects over and over again."  *See* Baldwin Dep. at 143:23-144:16.

85.     Baldwin researched for Council Members, in part, by reviewing answers given by them to prior questions directed to them about client projects.[87]

**RESPONSE:**        Undisputed for purposes of this motion.

86.     Baldwin researched for Council Members, in part, by using publicly available research tools to collect information.[88]

**RESPONSE:**        Undisputed for purposes of this motion.

87.     Baldwin researched for Council Members, in part, by preparing and directing questions to Council Members.[89]

**RESPONSE:**        Disputed.  As Ms. Baldwin testified at her deposition, as a Research Associate, she was "limited to the structured profile questions which . . . [she] could not edit to any great extent;" instead, Ms. Baldwin chose from a possible group of questions.  *See* Baldwin Dep. at 145:20-146:18.

88.     At times, if Baldwin was dissatisfied with the selection of Council Members for a particular project, she placed a request for new Council Members.[90]

**RESPONSE:**        Undisputed for purposes of this motion, however, as Ms. Baldwin testified, this occurred once in every 15 to 20 projects.  *See* Baldwin Dep. at 151:15-152:6.

---

[86]     Baldwin Dep. at 144:4-7.
[87]     Baldwin Dep. at 145:1-4.
[88]     Baldwin Dep. at 145:8-16.
[89]     Baldwin Dep. at 144:4-145:23.
[90]     Baldwin Dep. at 151:9-152:13.

89.     Baldwin was commended for taking time to fully understand client's needs.[91]

**RESPONSE:**          Undisputed for purposes of this motion.

90.     Baldwin exhibited the ability to find the most appropriate expert, even when faced with difficult requests.[92]

**RESPONSE:**          Undisputed for purposes of this motion.

91.     When Baldwin did not believe that a phone consultation was the right product for a client, she would offer another suggestion.[93]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Ms. Baldwin testified, this occurred with "very few clients" and only "on some occasions."  Thus, this was not one of Ms. Baldwin's primary duties as a Research Associate.  *See* Baldwin Dep. 138:13-20.

> **a.  Plaintiffs Served As Thought Partners And Trusted Advisors In Developing Or Refining Research Projects For GLG's Clients And Advising Them As To Which Counsel Members Would Meet Their Needs**
>
> **(1)  Plaintiff Cohen Served As A Thought Partner And Trusted Advisor For GLG Clients**

92.     Cohen's responsibilities with respect to GLG's clients' research requests "require[d] [him] to work with clients to develop primary research resources that help investment analysts make more informed decisions."[94]

**RESPONSE:**          Disputed to the extent that Mr. Cohen has no personal knowledge how GLG's clients used the primary research resources that he provided.

---

[91]     Exh. 23 (bates-labeled GLG00004660).
[92]     Exh. 23 (bates-labeled GLG00004660).
[93]     Baldwin Dep. at 138:13-20.
[94]     Cohen's Essay Three for Admission to the Georgetown MBA Program (bates-labeled COHEN 0124-26), attached as Exh. 43, at COHEN 0124; Exh. 1 at COHEN 0108 ("I work[ed] to provide primary research solutions for investment analysts looking to further develop their investment thesis."); Johnson Dep. at 66:22-63:5, 63:10-21, 163:4-11, 168:4-25, 175:8-15 (discussing Cohen's role as a trusted advisor to GLG's clients).

23

93.     According to Cohen, his "work experience [at GLG was] particularly valuable in cultivating skills as a trusted advisor and a leader with clients and [his] team internally."[95]

**RESPONSE:**         Disputed to the extent that Mr. Cohen has no personal knowledge of whether GLG's clients viewed him as a "trusted advisor" or a leader.

94.     "A major part of [Cohen's Research Associate] role [was] researching the value chain and find[ing] the best way to uncover key data and work[ing] interactively with the client to get them this information."[96]

**RESPONSE:**         Undisputed for purposes of this motion, however, as Mr. Cohen explained, his role as a Research Associate primarily involved facilitating phone conversations for clients. *See* Cohen Dep. at 164:17-165:1.

95.     On a regular basis, Cohen spent time interacting with some of the world's most sophisticated investors to develop and/or refine research plans for them, which he accomplished by using his understanding of each client's unique business needs and goals.[97]

**RESPONSE:**         Undisputed for purposes of this motion, however, as Mr. Cohen explained, his role as a Research Associate primarily involved facilitating phone conversations for clients. *See* Cohen Dep. at 164:17-165:1.

96.     Cohen's role as a Research Associate "included working daily with analysts and partners at major hedge funds and private equity firms to identify solutions to their investment questions with primary research resources. [He spoke] with Analysts, Portfolio Managers, and Sr. Partners at these firm everyday and [learned] not only to help provide unique industry

---

[95]     Cohen's Essay Three for Admission to the Babson MBA Program (bates-labeled COHEN 0138-39), attached as Exh. 44, at COHEN 0138 ("My work experience has been particularly valuable in cultivating my skills as a trusted resource and advisor to those facing key business and investment decisions."); Cohen Dep. at 330:6-12 (confirming that this statement to Babson was truthful and accurate).
[96]     Exh. 43 at COHEN 0124; Cohen Dep. 344:11-20; Exh. 31 at COHEN 0083) ("Perform value chain analysis of [TMT] companies based on client investment targets to engage appropriate subject matter expertise.").
[97]     Cohen Dep. at 164:22-165:1; Exh. 25 at GLG00002055; Mehlhorn Dep. at 48:16-49:2.

expertise by leveraging [GLG's] resources, but also to earn their trust in handling highly

sensitive and confidential information. Developing these relationships taught [him] how to ask

the right questions in order to best position [himself] as a highly valuable part of their investment

process."[98]

**RESPONSE:**          Disputed to the extent that Mr. Cohen has no personal knowledge of how

GLG's clients used the information he provided.  The remainder of the statement is undisputed

for purposes of this motion, however, as Mr. Cohen explained, his role as a Research Associate

primarily involved facilitating phone conversations for clients.  *See* Cohen Dep. at 164:17-165:1.

97.     Cohen's role as a Research Associate "provide[d] [him the] freedom to push

[him]self creatively and analytically by being involved in new and valuable approaches to

research, value chain analysis, and investment decisions."[99]

**RESPONSE:**          While Plaintiff does not dispute that he made this statement in the context

of his applications to business school, the materiality of this statement is disputed.

98.     Cohen worked regularly to improve his role as a "research partner" with GLG's

clients.[100]

**RESPONSE:**          While it is undisputed that Mr. Cohen worked to improve his abilities, it is

disputed that he served as a "research partner" as his role primarily involved facilitating phone

conversations for clients.  *See* Cohen Dep. at 164:17-165:1.   Further, he has no personal

knowledge whether Defendant's clients viewed him as a research "partner."

---

[98]       Exh. 44 at COHEN 0138; Exh. 1 at COHEN 0109 (same).
[99]       Cohen's Essays for Admission to the USC, Marshall School of Business (bates-labeled COHEN 0084-90),
attached as Exh. 45, at COHEN 0085; Cohen Dep. at 305:18-306-3, 309:16-310:2; Exh. 2 at COHEN 0118
(indicating same); Exh. 3 at COHEN 0132 (indicating same).
[100]      Cohen's 2007 Self-Evaluation (bates-labeled GLG00001981-85), attached as Exh. 46, at GLG00001983
("Goals for continued improvement [include] becom[ing] a better research partner.").

99.    Cohen's research and advisory duties included "[p]artner[ing] with clients and team members for forward looking idea generation."[101]

**RESPONSE:**    Undisputed for purposes of this motion, however, as Mr. Cohen explained, his role as a Research Associate primarily involved facilitating phone conversations for clients. *See* Cohen Dep. at 164:17-165:1.

100.    On occasion, based on his independent assessment of projects that might advance a client's investment objectives, Cohen created his own research projects for clients and then proactively reached out to clients to present his ideas.[102]

**RESPONSE:**    Disputed.  There is no support for this purported statement of undisputed fact in the portion of Plaintiff Cohen's deposition cited by Defendant in support of this statement.

101.    Serving as a "thought partner" with clients, Cohen recommended Council Members to clients based on their research needs, while advising clients as to the relevancy of each Council Member's skills to the proposed research project.[103]

**RESPONSE:**    Disputed.  As Mr. Cohen testified at his deposition, he "never considered [himself] a thought partner."  *See* Cohen Dep. at 234:9-12.  Further, as Mr. Cohen explained, his role as a Research Associate "was to locate research projects for clients."  While this did require him, in some cases, to emphasize the relevance of specific Council Members he provided, this was not his primary duty as a Research Associate.  *See* Cohen Dep. at 234:2-20.

102.    As part of advising clients with respect to their proposed research projects, Cohen spent about 70-80% of his day speaking with clients about their research questions, identifying which Council Members may be appropriate to perform the work, communicating with and

---

[101]    Exh. 29 (bates-labeled GLG00000001).
[102]    Cohen Dep. at 174:4-178:17.
[103]    Cohen Dep. at 233:19-235:24; Johnson Dep. at 77:11-18; Exh. 42 (bates-labeled GLG00000721-29), at 722.

analyzing those Council Members, and then following-up with the client to provide recommendations.[104]

**RESPONSE:**     Undisputed for purposes of this motion, however, it is averred that all of these tasks were associated with facilitating phone conversations between GLG's clients and GLG subject matter experts.  *See* Cohen Dep. at 174: 15-19.

103.    To determine clients' research needs, Cohen interviewed and otherwise communicated with clients and conducted independent research on their industries, businesses, and/or relevant market trends.[105]

**RESPONSE:**     Disputed.  There is no support for this purported statement of undisputed fact in the portion of Plaintiff Cohen's deposition cited by Defendant in support of this statement. Instead, as Mr. Cohen testified in the portion of his deposition cited by Defendant, the information that he utilized in determining what information the client was looking for came to him via GLG's internal website, through e-mail or in phone conversations with the client.  *See* Cohen Dep. at 166:16-167:5.

104.    Cohen advised clients as to their proposed research projects by aligning their needs with the skills and experience of appropriate Council Members, which he accomplished by "gaug[ing] [the Council Members'] level of knowledge based on what the client is looking to learn."[106]

**RESPONSE:**     Disputed. As Mr. Cohen testified in the portion of his deposition cited by Defendant, in order to facilitate conversations between GLG's clients and its Council Members, Mr. Cohen would review e-mail responses from Council Members and forward them to the client to "proceed as they saw fit."  *See* Cohen Dep. at 165:7-13.

---

[104]     Cohen Dep. at 173:21-174:19.
[105]     Cohen Dep. at 166:16-167:5.
[106]     Cohen Dep. at 165:2-167:1; Mehlhorn Dep. at 307:14-308:19.

105.    In order to identify one or more Council Members who would be appropriate to assist a client with their project, Cohen typically first analyzed the client's proposed research inquiry, searched GLG's proprietary information systems, identified individuals with the relevant background, and then independently determined each Council Member's fit for the project based on an analysis of their experiences and any comments previously recorded in GLG's proprietary information systems.[107]

**RESPONSE:**        Disputed.  As Mr. Cohen testified in the portion of his deposition cited by Defendant, "a good majority of the time [the client] specifically identified the type or the actual individual that they wanted to speak with."  *See* Cohen Dep. at 165:16-19.  Further, Defendant overstates Mr. Cohen's "analysis" of a client's research and "independent" determination of each Council Member's fit for the project.  *See* Cohen Dep. at 165:9-15.

106.    In order to be able to advise his clients and recommend Council Members for research projects, Cohen analyzed and maintained an in-depth knowledge of a broad array of Council Members and how each individual's knowledge and skills could contribute to a client's research needs.[108]

**RESPONSE:**        Disputed.  There is no support for this purported statement of undisputed fact in the portion of Plaintiff Cohen's deposition cited by Defendant in support of this statement Instead, as Mr. Cohen testified, in recommending Council Members that were not specifically identified by a client, he relied on his "knowledge of doing these projects over and over again on the same topic."  *See* Cohen Dep. at 173:2-13.

---

[107]    Cohen Dep. at 165:2-167:1.
[108]    Cohen Dep. at 173:2-13.

107.    Cohen independently developed questions to test Council Members' subject matter expertise, and then developed follow-up inquiries as needed depending on the responses.[109]

**RESPONSE:**        Disputed.  There is no support for the statement that Mr. Cohen "independently developed questions to test Council Members' subject matter expertise" or "developed follow-up inquiries as needed depending on the request."  Instead, Mr. Cohen testified that he often just used the questions that client specifically asked or general background questions regarding their experience and background.  *See* Cohen Dep. at 170:19-171:5.

108.    After Council Members responded to Cohen's inquiries, he then analyzed the responses to determine which Council Member(s) would be suitable for the research project.[110]

**RESPONSE:**        Undisputed for purposes of this motion, however, as Mr. Cohen testified in the portion of his testimony cited by Defendant, his role was simply to deliver relevant responses from the Council Member to the client for the client to "proceed as they saw fit."  *See* Cohen Dep. at 165:7-13.

109.    In order to advise clients as to their research projects, Cohen devoted considerable time to developing, maintaining and expanding expertise with respect to the needs of, and developments in, the particular industry that he serviced – Technology, Media and Telecom.[111]

---

[109]    Cohen Dep. at 170:19-172:14.
[110]    Cohen Dep. at 164:14-168:11.
[111]    Cohen Dep. at 175:9-176:7; Johnson Dep. at 63:10-21; Letter from Cohen to Robert K. Futterman & Associates (seeking consideration for Research Analyst position) (bates-labeled COHEN 0150), attached as Exh. 47 ("[M]y . . . current position at [GLG] [has] provide[d] me with a breadth of analytical and market understanding."); Johnson Dep. at 63:10-21 ("[Cohen] was responsible – he was a good advisor and he knew he had to get to the point when he was talking to clients. And they seemed to respond to that positively and that led them to call on Jeff when they had research projects that they were working on and they needed help on. And I think that he did a good job of understanding what they were looking for and connected them with counsel members in a network group. He could provide that expertise.").

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of Mr. Cohen's deposition testimony, or the other evidence cited by Defendant in support of this statement.

110.     Cohen worked on developing, maintaining and expanding his subject matter expertise on a regular basis during the time that he was employed as a Research Associate.[112]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of Mr. Cohen's deposition testimony cited by Defendant in support of this statement.

111.     Cohen was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[113]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of Mr. Cohen's deposition testimony, or the other evidence cited by Defendant in support of this statement.

112.     In order to better understand his clients' needs, Cohen conducted independent research on the Technology, Media and Telecom industry for which he was responsible, as well as for his specific clients within the industry.[114]

**RESPONSE:**          Disputed to the extent that Defendant overstates Mr. Cohen's testimony. Instead, as Mr. Cohen testified, in order to better understand Defendant's clients that he would be assigned to work with, he would "stay up-to-date on relevant news items as it pertained to my industry coverage."  *See* Cohen Dep. at 175:13-176:7.

113.     Cohen often studied professional trade journals and other industry-specific news to identify new developments that he could then use to anticipate his clients' research needs.[115]

---

[112]     Cohen Dep. at 185:1-4.
[113]     Cohen Dep. at 183:7-184:6; Mehlhorn Dep. at 173:12-175:20.
[114]     Cohen Dep. at 175:10-176:7.

**RESPONSE:**          Disputed to the extent that Defendant overstates Mr. Cohen's testimony by

characterizing his review of relevant new items as the "stud[y] of professional trade journals."

*See* Cohen Dep. at 175:13-23.

114.    Cohen acknowledges that he made meaningful contributions to developing GLG's

overall marketplace of subject matter expertise during his tenure as a Research Associate.[116]

**RESPONSE:**          While it is undisputed that Mr. Cohen made this statement in the context

of his application to business schools, the materiality and relevance of this statement is

questionable, at best.

### (2) Plaintiff Ronen Served As A Thought Partner And Trusted Advisor

115.    Ronen was responsible for working with approximately thirty (30) different

clients as an "indispensable resource," and added value in his role as a Research Associate.[117]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed

fact in the document cited by Defendant.  In fact, the document does not even pertain to Mr.

Ronen as it is the first page of a business school essay prepared by Mr. Cohen.

116.    As a Research Associate, Ronen's job duties included "[b]uild[ing] professional

relationships with portfolio managers and buy-side analysts at leading hedge funds, private

equity/venture capital firms and investment banks."[118]

**RESPONSE:**          While it is undisputed that Mr. Ronen made this statement in the context

of his applications to business school, to extent that Defendant asserts that Mr. Ronen's primary

---

[115]     Cohen Dep. at 175:13-23.
[116]     Exh. 2 at COHEN 0118.
[117]     Exh. 2 at COHEN 0118.
[118]     Ronen's Application to the Columbia Business School (bates-labeled RONEN01088-1108), attached as Exh. 37 at RONEN 01095-96; Ronen Dep. at 199:12-200:1 (authenticating Exh. 37 and confirming that its contents are true and accurate), 200:4-23 (explaining that he would build professional relationships by frequently speaking with clients and taking them to lunches and dinners); Ronen's Application for Admission to Cornell University's Johnson School of Business, attached as Exh. 40, at RONEN01114; Ronen Dep. at 212:10-16 (confirming that the statement on RONEN 01114 of Exh. 40 is true and accurate).

duty as a Research Associate was to "[b]uild professional relationships with portfolio managers and buy-side analysts at leading hedge funds, private equity/venture capital firms and investment banks," such assertion is disputed.  Instead, Mr. Ronen's primary duty as a Research Associate was to assist GLG in providing its clients access to GLG's network of experts.  *See* Ronen Dep. at 82:8-83:8.

117.    According to Ronen, he collaborated on a "daily basis" with some of the "most legendary investors at the world's largest hedge funds, providing them with crucial primary research."[119]

**RESPONSE:**    While it is undisputed that Mr. Ronen made this statement in the context of his applications to business school, Mr. Ronen lacks personal knowledge with respect to whether his "collaboration" was "crucial" to Defendant's clients.

118.    As a Research Associate and "thought partner" to his clients, Ronen was "constantly working to introduce, formulate, and test investment hypotheses that consistently [led] to returns that outperform[ed] the competition, while mitigating risk."[120]

**RESPONSE:**    While it is undisputed that Mr. Ronen made this statement in the context of his applications to business school, Mr. Ronen lacks personal knowledge with respect to whether or how Defendant's clients utilized any information provided by Mr. Ronen.

119.    While working as a Research Associate, Ronen "always deliberately and proactively [thought] about ways to add value."[121]

---

[119]    Exh. 37 at RONEN 01101-2; Ronen's Application for Admission to the Stern School of Business at NYU (bates-labeled RONEN 01203-1233), attached as Exh. 48, at RONEN 01217 (same); Ronen Dep. at 225:12-19; 232:10-17 (confirming that the contents of Exh. 48 and the statement on page RONEN 01208 of Exh. 48 are true and accurate).

[120]    Exh. 37 at RONEN 01095-96; Ronen Dep. at 201:6-24 (confirming that the statement at RONEN 01095-96 of Exh. 37 is true and accurate); Exh. 48 (bates-labeled RONEN 01203-1233), at RONEN 01217 (same); Ronen Dep. at 231:22-232:9 (confirming that the content at RONEN 01217 of Exh. 48 is a true and accurate statement of Ronen's responsibilities as a Research Associate).

**RESPONSE:**          While it is undisputed that Mr. Ronen made this statement in the context

of his annual performance review, this statement is immaterial to the application of the

administrative exemption to Mr. Ronen's job duties as a Research Associate.

120.    Ronen's job duties as a Research Associate included "critical thinking that went

into providing multiple products and solutions to clients while strengthening the GLG

relationship a whole."[122]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed

fact in the portion of the document cited by Defendant.

121.    According to Ronen, his "key strengths" included an "[a]wareness and

anticipation of client needs," and an "[a]bility to provide creative and holistic client solutions."[123]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Mr. Ronen explained,

what he meant was that he followed up with clients to see if there was anything else that they

needed or if there were "any other ways to attack this project from a different angle" and

provided GLG's clients with multiple experts to choose from and passed along additional experts

for the client to consider.  *See* Ronen Dep. at 101:12-18, 102:2-18.

122.    Ronen was a "trusted advisor" to the clients he worked with, and "one of [his]

favorite aspects of the [R]esearch [Associate] position [was] building and maintaining strong

relationships with [his] clients."[124]

**RESPONSE:**          While it undisputed that Mr. Ronen made this statement in the context of

his self-assessment, as he testified at his deposition, the term "thought partner" was simply

---

[121]     Ronen's GLG Management Self Evaluation for 2008 (bates-labeled GLG0004926-4930), attached as Exh. 49, at GLG00004929; Ronen Dep. at 139:16-140:13 (confirming that this statement was true and accurate).
[122]     Ronen's 2007 Self-Evaluation (bates labeled RONEN_00000968-971), attached as Exh. 50 at RONEN_00000971.
[123]     Ronen Dep. at 101:7-104:19.
[124]     Ronen's 2008 GLG Research Management Self-Evaluation for 2008 (bates-labeled RONEN_000000955-958), Exh. 51, at RONEN_000000956; Ronen Dep. at 140:16-141:8 (confirming that he authored Exh. 51 and that its contents are true and accurate).

"GLG speak," which he used to show that he "had adopted their ways and been a good employee as such."  *See* Ronen Dep. at 141:13-21.

123.    Ronen believes he was able to "stand out in the quality of service [he] provide[d] because of the high level of thoughtfulness and consideration that [was] the hallmark of [his] every interaction."[125]

**RESPONSE:**        Undisputed for purposes of this motion, however Plaintiffs deny that this statement is material to the analysis of whether the work performed by Mr. Ronen as a Research Associate satisfies the administrative exemption.

124.    As a Research Associate, Ronen "[s]erved as a thought partner with clients to design and deliver proprietary primary market research analysis to address challenging capital market questions at all stages of the investment cycle."[126]

**RESPONSE:**        While it is undisputed that Mr. Ronen made this statement in the context of his business school applications, Mr. Ronen does not have any personal knowledge regarding how GLG's clients viewed or utilized the services provided by Mr. Ronen during the period of time that he was employed as a Research Associate.

125.    Ronen was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[127]

**RESPONSE:**        While it is undisputed that Defendant expected Mr. Ronen to "develop[] and maintain[] a working knowledge of his practice area's core industries to improve project and product service quality," this is immaterial to the analysis of whether or not Mr. Ronen did in

---

[125]      M. Ronen's 2008 GLG Research Management Self-Evaluation for 2008 (bates-labeled RONEN_000000955-958), attached as Exh. 51 at RONEN_000000956.
[126]      Exh. 37 at RONEN 01095-96; Ronen Dep. at 201:6-24 (confirming that the statement at RONEN 01095 of Exh. 37 is true and accurate).
[127]      Mehlhorn Dep. at 173:17-175:20.

fact perform these duties during the period of time that he was employed as a Research Associate.

126.    Ronen understood that it was management's expectation that he "work diligently to provide thoughtful, creative recommendations to the clients and to stand by those recommendations as a way of helping [GLG's] clients make better, more effective decisions."[128]

**RESPONSE:**        While it is undisputed that Defendant expected Mr. Ronen to "work diligently to provide thoughtful, creative recommendations to the clients and to stand by those recommendations as a way of helping [GLG's] clients make better, more effective decisions," this is immaterial to the analysis of whether or not Mr. Ronen did in fact perform these duties during the period of time that he was employed as a Research Associate and/or whether the work performed by Mr. Ronen as a Research Associate satisfies the administrative exemption.

127.    While working as a Research Associate, Ronen developed a strong understanding of the distinctions between hedge funds and mutual funds, which Ronen found to be helpful in meeting the needs of the clients he serviced.[129]

**RESPONSE:**        Undisputed for purposes of this motion.

128.    Ronen understood GLG's communications to Research Associates called "the Greenies" to emphasize the relevancy of each Research Associates' duty to "serve as a vital thought partner to [clients'] work."[130]

**RESPONSE:**        While it is undisputed that Defendant's managers wanted Research Associates to "serve as a vital thought partner to [clients'] work," this is immaterial to the analysis of whether or not Mr. Ronen did in fact perform these duties during the period of time

---

[128]        Exh. 41 at GLG00000731; Ronen Dep. at 327:18-328:13.
[129]        Ronen Dep. at 444:7-445:6; E-mail Correspondence from Robert Matule to Ronen (bates-labeled RONEN 01518-1520), attached as Exh. 52.
[130]        Ronen Dep. at 324:2-10; Exh. 42 at GLG00000722.

that he was employed as a Research Associate and whether the work performed by Mr. Ronen as

a Research Associate satisfies the administrative exemption.

129.    According to David Temple, Ronen's former colleague at GLG who Ronen had

submit recommendation letters to graduate schools on his behalf, Ronen's "ability to become a

highly trusted partner for his client-base has caused [Ronen's] clients to rely on him more

frequently . . . ."[131]

**RESPONSE:**        Undisputed for purposes of this motion.

130.    According to Mr. Temple, Ronen "differentiated himself by proactively going

above and beyond the call of duty to help clients make difficult decisions."[132]

**RESPONSE:**        While it is undisputed that Mr. Temple made this statement in the context

of a business school recommendation for Mr.Ronen, Mr. Temple lacks personal knowledge of

whether, and to what extent, GLG's clients relied upon Mr. Ronen in making "difficult

decisions."

### (3) Plaintiff Baldwin Served As A Thought Partner And Trusted Advisor

131.    As a Research Associate, Baldwin communicated with clients about drug trials,

new medical devices and new pharmaceuticals.[133]

**RESPONSE:**        Undisputed for purposes of this motion.

---

[131]    David Temple's October 6, 2008 Recommendation Letter in Support of Ronen's Application for
Admission to the Johnson School of Business at Cornell (bates-labeled RONEN 01312-1316) attached as Exh. 53 at
RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate);
Ronen Dep. at 239:4-8 (confirming that Ronen worked as a Research Associate at the time Mr. Temple submitted
this recommendation letter on Ronen behalf); Exh. 33 (bates-labeled GLG004677-4680), at GLG004678-79;
Temple Dep. at 87:18-88:17; (confirming that the contents of Exh. 33 are true and accurate); David Temple's
Recommendation Letter in Support of Ronen's Application for Admission to Yale University (bates-labeled
RONEN_0000000133-136), attached as Exh. 54, at RONEN_000000134; Temple Dep. at 102:13-22.
[132]    Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are
true and accurate); Exh. 54 at RONEN_000000134; Temple Dep. at 47:15-17; 50:20-22 (confirming that the
contents of Exh. 54 are true and accurate).
[133]    Baldwin Dep. at 28:12-14.

132.   Baldwin's efforts to advise clients as a Research Associate were a critical part of GLG's effort to promote its brand and distinguish itself from competitors.[134]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the testimony cited by Defendant.

133.   Baldwin was responsible for developing and maintaining a working knowledge of his practice area's core industries to improve project and product service quality.[135]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed fact in the portion of the deposition testimony cited by Defendant.

134.   If Baldwin was working on a project similar to one she had done before, she would rely on portions of the prior project but also made modifications as necessary and searched for new Council Members as needed.[136]

**RESPONSE:**          Undisputed for purposes of this motion.

135.   After placing clients in contact with Council Members, Baldwin worked with the client to make sure that the client was satisfied with the recommendation and offered additional solutions when necessary.[137]

**RESPONSE:**          Disputed.  As Mr. Schaefer testified at an earlier point in his deposition, he did not know what steps Ms. Baldwin took in executing a client's requests for phone consultations and that only Ms. Baldwin would know.  *See* Deposition of Todd Schaefer ("Schaefer Dep."), attached to Filosa Decl. as Ex. F, at 61:25-62:22.

---

[134]   Schaefer Decl. ¶ 8; Baldwin Dep. at 127:11-129:20 (admitting that she was unaware of Schaefer's confidence in her ability and had no basis to dispute his representations about the extent to which he accepted her recommendations).

[135]   Mehlhorn Dep. at 173:17-175:20.

[136]   Baldwin Dep. at 149:4-23.

[137]   Transcript of the Deposition of Todd Schaefer, dated November 5, 2010 ("Schaefer Dep."), pertinent portions of which are attached as Exh. 55, at 79:3-80:11.

136.    By 2008, most clients came directly to Baldwin with their requests, rather than being referred to her by a supervisor.[138]

**RESPONSE:**         Undisputed for purposes of this motion.

137.    Baldwin worked on surveys as a Research Associate, which sometimes accounted for 30 to 40 percent of her time.[139]

**RESPONSE:**         Disputed to the extent Defendant mischaracterizes Ms. Baldwin's testimony.  As Ms. Baldwin testified, her survey work varied from a peak where it was 30 to 40 percent of her, "but otherwise it would maybe be five percent of [her] time."  Instead, the majority of her time was spent on phone consultations and other projects.  *See* Baldwin Dep. at 141:10-142:1.

138.    As a Research Associate, Baldwin would sometimes create the survey itself or write questions for it.[140]

**RESPONSE:**         Disputed to the extent that Defendant omits the portion of Ms. Baldwin's testimony where she testified that 70 to 80 percent of the time, she simply "sent the [project] to the survey team and they would write the survey for the client."  *See* Baldwin Dep. at 221:21-222:4.

139.    Baldwin researched and identified appropriate Council Members to respond to the client survey.[141]

**RESPONSE:**         Disputed to the extent that Defendant mischaracterizes Ms. Baldwin's testimony.  Instead, Ms. Baldwin testified that she narrowed the universe of Council Members by using key word searches.  *See* Baldwin Dep. at 225:5-11.

---

[138]     Baldwin Dep. at 123:9-14; 130:10-13.
[139]     Baldwin Dep. at 141:7-9; 17-24.
[140]     Baldwin Dep. at 221:21-222:1.
[141]     Baldwin Dep. at 225:5-11.

140.    Baldwin understood GLG's "The Greenies" as instructing Research Associates to explain to clients why they were selecting specific Council Members, and to provide clients with characteristics and attributes which helped provide a rationale for their Council Member recommendations.[142]

**RESPONSE:**    Disputed.  As Ms. Baldwin testified, "The Greenies" were more of a style guide for writing e-mails which was "actually just a critique of people who had written bad G[ive] T[o] C[lient] e-mails."  *See* Baldwin Dep. at 233:22-234:6.

### E.  Plaintiffs' Primary Duties Did Not Include Selling, But Did Include Promoting And Marketing GLG's Research Services To Existing And Prospective Clients To Advance The Efforts Of GLG's Sales Team

#### (i)  Cohen's Promotional And Marketing Job Duties

141.    As a Research Associate, Cohen was not himself engaged in sales, as GLG employed other individuals in its Sales Department to sell subscriptions and services to GLG's clients.[143]

**RESPONSE:**    Undisputed for purposes of this motion.

142.    Cohen's primary duty included promoting and marketing GLG's research services to existing and prospective clients to advance the efforts of GLG's sales team.[144]

**RESPONSE:**    It is disputed that Mr. Cohen's primary duty involved promoting and marketing GLG's services to existing and prospective clients; instead, Mr. Cohen testified that the nature of his role was to "execute more project work for [GLG's clients] and drive volume."  *See* Cohen Dep. at 193:20-24, 194:21-195:1.

143.    Cohen engaged in marketing and promotion activities on a regular basis during the time he was employed as a Research Associate.[145]

---

[142]    Exh. 41 at GLG00000731; Baldwin Dep. at 233:22-234:6.
[143]    Cohen Dep. at 248:24-249:20, 250:10-17.
[144]    Cohen Dep. at 176:8-13, 194:10-16, 250:12-20.

**RESPONSE:**          Disputed.  As Mr. Cohen testified, one of his job duties as a Research

Associate was to reach out to <u>existing</u> clients that were assigned to his call plan in order to

introduce himself and discuss GLG's services and what GLG could do for them or notify them of

upcoming events.  *See* Cohen Dep. at 176:16-178:17.

144.    Cohen's promotion and marketing duties involved promoting sales of GLG's

services by others (i.e. GLG's sales force), not his own direct sales:

> Q:    And how were you involved in getting [your clients] to
>       renew [their subscriptions]?
>
> A:    I am not in charge of sales or contracts.
>
> Q:    I understand that. . . . but sometimes, as a Research
>       Associate, you would collaborate with people in sales to
>       promote the relationship hoping that the sales people could
>       then execute a sale; is that right?
>
> A:    That is fair.[146]

**RESPONSE:**          It is undisputed that Mr. Cohen provided the testimony quoted by

Defendant, however, it is disputed that this constitutes "promotion and marketing" duties as

defined by the Department of Labor.

145.    Cohen was responsible for putting Council Members in a position to provide

appropriate services to GLG's clients, developing and expanding long-term relationships with

clients, and helping to grow GLG's business.[147]

**RESPONSE:**          Disputed.  There is no support for this purported statement of undisputed

fact in the portion of the deposition testimony cited by Defendant.

146.    Cohen's promoting and marketing duties involved developing and deepening

relationships with existing and prospective clients to increase their use of GLG's services.[148]

---

[145]    Cohen Dep. at 176:14-177:10.
[146]    Cohen Dep. at 193:11-194:16.
[147]    Johnson Dep. at 150:13-151:5, 158:8-13; 160:8-161:5 (discussing Cohen's job responsibilities).
[148]    Cohen Dep. at 174:23-176:13.

**RESPONSE:**        Disputed.  There is no support for this purported statement of undisputed

fact in the portion of the deposition testimony cited by Defendant that Mr. Cohen engaged in any

duties with respect to prospective clients.  Further, as explained by Mr. Cohen in the portion of

his deposition immediately following Defendant's citation, one of his job duties as a Research

Associate was to reach out to underline existing clients that were assigned to his call plan in order to

introduce himself and discuss GLG's services and what GLG could do for them or notify them of

upcoming events.  *See* Cohen Dep. at 176:16-178:17.

147.    Cohen educated clients with respect to GLG's services and proposed ideas for

new projects.[149]

**RESPONSE:**        Disputed to the extent that Defendant overstates Mr. Cohen's testimony by

stating that he "educated clients;" instead, as Mr. Cohen explained, one of his job duties as a

Research Associate was to reach out to existing clients that were assigned to his call plan in

order to introduce himself and discuss GLG's services and what GLG could do for them or

notify them of upcoming events.  *See* Cohen Dep. at 176:14-177:3.

148.    Cohen promoted GLG's services by anticipating clients' research needs and

studying their individual businesses and relevant market trends.[150]

**RESPONSE:**        Disputed.  There is no support for this purported statement of undisputed

fact in the portion of the deposition testimony cited by Defendant.  In fact, the portion of

---

[149]    Cohen Dep. at 176:8-13, 177:1-6; Johnson Dep. at 160:8-161:5, 129:7-20 ("[The purpose of Cohen's call plan] was [ ] to keep in touch with the clients and to gain more knowledge about what their interests were . . . . [T]he job is very much [a] relationship business. So we wanted to reach out to our [Technology, Media & Telecommunications ("TMT")] contacts every month and check in with them, see how things were going, see if they were still covering the [TMT] space, educate them on any new initiatives that GLG had that might be relative to their research process. And to really – to educate them and promote the use of [GLG] within their organization.").
[150]    Cohen Dep. at 174:23-176:13, 334:16-22, 335:18-21 ("[As an example,] [s]everal clients would make investments outside the United States. So in order to provide Council Members that would be able to comment on that, it required me to learn about the industry and some of the dynamics abroad."); Exh. 2 at COHEN 0118; Johnson Dep. at 129:7-20; Cohen Dep. at 334:19-22 & 335:14-17 (confirming that this document is truthful, accurate, and relates to Cohen's duties as a Research Associate).

testimony quoted does not appear among the portions of Mr. Cohen's testimony cited by

Defendant.  Notwithstanding this, Defendant mischaracterizes Mr. Cohen's testimony as there is

no support for the assertion that Mr. Cohen "promoted" GLG's service or "anticipat[ed] clients'

research needs;" instead, Mr. Cohen testified that because several clients made investments

outside of the United States, in searching for relevant Council Members, he was "required . . . to

learn about the industry and some of the dynamics abroad."  *See* Cohen Dep. at 334:22-335:9.

149.    In promoting GLG, Cohen made his own decisions about which clients to call and

when and which ideas to propose to a particular client.[151]

**RESPONSE:**          Disputed.  As Mr. Cohen explained in the portion of the deposition

testimony cited by Defendant, "I was required to make these phone calls on a monthly basis.  *See*

Cohen Dep. at 179:7-8.  Thus, Defendant's characterization of the cited portion of Mr. Cohen's

testimony is grossly overstated.

150.    In deciding which clients to call, Cohen conducted his own research and

considered information provided by the Sales Department regarding a client's expressed or

assumed interests and analyzed that client's past project work, and he then used that information

to recommend GLG services that he believed would suit the client.[152]

**RESPONSE:**          Disputed.  As Mr. Cohen explained in the portion of the deposition

testimony cited by Defendant, "I was required to make these phone calls on a monthly basis.  *See*

Cohen Dep. at 179:7-8.  Thus, Defendant's characterization of the cited portion of Mr. Cohen's

testimony is grossly overstated.

---

[151]     Cohen Dep. at 179:5-180:19.
[152]     Cohen Dep. at 179:5-180:19.

151.    Cohen's "abilit[y] to increase usage, interest and demand with [GLG's] accounts … had a direct positive impact on [the Sales Department's] ability to upgrade clients and produce higher revenues for the firm."[153]

**RESPONSE:**        While it is undisputed that the work performed by Mr. Cohen had an effect on GLG's ability to upgrade clients, it is disputed that his primary duty as a Research Associate involved supporting sales.

152.    Cohen's promotion of Council Members' services advanced the efforts of GLG's sales team to encourage clients to upgrade their subscription levels or retain GLG's Council Members for more complex projects.[154]

**RESPONSE:**        While it is undisputed that the work performed by Mr. Cohen had an effect on GLG's ability to upgrade clients, it is disputed that his primary duty as a Research Associate involved supporting sales; instead, as Mr. Cohen testified, he "just executed [GLG's clients'] project work."  *See* Cohen Dep. at 193:24.

153.    Cohen also collaborated with the Sales Department to analyze client usage and research preferences that could then be used by the Sales Department to pitch upgrades to premium services.[155]

**RESPONSE:**        Undisputed for purposes of this motion, however, it is disputed that this occurred with any regularity, as Mr. Cohen testified at his deposition it was fair to say that he "sometimes collaborated with people in sales."  *See* Cohen Dep. at 194:12-16.

---

[153]    Brad Spiegel Recommendation Letter for Cohen's Admission to the Babson MBA Program (bates-labeled GLG00002011-13) attached as Exh. 56 at GLG00002012.
[154]    Cohen Dep. at 193:11-195:1.
[155]    Exh. 29 at GLG00000001.

154.    Cohen's promotional efforts assisted the Sales Department in increasing subscriptions and the use of specialized services such as Surveys or Market Studies and in pitching upcoming events or relevant conferences.[156]

**RESPONSE:**        Disputed.  There is no support for this purported statement of undisputed fact in the portion of the deposition testimony cited by Defendant.

155.    Cohen's promotional work included making calls to existing clients as part of his "calling plan" each month in which he discussed services that GLG could provide and making suggestions and recommendations about which GLG services could assist clients with their needs.[157]

**RESPONSE:**        While it is undisputed that part of Mr. Cohen's job duties as a Research Associate required him to make calls from a call plan assigned to him, Defendant's characterization of this as "promotional work" is disputed as there is no support for this statement in the evidence cited by Defendant.

### (ii)    **Ronen's Promotional And Marketing Job Duties**

156.    As a Research Associate, Ronen was not engaged in sales, as GLG had a separate sales force.[158]

**RESPONSE:**        Undisputed for purposes of this motion.

157.    In his role as a Research Associate, Ronen regularly supported the sales force's efforts to increase sales.[159]

---

[156]        Cohen Dep. at 196:13-197:11.
[157]        Cohen Dep. at 176:8-177:10; Exh. 46 at GLG00001982-83 ("I made a large amount of calls per month due to assisting on Todd's massive call sheet. It was mentioned as an area for improvement in June, and I feel like I've become more thoughtful and effective on the phone pulling projects, explaining our service, etc.").
[158]        Ronen Dep. at 112:24-113:4; 116:14-19.
[159]        Ronen Dep. at 116:14-19; 128:8-15; Exh. 49, at GLG00004927 (identifying example of type of information Ronen "regularly provide[d] to sales").

**RESPONSE:**        Disputed to the extent that there is no support for Defendant's purported

statement of undisputed fact, as the evidence cited by Defendant fail to establish that Mr. Ronen

"regularly supported the sales force's efforts to increase sales;" instead, this evidence only

establishes that Mr. Ronen regularly provided certain information to GLG's Sales Department.

158.    According to David Temple, Ronen played an "active role" in "improv[ing]

[GLG's] product offerings."[160]

**RESPONSE:**        While it is undisputed that Mr. Temple made this statement in the context

of his recommendation of Mr. Ronen for business school, this statement is immaterial to the

analysis of whether or not Mr. Ronen did in fact perform these duties during the period of time

that he was employed as a Research Associate.

159.    Ronen's duties included promoting GLG's research services to the clients with

whom he worked.[161]

**RESPONSE:**        While it is undisputed that the work performed by Mr. Ronen as a

Research Associate had the effect of promoting GLG's research services to clients, it is disputed

that this was Mr. Ronen's primary duty during the period of time he was employed as a Research

Associate.  Instead, Mr. Ronen's primary role was to assist GLG in providing its clients access to

its network of experts.  *See* Ronen Dep. at 82:8-83:8.

160.    Ronen would propose to clients that they consider using additional GLG products

and services, and his purpose in engaging in such discussions was to "promote" GLG's services

to those clients.[162]

---

[160]    Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Exh. 33, at GLG00004679; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 53 are true and accurate).
[161]    Ronen Dep. at 111:21-112:5.
[162]    Ronen Dep. at 113:5-15; 116:6-13.

**RESPONSE:**          While it is undisputed that Mr. Ronen occasionally proposed additional experts or additional products, it is disputed that Mr. Ronen's purpose was to "promote" GLG's services to those clients, as there is no support for this assertion in the portion of Mr. Ronen's testimony cited by Defendant.

161.    According to Ronen, a "proactive RM/RA can make a big difference," so he "always concentrated on pushing [his] clients to try an initial survey, private visit, or other non-consultation project."[163]

**RESPONSE:**          Disputed to the extent that there is no support for Defendant's purported statement of undisputed fact as Defendant's citation to "Exh. 250" does not appear to be attached to the declaration of Defendant's counsel.

162.    According to David Temple, as a Research Associate Ronen "[d]emonstrated sales/marketing ability" and was "a natural in pitching [GLG]s product to new clients."[164]

**RESPONSE:**          While it is undisputed that Mr. Temple may have felt this way, as Defendant notes at paragraph 156, as a Research Associate, Mr. Ronen was not engaged in sales.

163.    Ronen's job duties included promoting Red Flag Reviews and Consumer Market Studies to clients.[165]

**RESPONSE:**          While it is undisputed that the work performed by Mr. Ronen as a Research Associate may have, from time to time, involved the promotion of these specific research services to clients, it is disputed that this was Mr. Ronen's primary duty during the period of time he was employed as a Research Associate.  Instead, Mr. Ronen's primary role was

---

[163]      Exh. 250 at RONEN00250; Ronen Dep. at 144:19-146:13 (confirming that he wrote this email and that its contents were true and accurate).
[164]      Exh. 33 at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).
[165]      Ronen Dep. at 366:11-367:22.

to assist GLG in providing its clients access to its network of experts.  *See* Ronen Dep. at 82:8-83:8.

164.    GLG expected Ronen to promote GLG's products and services to clients, including surveys and market studies.[166]

**RESPONSE:**          While it is undisputed that Defendant expected Mr. Ronen to promote these products, this is immaterial to the analysis of whether or not Mr. Ronen did in fact perform these duties during the period of time that he was employed as a Research Associate.

165.    Ronen's job duties as a Research Associate included solidifying and expanding market share.[167]

**RESPONSE:**          Disputed to the extent that there is no support for Defendant's purported statement of undisputed fact in the portion of Mr. Ronen's deposition transcript cited by Defendant.

166.    Ronen understood GLG's "The Greenies" to set forth GLG's goal of "articulat[ing] the value of Research Management in every single interaction with a client."[168]

**RESPONSE:**          While it is undisputed that Defendant expected Mr. Ronen to "articulate the value of Research Management in every single interaction with a client," this is immaterial to the analysis of whether or not Mr. Ronen did in fact perform these duties during the period of time that he was employed as a Research Associate.

167.    According to David Temple, Ronen "[p]roactively look[ed] for ways to improve [GLG's] value proposition."[169]

---

[166]    November 19, 2008 e-mail correspondence from Sam Jacobs (bates-labeled RONEN00112-114), attached as Exh. 58, at RONEN00113; Ronen Dep. at 162:20-163:12.
[167]    Ronen Dep. at 367:10-13.
[168]    Exh. 41 at GLG00000731; Ronen Dep. at 327:10-17.
[169]    Exh. 33 at GLG00004680; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 33 are true and accurate).

**RESPONSE:**        While it is undisputed that Mr. Temple made this statement in the context

of recommending Mr. Ronen for business school, this statement is immaterial to the analysis of

whether or not Mr. Ronen did in fact perform these duties during the period of time that he was

employed as a Research Associate.

### (iii)   Baldwin's Promotional And Marketing Job Duties

168.   Baldwin did not sell products to clients because GLG had a separate Sales

Department engaged in sales.[170]

**RESPONSE:**        Undisputed for purposes of this motion.

169.   With respect to clients Baldwin covered, there was a benefit to GLG to expanding

relationships with those clients.[171]

**RESPONSE:**        Disputed to the extent that Defendant mischaracterizes Ms. Baldwin's

deposition testimony when it asserts that Ms. Baldwin believed that "there was a benefit to

GLG;" instead, as Ms. Baldwin's deposition testimony makes clear , she believed that, in terms

of her performance assessment, there was a benefit to expand relationships with those clients and

do more work with them.  *See* Baldwin Dep. at 172:7-19.

170.    If Baldwin was speaking with a client at a firm she covered, she would let them

know about other products and services offered by GLG.[172]

**RESPONSE:**        Undisputed for purposes of this motion.

171.   GLG encouraged Baldwin to educate clients about other products and encourage

them to take advantage of other products.[173]

**RESPONSE:**        Undisputed for purposes of this motion.

---

[170]        Baldwin Dep. at 178:10-18.
[171]        Baldwin Dep. at 172:7-19.
[172]        Baldwin Dep. at 169:5-170:6.
[173]        Baldwin Dep. at 170:1-6.

172.     Baldwin stated that one of the goals of satisfying client requests was to have the clients work with GLG again.[174]

**RESPONSE:**          Undisputed for purposes of this motion.

173.     It was Baldwin's belief that by doing good work on client projects as a Research Associate, clients would increase their usage of GLG services and products.[175]

**RESPONSE:**          Disputed to the extent that, as Ms. Baldwin testified during her deposition, "there's not a direct relationship with them being happy with projects and doing more work." *See* Baldwin Dep. at 173: 9-12.

174.     One of GLG's goals for research professionals was to maximize its work with clients so that the clients would not work with competitors.[176]

**RESPONSE:**          Undisputed for purposes of this motion.

175.     Baldwin's supervisors advised her that if she did excellent work for clients, the client would prefer to use her, which would expand and deepen the client relationship.[177]

**RESPONSE:**          Disputed to the extent that Defendant misstates Ms. Baldwin's testimony which stated that Ms. Baldwin's supervisors advised her that if she did "excellent work for clients, they will use us more" and will "maintain . . . or grow the relationship."  *See* Baldwin Dep. at 174:6-16.

176.     Baldwin had a list of clients with whom she was working that she was expected to call periodically, which eventually developed into a "call plan."[178]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[174]          Baldwin Dep. at 171:6-172:19.
[175]          Baldwin Dep. at 173:5-13.
[176]          Baldwin Dep. at 173:18-174:5.
[177]          Baldwin Dep. at 174:6-16.
[178]          Baldwin Dep. at 235:18-21; 236:1-3.

177.    There was no policy as to how much time Baldwin was to spend calling the individuals on her call plan.[179]

**RESPONSE:**          Disputed to the extent that while there may not have been a formal policy, Ms. Baldwin was told by her supervisors that she should call a few clients from her call plan each day.  *See* Baldwin Dep. at 236:15-24.

178.    Baldwin understood that the call plan was designed to remind clients that Research Associates were available to help them and to increase usage with the clients.[180]

**RESPONSE:**          Undisputed for purposes of this motion, however, it was also Ms. Baldwin's understanding that the purpose of the call plan was to "make sure that our clients didn't forget about us."  *See* Baldwin Dep. at 237:9-14.

179.    Calling clients served several purposes, including client relationship development.[181]

**RESPONSE:**          Disputed.  While it is undisputed that the call plan may have, in theory, served this purpose, as Ms. Baldwin testified, for the most part, she just left voice messages.  *See* Baldwin Dep. at 243:24-244:5.   Further, as Mr. Schaefer testified, he was not aware of whether Ms. Baldwin called her clients to engage in this "client relationship development," as Defendant characterizes it.  *See* Schaefer Dep. at 127:16-19.

180.    During calls to clients, Baldwin introduced herself to clients, inquired into their research needs, and followed up on requests to ensure the client's needs were met.[182]

**RESPONSE:**          Disputed.  Disputed to the extent that there is no support for Defendant's purported statement of undisputed fact as Mr. Schaefer testified, he was not aware of whether

---

[179]    Baldwin Dep. at 236:11-14.
[180]    Baldwin Dep. at 237:13-23.
[181]    Schaefer Dep. at 126:17-127:15.
[182]    Schaefer Dep. at 126:17-127:15.

Ms. Baldwin called her clients to engage in this "client relationship development," as Defendant characterizes it. *See* Schaefer Dep. at 127:16-19.

181.    One of Baldwin's goals while speaking on the phone with clients was to develop a personal relationship or rapport with a client contact.[183]

**RESPONSE:**        Undisputed for purposes of this motion, however, as Ms. Baldwin explained, this was only a goal "to a limited extent." *See* Baldwin Dep. at 182:17-21.

182.    The call plan was designed to remind GLG clients that Research Associates were available to assist them.[184]

**RESPONSE:**        Disputed.  Ms. Baldwin has no personal knowledge as to what the call plan was designed to do, as her testimony makes clear: "I guess, in theory, the call plan was designed to remind our clients that we were available to help them." *See* Baldwin Dep. at 237:9-17.

183.    The ultimate goal of the call plan was to increase usage by clients.[185]

**RESPONSE:**        Disputed.  Ms. Baldwin has no personal knowledge as to the ultimate goal of the call plan was.  As her testimony makes clear, when asked whether the call plan would "hopefully increase usage with clients," to which she responded, "I guess so, yes.  That was their ultimate hope." *See* Baldwin Dep. at 237:18-23.

184.    Baldwin took clients out to lunch or for drinks.[186]

**RESPONSE:**        Disputed.  As Ms. Baldwin made clear at her deposition, while she did meet with other employees of one of GLG's clients for drinks, this was not a work function. *See* Baldwin Dep. at 77:17-19, 102:8-10, 176:13-21.

---

[183]    Baldwin Dep. at 182:17-24.
[184]    Baldwin Dep. at 237:13-17.
[185]    Baldwin Dep. at 237:18-23.
[186]    Baldwin Dep. at 102:8-10.

185.    In her 2007 performance evaluation, Baldwin was encouraged to strive to become the primary point of contact for a focused number of client accounts by mid-year.[187]

**RESPONSE:**    Undisputed for purposes of this motion that this statement is contained in Ms. Baldwin's 2007 performance evaluation, however, Defendant has cited to no evidence which would establish that Ms. Baldwin actually achieved this goal.

186.    Building deeper client relationships was identified as one of Baldwin's performance goals in 2008.[188]

**RESPONSE:**    Undisputed for purposes of this motion that this statement is contained in Ms. Baldwin's 2007 performance evaluation, however, Defendant has cited to no evidence which would establish that Ms. Baldwin actually achieved this goal.

187.    Baldwin discussed with others at GLG her relationships with clients and the value of such relationships to the firm.[189]

**RESPONSE:**    Disputed to the extent that Ms. Baldwin testified she only had discussions like this with respect to a single client over a period of two years.  *See* Baldwin Dep. at 423:2-19.

188.    Baldwin often discussed the significance of GLG's relationship with a particular consulting firm and how GLG had done everything it could to build personal and work relationships with that firm to build a deeper relationship.[190]

**RESPONSE:**    Disputed that Ms. Baldwin had these conversations "often" as she testified she only had discussions like this with respect to a single client over a period of two years.  *See* Baldwin Dep. at 423:2-19.

---

[187]    Exh.23 at GLG00004660.
[188]    Baldwin Dep. at 422:16-423:1.
[189]    Baldwin Dep. at 423:2-6.
[190]    Baldwin Dep. at 423:7-19.

### F.   Plaintiffs' Primary Duties Included Monitoring For, And Advising Clients Regarding, Compliance Issues

189.   Compliance was a fundamental part of GLG's business strategy and value proposition.[191]

**RESPONSE:**   Undisputed for purposes of this motion, however, whether "compliance was a fundamental part of GLG's business strategy and value proposition" is not material to the instant matter.

190.   GLG prided itself on its compliance responsibilities and promoted it as a key differentiator between GLG and its competitors.[192]

**RESPONSE:**   Undisputed for purposes of this motion, however, whether "GLG prided itself on its compliance responsibilities and promoted it as a key differentiator between GLG and its competitors" is immaterial to the instant matter.

191.   Research Associates' compliance responsibilities were critical to GLG's clients and they were one reason clients chose GLG over its competitors.[193]

**RESPONSE:**   Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to admissible evidence.  While Defendant cites to the deposition testimony of Mr. Mehlhorn and Mr. Jacobs, neither of these individuals has personal knowledge regarding (i) whether Defendant's Research Associates' compliance responsibilities were critical to GLG's clients, and/or (ii) were one reason clients chose GLG over its competitors.  Indeed, only those clients would be competent to testify regarding these topics.

---

[191]    Jacobs Decl. ¶ 12.
[192]    Jacobs Decl. ¶ 12.
[193]    Mehlhorn Dep. at 73:6-76:10, 98:7-106:18; GLG Compliance Rules & Practices for Managers and Associates, (bates-labeled GLG00000541-0629) attached as Exh. 59 at GLG00000546 ("Compliance . . . is not only vital to the protection of [GLG's] business model and corporate values, it is also a key component of our client service and market differentiator."); Jacobs Decl., ¶ 11 (describing the critical nature of Research Associates' compliance job duties).

192.   Compliance failures could have legal consequences for GLG and/or its clients.[194]

**RESPONSE:**   Undisputed for purposes of this motion.

193.   A clear message was delivered to Research Associates that there were no fixed compliance guidelines that could address the multitude of compliance risks and, therefore, Research Associates were directed to use their own best judgment to address compliance issues.[195]

**RESPONSE:**   Disputed.  While Mr. Jacobs may now claim that there were no fixed compliance guidelines, this testimony ignores Defendant's well-established "Compliance Rules & Practices," which clearly articulate GLG's compliance guidelines.  *See* Compliance Rules & Practices Guides for Research Managers & Associates, attached to the Declaration of Michael Puma as Exhibit 59.

194.   Most of a Research Associate's daily duties were expected to involve this compliance responsibility.[196]

**RESPONSE:**   Disputed.  Mr. Jacob's belief as to what was expected of Research Associates generally is immaterial to whether Plaintiffs' primary duty involved which meets the definition of the administrative exemption.  Further, Mr. Jacobs has no personal knowledge of the work performed by Plaintiffs during the period of time that they were employed as Research Associates, as Mr. Jacobs testified that his interactions with Messrs. Cohen and Ronen were limited to passing them in the hallway and, with respect to Ms. Baldwin, testified that he only had "cursory interaction" with her.  *See* Jacobs Deposition at 38:19-41:9, 41:20-42:2.

---

[194]   Exh. 59 at GLG00000567-569; Mehlhorn Dep. at 49:21-53:4 (explaining that a Research Associate could put the entire company at risk if they overlooked a compliance risk).
[195]   Jacobs Decl. ¶ 13.
[196]   Jacobs Decl. ¶ 11.

195.    The compliance duty included assessing projects that might be suitable to propose to clients, analyzing projects proposed by clients and appropriately describing client projects in GLG's database that was used to track and provide advice as to clients' proposed research inquiries.[197]

**RESPONSE:**        Disputed.  Mr. Jacob's belief as to what was expected of Research Associates generally is immaterial to whether Plaintiffs' primary duty involved which meets the definition of the administrative exemption.  Further, Mr. Jacobs has no personal knowledge of the work performed by Plaintiffs during the period of time that they were employed as a Research Associates, as Mr. Jacobs testified that his interactions with Messrs. Cohen and Ronen was limited to passing them in the hallway and, with respect to Ms. Baldwin, testified that he only had "cursory interaction" with her.  *See* Jacobs Deposition at 38:19-39:39:19, 39:20-41:9, 41:20-42:2.

196.    Plaintiffs were responsible for "help[ing] clients and Council Members [ ] avoid inappropriate interactions in projects that [GLG] arrange[d] or facilitate[d]" by "review[ing] and act[ing] upon information supplied by [Council Members' and clients that raise[d] potential compliance issues."[198]

**RESPONSE:**        While it is undisputed for purposes of this motion these statements are contained in Defendant's Compliance policies which were provided to Plaintiffs, these statements are immaterial to the issues in the pending motions.

---

[197]        Jacobs Decl. ¶ 10.
[198]        Exh. 59 at GLG00000546-547 ("It is therefore important to GLG's interests and values, and a core job requirement, that [Research Associates] play an active compliance role in any project they touch.").

### (i)   Plaintiff Cohen Monitored For, And Advised Clients Regarding, Compliance Issues

197.   Cohen acknowledges that compliance rules were "very important" to GLG's business.[199]

**RESPONSE:**        Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support a finding that Mr. Cohen acknowledged that compliance rules were "very important" to GLG.

198.   Cohen was responsible for monitoring clients' research projects and interactions with Council Members for potential compliance problems that could create a regulatory risk for a client or GLG, and seeking to prevent situations in which there could be an improper exchange of information in violation of securities laws and regulations.[200]

**RESPONSE:**        While it is undisputed that Mr. Cohen performed a compliance function as part of his duties as a Research Associate, as Mr. Cohen testified, he performed this duty by "keep[ing] an eye out for potentially troubling compliance issues" and once he identified an issue he "would pass it along to [GLG's] Complaince Escalation [Department] for assistance."  *See* Cohen Dep. at 223:18-224:7.  Thus, Defendant's characterization of Mr. Cohen's duties in that capacity is grossly overstated.

199.   Cohen monitored for, and advised clients regarding, compliance issues that might arise between clients and Council Members on a regular basis during the time he was employed as a Research Associate.[201]

**RESPONSE:**        While it is undisputed that Mr. Cohen "kept an eye out" for potential compliance issues and passed these issues along to GLG's Compliance Department, Defendant

---

[199]        Exh. 59 at GLG00000567-569; Mehlhorn Dep. at 49:21-53:4 (explaining that a Research Associate could put the entire Company at risk if they overlooked a compliance risk).
[200]        Cohen Dep. at 221:21-222:6, 223:18-224:7, 225:4-13.
[201]        Cohen Dep. at 221:21-222:6, 223:18-224:7, 225:4-13; Johnson Dep. at 74:19-75:17.

has failed to cite to any evidence which would support a finding that Mr. Cohen "advised clients regarding compliance issues that might arise between clients and Council Members <u>on a regular basis</u>."

200.    Cohen advised both clients and Council Members in a way that intended to limit regulatory risks for the clients and GLG.[202]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support such a finding.  Instead, at most, Mr. Cohen testified that if he "noticed a [compliance] issue, he would communicate this to the client or a Council Member, that this aspect of whatever . . . the issue was is something that we cannot move forward with."  *See* Cohen Dep. at 225:01-13.

201.    Cohen's job duties including being alert for red flags regarding compliance rules.[203]

**RESPONSE:**          Undisputed for purposes of this motion.

202.    Cohen was required to be alert for red flags regarding compliance rules in many contexts, including when he communicated with Council Members' regarding their responses to questions testing their expertise for a particular project and their comments in response to invitations to consult for a client.[204]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[202]      Cohen Dep. at 224:1-224:7, 225:4-13; Johnson Dep. at 74:11-75:17.
[203]      Exh.59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules.").
[204]      Cohen Dep. at 226:19-227:10; Exh. 59 at GLG00000567.

203.    Cohen also performed his compliance duties (e.g., monitored for compliance issues and risks) in live meetings with clients and Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[205]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support such a finding.  As Mr. Cohen's deposition testimony makes clear, the only compliance function that he testified that he performed was with respect to Seminars and Roundtables.  *See* Cohen Dep. at 299:17-300:20.

204.    At Roundtables and Seminars, Cohen was expected to redirect the conversation if a client posed a question to a Council Member that Cohen identified as raising a compliance-related issue or violating GLG's compliance rules.[206]

**RESPONSE:**          Undisputed for purposes of this motion.

205.    At Roundtables and Seminars, Cohen was expected to interrupt and end a discussion if necessary to prevent compliance problems and, following the event, report the issue to GLG's Compliance Escalation Department.[207]

**RESPONSE:**          Undisputed for purposes of this motion.

> **(ii)  Plaintiff Ronen Monitored For, and Advised Clients Regarding, Compliance Issues**

206.    In Ronen's view, "[o]ne of the biggest legal challenges faced by expert network operators is legal compliance in regards to information passed from information provider to researcher."[208]

---

[205]    Cohen Dep. at 229:17-230:19; Exh. 60 (bates-labeled GLG00001182-1263), at 1228-31.
[206]    Exh. 60 at GLG00001230; Cohen Dep. at 229:17-230:19; Johnson Dep. at 194:12-21.
[207]    Exh. 60 at GLG00001230; Cohen Dep. at 229:17-230:19 ("Q: [Referring to Section 17(c)(iv) on GLG00001230] Did you understand [this] to be the policy? A: I did. Q: And did you host Round Tables and Seminars? A: I did. Q: And did you fulfill this duty when you hosted those events? A: I believe I did. . . . Q: Where you mindful of the [compliance responsibilities] when you were [hosting Round Tables and Seminars?] A: Absolutely. Very mindful.").

**RESPONSE:**          Undisputed for purposes of this motion.

207.    Ronen understood that his job responsibilities as a Research Associate included monitoring interactions for potential compliance issues.[209]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Mr. Ronen testified, everything was so consistent and similar that he would immediately be aware if something was not right.  *See* Ronen Dep. at 119:22-120:1.

208.    Ronen reviewed GLG's compliance manuals and took their contents seriously.[210]

**RESPONSE:**          Undisputed for purposes of this motion.

209.    According to Ronen, he "always adhere[d] to the standards outlined in [GLG's] 'Compliance Rules & Practices Guide For Research Managers'" and would "proactively educate [his] clients on the rules to stem potential violations." This included working with compliance officers of the clients with whom he worked.[211]

**RESPONSE:**          Undisputed for purposes of this motion.

210.    Ronen's job duties including being alert for red flags regarding compliance rules.[212]

**RESPONSE:**          Undisputed for purposes of this motion.

211.    Ronen monitored for compliance issues during live meetings with clients and Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[213]

---

[208]    Exh. 39 at RONEN_0000001287; Ronen Dep. at 336:11-337:5 (confirming that it was his decision to include the statement on RONEN_0000001287 of Exh. 39 in the Research Associate training because he thought it was important).
[209]    Ronen Dep. at 119:2-10; 122:12-123:6.
[210]    Ronen Dep. at 125:7-126:6.
[211]    Exh. 49 at GLG000000497; Ronen Dep. at 125:7-126:6 (confirming that he authored Exh. 49 , that its contents are true and accurate, and that he reviewed GLG's compliance manuals and took their contents seriously); 129:12-130:15 (confirming that he would proactively educate GLG clients to avoid potential violations).
[212]    GLG Compliance Rules and Practices Guide for Research Managers and Associates, last updated July 15, 2008 (bates labeled GLG00000541-629) attached as Exh. 59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules."); Ronen Dep. at 358:2-6.

**RESPONSE:**          Undisputed for purposes of this motion.

>          (iii)   **Plaintiff Baldwin Monitored For, and Advised Clients Regarding, Compliance Issues**

212.    According to Baldwin, the negative consequences of compliance failures could include a Council Member sharing information he does not have permission to share or that is nonpublic.[214]

**RESPONSE:**          Undisputed for purposes of this motion.

213.    Another negative consequence of a compliance failure could be a client having to freeze all action on a proposed investment.[215]

**RESPONSE:**          Undisputed purposes of this motion.

214.    The legal consequences of compliance failures could involve investigations, newspaper articles in the Wall Street Journal, and possibly SEC action.[216]

**RESPONSE:**          Undisputed for purposes of this motion, however, as Ms. Baldwin stated, she does not have any understanding as to the value that GLG's clients place on the compliance function performed by GLG.  *See* Baldwin Dep. at 186:18-21.

215.    Baldwin performed a compliance role as a Research Associate.[217]

**RESPONSE:**          Undisputed for purposes of this motion.

216.    Baldwin's job duties included being alert for red flags regarding compliance rules.[218]

---

[213]    Ronen Dep. at 358:7-17; GLG Compliance Rules and Practices Guide for Research Managers and Associates, last updated March 13, 2008 (bates labeled GLG00001182-1263) attached as Exh. 60 at GLG00001228-31.

[214]    Baldwin Dep. at 185:15-186:5.

[215]    Baldwin Dep. at 185:15-186:5.

[216]    Baldwin Dep. at 186:12-17.

[217]    Baldwin Dep. at 184:18-20. See also Exh. 59 at GLG00000567.

[218]    Exh. 59 at GLG00000567 ("While [Council Members] are solely responsible for the information they submit, and GLG does not independently verify such information in the ordinary course, it is part of your job to be alert for red flags regarding compliance rules.").

**RESPONSE:**          Undisputed for purposes of this motion.

217.   According to Baldwin, the purpose of the compliance function performed by Research Associates was to ensure that client/Council Member interactions complied with GLG's compliance framework.[219]

**RESPONSE:**          Undisputed for purposes of this motion.

218.   Baldwin's compliance responsibilities were critical to GLG and GLG's clients, and they were one reason clients chose GLG over its competitors.[220]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would even remotely support such a finding.

219.   Baldwin understood that GLG's clients valued her compliance role.[221]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support such a finding.  The portion of Ms. Baldwin's deposition does not support this assertion as she testified that it was her understanding that GLG's clients "appreciated [the compliance framework] to some extent because it made us a safer provider to work with.  However, it often got in their way."  *See* Baldwin Dep. at 183:21-24.  Thus, this does not support the assertion that Ms. Baldwin understood that GLG's clients *valued her compliance role*, especially because Ms. Baldwin has no personal knowledge of this.  Further, while Mr. Jacobs references "hundreds of conversations with clients," his testimony is clearly hearsay and further lacks any semblance of competency as

---

[219]    Baldwin Dep. at 185:6-10.
[220]    Mehlhorn Dep. at 73:6-76:10, 98:7-106:18; Exh. 59 at GLG00000546 ("Compliance . . . is not only vital to the protection of [GLG's] business model and corporate values, it is also a key component of our client service and market differentiator."). See also Jacobs Decl. ¶ 11 ("One of the most critical duties performed by Research Associates was their monitoring of the nature of client requests and client interactions with Council Members for compliance concerns.").
[221]    Baldwin Dep. at 183:16-24; Jacobs Decl. at ¶ 12 ("Through hundreds of discussions with clients, it was my clear understanding that clients deeply valued GLG's compliance function and saw it as a fundamental part of GLG's value proposition.").

he has no personal knowledge as to whether (or how deeply) GLG's clients valued Ms.

Baldwin's compliance role.

220.    Baldwin understood that GLG's legal and compliance teams generally only

became aware of potential compliance issues if the research team identified them.[222]

**RESPONSE:**        Disputed.  As Ms. Baldwin testified at her deposition, she was unaware of

whether GLG's legal and compliance team also separately reviewed potential compliance issues,

but that they might.  *See* Baldwin Dep. at 136:16-21.

221.    According to Baldwin, it was the Research Associate's duty to screen Council

Members about what they could and could not discuss.[223]

**RESPONSE:**        Disputed.  As Ms. Baldwin testified at her deposition, when she was

presented with feedback from a Council Member that raised a potential compliance concern, she

would immediately address this concern with her supervisors.  *See* Baldwin Dep. at 217:15-22.

222.    Baldwin assessed the topics and questions proposed by clients for potential

compliance issues.[224]

**RESPONSE:**        Disputed to the extent that Ms. Baldwin's testimony was limited to survey

requests from clients and not all projects.  *See* Baldwin Dep. at 222:18-21.

223.    At the conclusion of a Council Member's work for a client, Baldwin reviewed the

reported scope of the project to make a final assessment for compliance issues.[225]

**RESPONSE:**        Undisputed for purposes of this motion.

224.    There were compliance concerns associated with the nature of questions Research

Associates posited to Council Members.[226]

---

[222]        Baldwin Dep. at 136:16-21.
[223]        Baldwin Dep. at 217:3-14.
[224]        Baldwin Dep. at 222:18-21.
[225]        Baldwin Dep. at 219:8-15.

**RESPONSE:**          Undisputed for purposes of this motion.

225.    If a Council Member's feedback in response to her questions raised a compliance issue in Baldwin's mind, she would ask follow-up questions.[227]

**RESPONSE:**          Disputed to the extent that Ms. Baldwin did not testify that she "would ask follow-up questions."  Instead, Ms. Baldwin testified that she would highlight the issue and get input from her supervisors.  *See* Baldwin Dep. at 217:15-22.  Further, Ms. Baldwin also testified that "for the most part . . . I don't remember that many [compliance issues] occurring."  *See* Baldwin Dep. at 219:22-220:3.

226.    When adding questions to a survey based on client feedback, Baldwin assessed them for compliance issues before allowing the inclusion of the question in the survey.[228]

**RESPONSE:**          Disputed to the extent that Defendant's assertion of material fact omits Ms. Baldwin's testimony that she "very rarely" and "almost never" added questions of her own to a survey.

227.    According to Baldwin, it would be inappropriate for certain Council Members, depending on their background, to respond to a survey for a client.[229]

**RESPONSE:**          Undisputed for purposes of this motion.

228.    Three to four times each month Baldwin monitored compliance issues during live meetings with clients and Council Members, including Private Visits, Master Classes, GLG Seminars and Roundtables.[230]

---

[226]    Baldwin Dep. at 217:3-14.
[227]    Baldwin Dep. at 217:15-20.
[228]    Baldwin Dep. at 228:4-7.
[229]    Baldwin Dep. at 225:19-22.
[230]    Baldwin Dep. at 181:20-182:22; Exh. 60 at GLG00001228-31.

**RESPONSE:**        Disputed to the extent that Defendant mischaracterizes Ms. Baldwin's

deposition testimony where she stated that her role at these live meeting was to "very lightly

monitor the discussion."  *See* Baldwin Dep. at 181:23-182:11.

229.    At these meetings, Baldwin sometimes made an effort to develop personal

relationships with clients and she was required to intervene in the discussion at a client event if it

presented compliance concerns.[231]

**RESPONSE:**        Undisputed for purposes of this motion.

230.    Research Associates were responsible for jumping in and stopping live event

discussions if they violated GLG compliance rules.[232]

**RESPONSE:**        Undisputed for purposes of this motion, however, Ms. Baldwin was only

required to do this once during the period of time that she was employed as a Research

Associate.  *See* Baldwin Dep. at 183:4-15.

### G. Plaintiffs' Primary Duties Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance

231.    GLG expected Plaintiffs to customize and tailor communications to meet clients'

particular needs.[233]

**RESPONSE:**        Disputed to the extent that whether "GLG expected Plaintiffs to customize

and tailor communication to meet clients' particular needs" is immaterial to the application of the

administrative exemption which will be determined based on the work actually performed by

Plaintiffs.

232.    Plaintiffs exercised independent judgment and discretion in advising Council

Members and clients as to compliance issues.[234]

---

[231]    Baldwin Dep. at 182:12-16; Exh. 60 at GLG00001230.
[232]    Baldwin Dep. at 183:4-13; Exh. 60 at GLG00001230.
[233]    Exh. 42 at GLG00000722; Ronen Dep. at 324:11-23.

**RESPONSE:**         Disputed.  First, while Defendants have asserted that all Plaintiffs exercised independent judgment and discretion in advising Council Members and clients as to compliance issues, Defendant has only cited to the testimony which pertains to Mr. Cohen. Thus, the evidence cited by Defendant has no bearing on whether Ms. Baldwin or Mr. Ronen performed this function.  Further, with respect to Mr. Cohen, the evidence cited by Defendant does not establish the supposedly undisputed statement asserted by Defendant, as Mr. Cohen testified that he relied on Defendant's "very extensive" compliance rules and how they should be handled.

233.   GLG provided Plaintiffs with a Compliance Guide that they were expected to read, understand, and use as a resource or learning tool.[235]

**RESPONSE:**         Undisputed for purposes of this motion.

234.   Given the variety of projects that clients and Council Members engaged in, it was impossible to include in the Compliance Manual a comprehensive list of all information or situations that could raise potential compliance concerns.[236]

**RESPONSE:**         Disputed to the extent that whether it was possible to include a comprehensive list of all information or situations that could arise is immaterial to the application of the administrative exemption to the work performed by Plaintiffs during the period of time that they were employed as Research Associates.

235.   GLG's "The Greenies" specifically emphasized that Research Associates should not use template communications with clients (called a "one click give"), but rather should carefully craft "natural" and "thoughtful" communications "tailored" to each client.[237]

---

[234]   Mehlhorn Dep. at 49:21-53:4; Cohen Dep. at 222:2-6, 223:18-224:7, 225:4-13.
[235]   Exh. 59 at GLG00000546 ("This Guide is intended as a desktop compliance resource for . . . Research Associates."); Cohen Dep. at 225:14-227:10, 228:8-13, 229:1-7, 230:20-231:2.
[236]   Jacobs Decl. ¶ 10; Exh. 59 at GLG00000567; Cohen Dep. at 227:11-227:22.

**RESPONSE:**          While it is not disputed that "The Greenies" emphasized this, it is disputed that Plaintiffs followed this advice. *See* Cohen Dep. at 231:3-232:10; Ronen Dep. at 123:20-124:19; Baldwin Dep. at 233:22-234:10.

236.     The Greenies emphasized that, instead of simply listing out the names of recommended Council Members, Research Associates "should endeavor to explain why they made a specific selection and chose a specific Council Member" and, if a Research Associate is providing a client with recommendations for Council Members, the Research Associate should "distinguish broad characteristics or population attributes which help provide a rationale for selection."[238]

**RESPONSE:**          While it is not disputed that "The Greenies" emphasized this, it is disputed that Plaintiffs followed this advice. *See* Cohen Dep. at 231:3-232:10; Ronen Dep. at 123:20-124:19; Baldwin Dep. at 233:22-234:10.

> **(i)  Plaintiff Cohen's Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance**

237.     Except for a short period when he first began his employment, Cohen worked with clients independently in order to ascertain their research needs and then determined and advised clients as to the appropriate Council Member(s) to complete their research project(s).[239]

**RESPONSE:**          Undisputed for purposes of this motion.

238.     Cohen typically made independent judgments by himself throughout the day without having to seek or obtain his manager's approval.[240]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[237]     Exh. 42 at GLG00000722 (indicating that it was Research Associates' responsibility "to customize [his] communication thoughtfully [such] that each message [was] tailored to the client, thoughtful and natural"); Cohen Dep. at 237:8-11, 243:17-244:5, 245:23-246:11; Ronen Dep. at 324:11-23.
[238]     Exh. 41 at GLG00000731; Cohen Dep. at 244:17-245:14.
[239]     Cohen Dep. at 166:16-167:5; Johnson Dep. at 98:13-99:6, 114:4-10.
[240]     Cohen Dep. at 165:24-167:9.

239.    Cohen acknowledges that his responsibilities in connection with facilitating research projects typically "did not require communication with [his] manager."[241]

**RESPONSE:**        Undisputed for purposes of this motion.

240.    Cohen's duties in advising clients as to research projects involved devising high-level, creative solutions for clients by using his own independent judgment and discretion to develop Market Studies, Surveys, and Factual Operating Agreements in order to provide access to a breadth of perspectives on trends in each client's industry.[242]

**RESPONSE:**        Disputed.  The evidence cited by Defendant does not support the assertion that Mr. Cohen's job duties involved "high-level" solutions and makes no reference to whether these duties required independent judgment and discretion.  Further, as Mr. Cohen testified, these types of projects consisted of a small fraction of the work that he performed; instead, it is undisputed that the vast majority of the work performed by Mr. Cohen were "basic turn around projects."  *See* Cohen Dep. at 269:15-17.

241.    Cohen "thrived in [GLG's] fast-paced environment, having learned to communicate effectively and to devise creative solutions for clients."[243]

**RESPONSE:**        Disputed to the extent that, as Mr. Cohen testified, these types of projects consisted of a small fraction of the work that he performed; instead, it is undisputed that the vast majority of the work performed by Mr. Cohen were "basic turn around projects."  *See* Cohen Dep. at 269:15-17.

---

[241]     Cohen Dep. at 168:12-169:7 ("Q: So the functions you described so far [regarding your primary duty of acting as a liaison between clients and Council Members to facilitate project work] you would perform without communicating with your manager? A: Yes."); Johnson Dep. at 98:13-99:6, 114:4-10 (describing limited supervision of Cohen).

[242]     Cohen Dep. at 269:6-270:1; Johnson Dep. at 114:4-10 ("I would give him the project in person or over e-mail and let him run with the whole thing, which is more often the case where he would be responsible for creating the description, finding the counsel members. Essentially going from start to finish.").

[243]     Cohen Dep. at 269:6-12, 255:24-256:7; Exh. 56 at GLG00002013.

242.    Cohen typically conducted calls with clients without his manager on the phone.[244]

**RESPONSE:**            Undisputed for purposes of this motion.

243.    Cohen's manager typically did not provide guidance on Cohen's e-mails to clients.[245]

**RESPONSE:**            Disputed to the extent that Defendant's purported statement of undisputed fact mischaracterizes Mr. Cohen's testimony.  Instead, Mr. Cohen testified that his supervisor would assist him in structuring e-mails to clients "probably less often than not."  *See* Cohen Dep. at 191:13-20.

244.    Although Cohen kept his manager informed about his communications with clients, he typically did not discuss with his manager the content of his communications with clients.[246]

**RESPONSE:**            Undisputed for purposes of this motion.

245.    Most of the research projects that Cohen received came from clients directly, not through his manager or any other intermediary.[247]

**RESPONSE:**            Disputed to the extent that the frequency with which he received information directly form clients changed throughout the period of time he was employed as a Research Associate.

246.    Cohen typically exercised independent judgment without a manager's approval in responding to clients' research requests.[248]

**RESPONSE:**            Defendant has failed to support this purportedly undisputed statement of material fact with a citation to evidence which would even support such a finding.

---

[244]    Cohen Dep. at 169:9-20.
[245]    Cohen Dep. at 191:13-20.
[246]    Cohen Dep. at 180:20-181:1.
[247]    Cohen Dep. at 210:3-11.
[248]    Cohen Dep. at 187:15-189:8, 201:23-202:3.

247.    On those occasions when Cohen's manager, Todd Johnson, assigned him a new research project, he typically did so with little to no instruction on how to perform or complete the project.[249]

**RESPONSE:**          Undisputed for purposes of this motion.

248.    On a regular basis, Cohen evaluated multiple options for research projects and then (with little to no input from supervisors) used his independent judgment and discretion to formulate the best course of action to recommend to the client.[250]

**RESPONSE:**          Undisputed for purposes of this motion.

249.    Cohen was responsible for deciding which of GLG's thousands of Council Members to recommend for each client project.[251]

**RESPONSE:**          Defendant has failed to support this purportedly undisputed statement of material fact with a citation to evidence which would support a finding that Mr. Cohen was responsible for deciding which of GLG's Council Members to recommend for each client project.  Instead, the deposition testimony cited by Defendant relates to whether Mr. Cohen customized his communications with Defendant's clients in the manner which his manager and supervisors suggested.  *See* Cohen Dep. at 234:14-20, 236:9-16, 245:9-22.

250.    On a regular basis, Cohen identified on his own (without a manager's guidance) one or more Council Members that would have the experience and information the client was looking for.[252]

---

[249]    Cohen Dep. at 189:4-8 (discussing T. Johnson Email to Cohen dated 04/25/2007 (bates-labeled GLG00001845-53), attached as Exh. 61); T. Johnson Email to Cohen dated 11/13/2007 (bates-labeled GLG00001907), attached as Exh. 62.

[250]    Cohen Dep. at 169:9-20, 167:10-21 ("Q: Now, if there were multiple potential Council Members, how would you select which ones to then recommend to the client? A: Based on their experience and availability would be the primary factors to determine whether I would recommend them or add them to the project. Q: And when you say "their experiences," can you explain that or provide an example of that? A: If a client is looking to do research on a topic, certain people with certain experiences are best suited to address that topic. So that would be how I would determine whether they were relevant or not."); Exh. 61 at GLG00001845-53); Exh. 62 at GLG00001907).

[251]    Cohen Dep. at 234:14-20, 236:9-16; 245:9-22.

**RESPONSE:**          Undisputed for purposes of this motion.

251.    Even when clients already had a research topic in mind, Cohen typically used

creativity and an array of research tools to study the client, the competition, and market trends to

refine each client's research inquiry in order to be able to identify and recommend appropriate

Council Members for their projects.[253]

**RESPONSE:**          Disputed.  Defendant has failed to support this purportedly undisputed

statement of material fact with a citation to evidence which would support such a finding.

252.    Cohen had the discretion to decide when to seek out new subject-matter experts

for GLG's Council Member Network to meet any given client's needs.[254]

**RESPONSE:**          Disputed.  The portion of Mr. Cohen's testimony cited by Defendant

refers to a single instance where Mr. Cohen engaged a recruiting associate in GLG's Austin,

Texas office to attempt to recruit a Council Member who could address a specific research

project.  As Mr. Cohen testified: "I basically provided the type of background for the person we

would be interested in, sent it to our recruiter, and let them do their thing."  *See* Cohen Dep. at

260:23-262:6.  Further, as Mr. Cohen testified it was the client – and not Mr. Cohen – who made

the determination that the experts that in GLG's network were not meeting their needs.  *See*

Cohen Dep. at 262:7-17.

253.    In performing his promotional and marketing duties, Cohen individually decided

which clients to call and when, as well as which ideas to propose to a particular client.[255]

**RESPONSE:**          Disputed.  Defendant has failed to support this purportedly undisputed

statement of material fact with a citation to evidence which would support such a finding.

---

[252]        Cohen Dep. at 165:24-166:7.
[253]        Cohen Dep. at 170:5-18.
[254]        Cohen Dep. at 260:8-261:17; Exh. 56 at GLG00002011-12; Exh. 3 at COHEN 0132; Cohen Dep. at 321:3-11 (confirming that this document is truthful, accurate and relates to Cohen's duties as a Research Associate).
[255]        Cohen Dep. at 180:9-19, 196:18-197:11.

Instead, Mr. Cohen was provided with a list of clients that he was required to call on a monthly basis.  *See* Cohen Dep. at 178:2-9, 180:7-8.

254.    Although GLG had training materials called Greenies that highlighted some best practices for communicating effectively with clients and Council Members, they primarily focused on examples that other RAs had encountered and Cohen decided for himself which if any of the best practices included in the Greenies to use in any given situation.[256]

**RESPONSE:**           Undisputed for purposes of this motion.

255.    Cohen decided for himself in each instance whether to follow or deviate from the guidance in GLG's training materials on client communications, based on whether he thought the guidance was necessary or relevant to each particular communication.[257]

**RESPONSE:**           Undisputed for purposes of this motion.

256.    Cohen decided for himself in each instance whether or not it made sense for him to follow the guidance in the Greenies when communicating with a client.[258]

**RESPONSE:**           Undisputed for purposes of this motion.

257.    Cohen independently determined which materials and sources to consult in maintaining his subject-matter expertise regarding the TMT industry, his clients, and Council Members in his industry.[259]

---

[256]     Cohen Dep. at 233:11-18, 235:7-236:16, 237:8-238:5, 242:9-243:21, 244:17-245:22.

[257]     Cohen Dep. at 235:7-236:16, 237:8-238:5, 233:1-18 ("Q: Is what he is saying there [in the Greenies] consistent with your understanding of how you performed your job? A: Sometimes I would do this, other times I wouldn't. Depending on if I felt it was necessary or relevant. Q: And whose decision was it as to whether it was necessary or relevant in each case? A: Usually mine."); Exh. 42 at GLG00000722.

[258]     Cohen Dep. at 238:3-5 ("Q: And it was your decision in each instance [to decide] which was a better approach? A: Yeah."), 245:9-22 ("Q: Do you agree that that is the appropriate way to communicate with a client? A: I think that's relevant in some cases. Q: But not in others? A: That [] level of communication is not always the best, depending on the client. Q: And was it your judgment as to whether that level of communication was required or appropriate for each client that you dealt with? A: Yeah.").

[259]     Cohen Dep. at 176:2-7.

**RESPONSE:**         Disputed.  As Mr. Cohen testified, Defendant recommended – but did not require Mr. Cohen to review – sources that Mr. Cohen should refer to in order to stay up-to-date on relevant news items.  *See* Cohen Dep. at 176:2-7.

### (ii)   Plaintiff Ronen's Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance

258.    Except for a period of a few weeks when he first began his employment, Ronen worked independently to respond to client inquiries and advise clients as to the appropriate Council Members to complete their research project(s).[260]

**RESPONSE:**         Undisputed for purposes of this motion.

259.    Ronen had the discretion to determine which clients he would call or write on a given day.[261]

**RESPONSE:**         Undisputed for purposes of this motion.

260.    Ronen had the discretion to advise clients, without first having to discuss his advice with his manager, to undertake additional research projects using experts across different disciplines.[262]

**RESPONSE:**         Undisputed for purposes of this motion.

261.    Ronen had the discretion to recommend to clients that they engage in surveys, private visits and other non-consultation projects without first running his recommendations by his supervisor.[263]

---

[260]    Ronen Dep. at 92:15-94:23; 353:1-355:14; Dille Dep. at 100:12-18; 101:14-17 (stating that Ronen did not need his supervisor's approval to advise clients' regarding their research requests).
[261]    Ronen Dep. at 356:8-19.
[262]    Ronen Dep. at 109:15-110:18.
[263]    Ronen Dep. at 145:24-147:12.

**RESPONSE:**          Disputed.  As Mr. Ronen testified, it was Defendant's protocol to suggest other types of research projects to Defendant's clients when clients gave them a project.  *See* Ronen Dep. at 146:5-18.

262.    Ronen had the discretion to deviate from GLG's training materials when communicating with Council Members and clients.[264]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of material fact with a citation to evidence which would support a finding that Mr. Ronen "had the discretion to deviate from GLG's training materials;" instead, Mr. had the ability to adapt Defendant's training materials to a particular situation.  *See* Ronen Dep. at 358:18-359:5.

### (iii)  Plaintiff Baldwin's Primary Duty Included The Exercise Of Discretion And Independent Judgment With Respect To Matters Of Significance

263.    With respect to the clients with whom she interacted, Baldwin took over primary responsibility for some of them.[265]

**RESPONSE:**          Undisputed except that Ms. Baldwin did not take over primary responsibility for these clients until March 2008, at which time she was given responsibility for five clients and by the time she was promoted in December 2008, she had responsibility for six or seven clients.  *See* Baldwin Dep. at 107:17-108:6.

264.    Baldwin had primary responsibility for approximately six clients in 2008.[266]

**RESPONSE:**          Undisputed except that Ms. Baldwin did not have primary responsibility for these clients throughout all of 2008.  Instead, Ms. Baldwin was given primary responsibility for these clients in until March 2008.  *See* Baldwin Dep. at 107:17-22.

---

[264]    Ronen Dep. at 358:18-359:7.
[265]    Baldwin Dep. at 107:16-21.
[266]    Baldwin Dep. at 108:1-6.

265.    Based on conversations with clients, Baldwin used her judgment to identify Council Members that were best suited to provide advice on specific client research request.[267]

**RESPONSE:**         Disputed.  Because many of the clients that Ms. Baldwin performed research requests for asked the same thing and the work became very repetitive, such that approximately 70% of the projects that Ms. Baldwin performed were the same as projects that she had done before.  *See* Baldwin Dep. at 144:13-16, 147:11-148:1.

266.    Baldwin's supervisor encouraged her to be independent in performing her job duties.[268]

**RESPONSE:**         Undisputed for purposes of this motion.

267.    Baldwin's supervisor relied heavily on her input in deciding how to describe a client's project in GLG's computer system to attract qualified Council Members.[269]

**RESPONSE:**         Disputed.  While Mr. Schaffer now testifies in his affidavit that he "relied heavily on her in put," as Ms. Baldwin testified, she only, "on occasion," made recommendations to her supervisors as to how she should proceed with client projects.  *See* Baldwin Dep. at 127:11-15.  Further, as Ms. Baldwin described, Defendant's internal system was such that she only needed to enter certain keywords to narrow the scope of Defendant's network of experts in determining which Council Members to contact to see if they could provide advice on a particular topic.  *See* Baldwin Dep. at 143:23-144:10.

---

[267]    Schaefer Dep. at 63:24-65:3.
[268]    Baldwin Dep. at 129:8-13. See also Baldwin 2008 Promotion Recommendation, Exh. 63 at Baldwin_00000924 ("Ashleigh was given the responsibility to assist her manager on managing the relationship with a client. GLG's deal with **REDACTED** represents the largest in firm history. To date, Ashleigh has executed on a number of requests and has received excellent feedback, including this from one of **REDACTED** analysts: 'Well organized, very efficient, and great service by Ashleigh and Todd.'").
[269]    Schaefer Decl. ¶ 6; Baldwin Dep. at 127:11-129:20 (admitting that she was unaware of Schaefer's confidence in her ability and had no basis to dispute his representations about the extent to which he accepted her recommendations).

74

268.    When Baldwin had a new client project, she often discussed with her supervisor her ideas about how to proceed, whether a survey was an appropriate product, or the best way to describe the project in Vega.[270]

**RESPONSE:**        Undisputed for purposes of this motion.

269.    Although her supervisor generally communicated with Baldwin daily as a partner in their efforts to advise clients, he had great confidence in her from early on and deferred to her judgment regularly when they discussed her work for clients.[271]

**RESPONSE:**        Undisputed for purposes of this motion, except that this purported statement of undisputed fact is immaterial to the application of the administrative exemption.

270.    Baldwin's supervisor relied heavily on her input in deciding with her what products to recommend to clients.[272]

**RESPONSE:**        Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support such a finding.  In fact the cited portion of Mr. Schaefer's testimony only states that, "As Senior Research Manager, I was Ashleigh Baldwin's supervisor throughout the time period that she worked as a Research Associate."  *See* Schaefer Declaration at ¶ 2.

271.    Baldwin cannot recall ever proposing the use of a recruiting associate being rejected by her supervisor or by anyone else.[273]

**RESPONSE:**        While it is undisputed that Ms. Baldwin does not recall her getting push back from her supervisor regarding the use of a recruiting associate, that is because, as Ms.

---

[270]     Baldwin Dep. at 126:14-127:15.
[271]     Schaefer Decl. ¶ 3; Baldwin Dep. at 127:16-19; 129:4-20 (stating that she does not remember how often she had discussions with Schaefer but did not have grounds to dispute his representation of his reliance on her judgment).
[272]     Schaefer Decl. ¶ 2.
[273]     Baldwin Dep. at 153:2-11.

Baldwin testified, "there was no formal approval process" to use a recruiting associate.  *See* Baldwin Dep. at 153:2-11.  Thus, this purported statement of undisputed fact is immaterial to the instant matter.

272.   Baldwin's supervisor heavily relied on her input in deciding with her which Council Members to recommend to clients.[274]

**RESPONSE:**          Undisputed for purposes of this motion, however Ms. Baldwin avers that in most instances she discussed which counsel members to propose with her supervisors.  *See* Baldwin Dep. at 156:13-157:10.  Regardless, whether Ms. Baldwin's supervisors relied on her guidance is immaterial to the application of the administrative exemption.

273.   When Baldwin received client requests directly, she would let her supervisor know about it.[275]

**RESPONSE:**          Undisputed for purposes of this motion.

274.   In some cases, her supervisor would just respond, "that's great."[276]

**RESPONSE:**          Undisputed for purposes of this motion.

275.   In other cases, Baldwin would discuss with her supervisor the nature of the request and which Council Members might be appropriate for it.[277]

**RESPONSE:**          Undisputed for purposes of this motion.

276.   Baldwin's supervisor relied heavily on her input in deciding with her how to define a project for a client and what products to recommend.[278]

---

[274]      Schaefer Decl. ¶ 4.
[275]      Baldwin Dep. at 123:21-124:8.
[276]      Baldwin Dep. at 124:9-13.
[277]      Baldwin Dep. at 124:9-12.
[278]      Schaefer Decl. ¶ 5; Baldwin Dep. at 120:5-11 (stating that she did not know the extent to which Schaefer relied on her suggestions for product recommendations to the client).

**RESPONSE:**            Disputed.  While Ms. Baldwin's supervisor testifies in his affidavit that he

"relied heavily on her judgment," as Ms. Baldwin testified, in most cases it was her supervisor

who suggested products that she should recommend to clients.  *See* Baldwin Dep. at 119:16-

120:4.  Further, with respect to how to define a project for a client, Ms. Baldwin testified that "it

was very repetitive in terms of almost all clients did completely calls" and "at least 70 percent"

of her projects were the same as projects she had done before.  *See* Baldwin Dep. at 137:19-21,

147:11-148:11.

      277.    Baldwin did not need permission from her supervisor to select Council Members

for survey participation, although she may have discussed selections with her supervisor.[279]

**RESPONSE:**            While it is undisputed that Ms. Baldwin did not need approval from her

supervisors to select Council Members to participate in a survey in the majority of these cases,

this was because the populations were already pre-grouped.  *See* Baldwin Dep. at 229:17-22.

      278.    When Baldwin's supervisor discussed with her how to design a survey or which

Council Members to invite as respondents, he relied heavily on her input in making his ultimate

recommendation.[280]

**RESPONSE:**            Disputed.  Defendant has failed to support this purported statement of

undisputed fact with a citation to evidence which would support such a finding.  In fact the cited

portion of Mr. Schaefer's declaration only refers to his review and approval of Ms. Baldwin's e-

mails and does not relate to survey design and/or which Council Members to invite.  *See* Schafer

Decl. ¶ 9.  Further, the large majority of surveys that Ms. Baldwin worked on for her clients were

designed by GLG's survey team and were provided to the client for edits, thus Ms. Baldwin was

---

[279]        Baldwin Dep. at 229:17-22.
[280]        Schaefer Decl. ¶ 9; Baldwin Dep. at 228:22-229:1 (stating that she did now know to what extent her
supervisor relied upon her proposed survey).

not generally involved in the design of surveys other than as liaison between the client and the survey team.  *See* Baldwin Dep. at 221:21-222:8.

279.    Even when she was not creating a survey, Baldwin remained involved in the development process as the point person the survey team would come back to for follow-up that she would then communicate to the client and then again with the survey team.[281]

**RESPONSE:**          Undisputed for purposes of this motion, except to state about 70 to 80 percent of the time, Ms. Baldwin was not the one that created the survey.  *See* Baldwin Dep. at 221:24-222:8.

280.    Baldwin read the New York Times and Wall Street Journal to help her learn about the healthcare industry, better understand her clients' businesses, and speak intelligently with clients.[282]

**RESPONSE:**          Undisputed for purposes of this motion.

281.    Baldwin does not believe there was a manual or guideline about how to perform the Research Associate job.[283]

**RESPONSE:**          Disputed.  As Ms. Baldwin testified, she was provided with a number of training materials that likely covered what to do when she received a client request or how to search for Council Members.  *See* Baldwin Dep. at 153:17-154:5.

282.    Although GLG had training materials called Greenies that highlighted some best practices for communicating effectively with clients and Council Members, they primarily focused on examples that others had encountered and Baldwin decided for herself which if any of the best practices included in the Greenies to use in any given situation.[284]

---

[281]          Baldwin Dep. at 223:15-22.
[282]          Baldwin Dep. at 359:4-23.
[283]          Baldwin Dep. at 153:17-154:1.
[284]          Baldwin Dep. at 153:12-157:20; Exh. 42 at GLG00000722.

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a citation to evidence which would support such a finding as the cited portion of Ms. Baldwin's deposition testimony makes no reference to "The Greenies."  Instead, as Ms. Baldwin testified, "The Greenies" were a style guide which "was actually just a critique of people who had written bad G[ive] T[o] C[lient] e-mails."  *See* Baldwin Dep. at 233:22-234:10.

283.    Baldwin is not aware of manuals or other forms of written guidelines for Research Associates to use in selecting Council Members to recommend to clients.[285]

**RESPONSE:**          Disputed.  As Ms. Baldwin testified, she was provided with a number of training materials that likely covered what to do when she received a client request or how to search for Council Members.  *See* Baldwin Dep. at 153:17-154:5.

284.    There were no written guidelines or policies that advised Baldwin to seek a supervisor's approval in selecting Council Members.[286]

**RESPONSE:**          While it is undisputed that there were no such policies, it is also undisputed that Ms. Baldwin sat perpendicular to both of her supervisors and she talked to Mr. Schaefer constantly.  *See* Baldwin Dep. at 241:2-7.

---

[285]    Baldwin Dep. at 153:17-154:1.
[286]    Baldwin Dep. at 157:11-15.

### H. Plaintiffs Also Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments

#### (i) Plaintiff Cohen Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments

285.    Cohen regularly served as the face of the Company and the primary point of contact for the clients with whom he worked, including up to 28 of his own clients for which he had primary responsibility to provide advice on research projects and promote GLG each day.[287]

**RESPONSE:**    While it is undisputed that Mr. Cohen had contact with clients that were assigned to him, there is no support for Defendant's purported statement of undisputed fact that Mr. Cohen served "as the face of the Company" for these clients; instead, as Mr. Cohen testified, he "just executed their project work."  *See* Cohen Dep. at 193:24.

286.    Cohen had responsibility for facilitating the research projects of those clients for which he had primary responsibility.[288]

**RESPONSE:**    Disputed to the extent that Defendant's purported statement of undisputed fact is unsupported by a citation to any evidence which would support such a finding.  As Mr. Cohen testified, for the accounts that he was assigned to cover (or had "primary responsibility"), he was merely assigned to execute their project work.  *See* Cohen Dep. at 277:16-19.

287.    Cohen also assisted clients for which his manager, Todd Johnson, or other members of the TMT team had primary responsibility.[289]

---

[287]    Cohen Dep. at 178:19-179:16, 192:21-195:10, 200:23-201:4; T. Johnson Email to Cohen dated 11/06/2007 (bates-labeled GLG00001879-80), attached as Exh. 64 (referencing a sporting event that Cohen attended with clients); Points of Emphasis document sent by Cohen to Brad Spiegel for purpose of drafting business school recommendation letters (bates-labeled GLG00002006-08), attached as Exh. 75, at 2006 (stating that Cohen covered "way more accounts then [the] avg. RA"); Cohen Dep. at 276:23-277:7, 279:4-17 (confirming that this document is truthful, accurate, and relates to Cohen's duties as a Research Associate).

[288]    Cohen Dep. at 277:13-22, 259:15-260:7.

[289]    Cohen Dep. at 202:10-17, 214:19-22, 218:11-219:3; Exh. 46 at GLG00001982 ("I covered meetings for

**RESPONSE:**          Undisputed for purposes of this motion.

288.    Cohen also represented GLG during face-to-face meetings with clients, including meetings that he conducted independently to better understand their investment strategies and to promote GLG's services.[290]

**RESPONSE:**          Disputed to the extent that the evidence cited by Defendant refers to a single meeting where Mr. Cohen met with a client to "put a face to a name" and for him "to get a better understanding of what they liked to invest in and their strategies so that I could execute more project work for them and drive volume."  *See* Cohen Dep. at 194:21-195:1.

289.    Cohen also represented GLG by interacting directly with clients in hosting Education Seminars, Roundtable luncheons, and Custom Research Trips.[291]

**RESPONSE:**          Disputed to the extent that the first portion of Mr. Cohen's testimony cited by Defendant is a portion of his deposition transcript where Mr. Cohen was asked to read Defendant's job description for the Research Associate position and asked whether it was an accurate description of the job of Research Associate.  Similarly, the second portion of Mr. Cohen's deposition testimony is a two-line excerpt where Mr. Cohen was asked whether he hosted "Round Tables" and "Seminars" and does not support the purported statement of undisputed fact asserted by Defendant.  *See* Cohen Dep. at 183:7-184:6, 230:-7-8.

290.    Cohen sometimes served as the primary host of live meetings between clients and Council Members.[292]

---

colleagues at Clients I'm not actively involved with . . . [and] helped manage the Queue and picked up numerous projects for teammates."); T. Johnson email to Cohen (bates-labeled GLG00001915), attached as Exh. 65 (indicating Cohen covering for his manager T. Johnson); T. Johnson email to Cohen (bates-labeled GLG00001925), attached as Exh. 66 (same); T. Johnson email to Cohen (bates-labeled GLG00001936), attached as Exh. 67 (same).

[290]     Cohen Dep. at 194:17-195:10.

[291]     Cohen Dep. at 183:7-184:6, 230:7-8.

[292]     Cohen Dep. at 229:17-230:19, 295:15-296:7; Exh. 29 at GLG00000001.

**RESPONSE:**          While it is undisputed that Mr. Cohen sometimes hosted live meetings between clients and Council Members, there is no support in the evidence cited by Defendant that Mr. Cohen served as the "primary host" of these meetings.

291.    Cohen also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[293]

**RESPONSE:**          Disputed.  First, Defendant's citation to the testimony of Mr. Johnson fails to support this purported statement of undisputed fact asserted by Defendant.  Second, the deposition testimony of Mr. Mehlhorn makes no reference of Mr. Cohen (or any other Research Associate) providing advice on rates to Council Members.  Instead, as Mr. Cohen testified, any conversations with clients about rates were directed to GLG Sales department.  *See* Cohen Dep. at 194:1-8.  Finally, while Defendant asserts that Mr. Cohen "committed GLG to pay for thousands of dollars in services," Defendant fails to cite to any specific evidence pertaining to this "approval" exercised by Mr. Cohen.  Instead, it appears that Defendant is referring to the fact that Mr. Cohen sometimes reviewed invoices for payment to a Council Member for a project that had been completed, however, as Mr. Cohen's supervisor testified, this "approval" was also subject to the particular client's approval.  *See* Deposition of Todd Johnson ("Johnson Dep."), attached to Filosa Decl. as Ex. E, at 88:2-25.

      **(ii)   Plaintiff Ronen Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments**

292.    Ronen communicated directly with clients both telephonically and by e-mail.[294]

**RESPONSE:**          Undisputed for purposes of this motion.

---

[293]     Johnson Dep. at 82:22-24; Mehlhorn Dep. at 49:21-53:4.
[294]     Ronen Dep. at 92:15-93:4.

293.     Ronen had the discretion to entertain clients without the presence of his manager.[295]

**RESPONSE:**          While it is undisputed that Mr. Ronen sometimes had lunch or dinner with a client, there is no support for Defendant's assertion that Mr. Ronen "had the discretion to entertain clients" as Defendant asserts.  Instead, Mr. Ronen merely testified that "sometimes he was alone – just him and the client."  *See* Ronen Dep. at 200:22-201:2.

294.     Ronen represented GLG by interacting with clients and Council Members in hosting private visits, classes, seminars and roundtables.[296]

**RESPONSE:**          While it is undisputed that Mr. Ronen attended live meetings between clients and Council Members, Defendant has not presented any evidence which would suggest that this was Mr. Ronen's primary duty as a Research Associate.

295.     Ronen reviewed Council Members' invoices to ensure that they were consistent with project requirements.[297]

**RESPONSE:**          While it is undisputed that Mr. Ronen reviewed invoices as part of his duties as Research Associate, Mr. Ronen testified that "it must have been a small part of my job . . . but that it would make sense for [him] to at least see in case there was an aberration, in case there was a mistake made."  *See* Ronen Dep. at 152:24-153:10.

296.     Ronen approved payments to GLG Council Members.[298]

**RESPONSE:**          While it is undisputed that Mr. Ronen reviewed payments to Council Members, Mr. Ronen had no way to monitor whether or not a call or interaction did in fact occur, thus, the only time he would deny payment to a Council Member is when the client

---

[295]     Ronen Dep. at 200:14-201:5.
[296]     Ronen Dep. at 358:7-11.
[297]     Ronen Dep. 152:24-153:6.
[298]     Ronen Dep. at 152:24-153:6; 359:8-17; Dille Dep. at 101:18-22 (stating that Ronen did not need her approval to approve a Council Member's request for payment for services rendered); Ronen Dep. at 454:4-16.

83

contacted him and told him that the call had not, in fact, occurred.  *See* Ronen Dep. at 454:23-455:12.

297.    Ronen also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[299]

**RESPONSE:**          Disputed.  The deposition testimony of Mr. Mehlhorn cited by Defendant makes no reference to Mr. Ronen (or any other Research Associate) providing advice on rates to Council Members.  Further, as stated above, while it is undisputed that Mr. Ronen reviewed payments to Council Members, Mr. Ronen had no way to monitor whether or not a call or interaction did in fact occur, thus, the only time he would deny payment to a Council Member is when the client contacted him and told him that the call had not, in fact, occurred.  *See* Ronen Dep. at 454:23-455:12.

### (iii)   Plaintiff Baldwin Exercised Discretion and Independent Judgment By Representing GLG To The Public And Binding GLG To Financial Commitments

298.    Baldwin represented GLG by interacting with clients and Council Members in hosting private visits, classes, seminars and roundtables.[300]

**RESPONSE:**          Undisputed for purposes of this motion that Ms. Baldwin attended roundtables and other live events, however, Ms. Baldwin's role as "host" was to "have a GLG presence there" and to "make sure the room is arranged and everything goes smoothly," while "very lightly monitor the discussion" and having "very minimal[]" interaction with GLG's clients.  *See* Baldwin Dep. at 181:20-182:11.  Further, Ms. Baldwin attended these events, on average 3 to 4 times a month.  *See* Baldwin Dep. at 182:5-8.

---

[299]        Mehlhorn Dep. at 49:21-53:4.
[300]        Baldwin Dep. at 181:20-22.

299.   Baldwin reviewed Council Members' invoices to ensure that they were consistent with project requirements.[301]

**RESPONSE:**   Disputed.  The portion of Ms. Baldwin's deposition testimony cited by Defendant makes no mention of any "invoices" reviewed by Ms. Baldwin.  *See* Baldwin Dep. at 219:8-12.  While it is averred that Ms. Baldwin reviewed Council Members descriptions of each client interaction where a Council Member requested payment to see if there were any compliance issues, this was not a significant part of Ms. Baldwin duties as a Research Associate and only required Ms. Baldwin to confirm that she had read the description.  *See* Baldwin Dep. at 220:4-10.  Further, before any Council Member was paid, there were a number of additional layers of review, including review by her supervisors, as well as finance and compliance.  *See* Baldwin Dep. at 220:11-221:16.

300.   Within a few weeks of starting a [sic] GLG, Baldwin was making what GLG refers to as a "give to clients" – the recommendation to a client as to which Council Members may be most appropriate for their project.[302]

**RESPONSE:**   Undisputed for purposes of this motion and averred that, within a few weeks of starting her employment with GLG, Ms. Baldwin was completing hundreds of projects a month.  *See* Baldwin Dep. at 110:12-111:4.

301.   Baldwin appreciated the freedom given to her by her supervisor to do her own "gives" – recommendation to clients as to Council Members – within two weeks after joining GLG.[303]

**RESPONSE:**   While the statement contained in Ms. Baldwin's 2007 self-evaluation is undisputed, as Ms. Baldwin explained, during this period of time her supervisor reviewed each

---

[301]   Baldwin Dep. at 219:8-12.
[302]   Baldwin Dep. at 110:8-11.
[303]   Exh. 11 at GLG00004658.

of her e-mail communications with clients before Ms. Baldwin sent them and, very frequently, Ms. Baldwin's supervisor would change what Ms. Baldwin had initially drafted.  *See* Baldwin Dep. at 387:6-389:24.

302.    Baldwin approved payments to GLG Council Members.[304]

**RESPONSE:**              Disputed.  The portion of Ms. Baldwin's deposition testimony cited by Defendant makes no mention of Ms. Baldwin "approving" any payments to GLG Council Members.  *See* Baldwin Dep. at 219:13-15.  As noted above, while is undisputed that Ms. Baldwin reviewed Council Members descriptions of each client interaction where a Council Member requested payment to see if there were any compliance issues, this was not a significant part of Ms. Baldwin duties as a Research Associate and only required Ms. Baldwin to confirm that she had read the description.  *See* Baldwin Dep. at 220:4-10.  Further, before any Council Member was paid, there were a number of additional layers of review, including review by her supervisors, as well as finance and compliance.  *See* Baldwin Dep. at 220:11-221:16.  Thus, Defendant grossly mischaracterizes Ms. Baldwin's testimony when it asserts that it is undisputed that Ms. Baldwin "approved payments to GLG Council Members."

303.    Baldwin also advised on rates with Council Members and regularly approved payments to Council Members that committed GLG to pay for thousands of dollars of services.[305]

**RESPONSE:**              Disputed.  As noted above with respect to these same averments with respect to Messrs. Cohen and Ronen, the deposition testimony of Mr. Mehlhorn cited by Defendant makes no reference of Ms. Baldwin (or any other Research Associate) providing advice on rates to Council Members.  Further, as noted in paragraph 303, Defendant's averment

---

[304]        Baldwin Dep. at 219:13-15.
[305]        Mehlhorn Dep. at 49:21-53:4.

that Ms. Baldwin "regularly approved payments to Council Members that committed GLG to

pay for thousands of dollars of services," grossly mischaracterizes her deposition testimony.

**I.  Plaintiffs Also Exercised Independent Judgment And Discretion By Developing Or Implementing Management Policies And Operating Practices**

**(i)  Cohen Exercised Independent Judgment And Discretion By Developing Or Implementing Management Policies And Operating Practices**

304.  Cohen's duties also included working on corporate initiatives to develop and

strengthen GLG's business position, including when he took "the lead in the development of

better tools through technology to help service [GLG's] ever-changing client base," and when he

assisted GLG in automating its web-based research platform in a manner that assisted clients in

drafting certain project descriptions.[306]

**RESPONSE:**        While is undisputed that Mr. Cohen may have contributed in some small

part to the development of tools GLG offered to its clients, as the evidence by Defendant makes

clear, these job duties fell outside of Mr. Cohen day-to-day responsibilities as a Research

Associate.  *See* Exhibit 44 to the Puma Decl. at COHEN 0139.  As Mr. Cohen testified,

"everyone had some input" in GLG's efforts to upgrade its web-based research platform.  *See*

Cohen Dep. at 151:19-152:22.

305.  Cohen also was responsible for GLG's initiatives in "customiz[ing] Conference

marketing template [ ] email," "design[ing] the New Council Member email," and "creat[ing] a

recently successful template highlighting Project Specialists for Private Equity."[307]

**RESPONSE:**        Disputed.  Defendant has failed to support this purported statement of

undisputed fact with a proper citation to evidence which would support such a conclusion.

---

[306]        Exh. 44 at COHEN 0139; Cohen Dep. at 152:17-22, 153:15-154:17.
[307]        Exh. 36 at GLG00001983 (Cohen acknowledging that he was responsible for "customiz[ing] Conference marketing template [ ] email," "design[ing] the New Council Member email," and "creat[ing] a recently successful template highlighting Project Specialists for Private Equity").

Instead, Defendant cites to Exhibit 36 of Mr. Puma's declaration, which does not support this statement as it consists of a cover letter and resume from Mr. Ronen to a prospective employer. As such, Plaintiffs are unable to respond to this purported statement of undisputed fact.

306.    As part of enhancing GLG's services, Cohen educated his peers through GLG's TMT Knowledge Initiative, which involved researching a technology, preparing a presentation, and presenting his findings to the TMT group.[308]

**RESPONSE:**    While it is undisputed that, on two occasions, Mr. Cohen made a presentation during the TMT Group's weekly meeting, there is no support for Defendant's assertion that this was part of any effort to "enhance" GLG's services. Further, as noted in the material cited by Defendant, one of these two presentations was a collaboration between Mr. Cohen and his supervisor. Further, Defendant cites to a portion of Mr. Johnson's deposition testimony which does not support (or even relate to) this purported statement of undisputed fact.

307.    Cohen participated in GLG's Long Only Working Group ("LOWG") to generate client service initiatives and develop best practices for providing client services specifically to long-only asset managers.[309]

**RESPONSE:**    While it is undisputed that Mr. Cohen participated in the Long Only Working Group, Defendant overstates Mr. Cohen's participation in this group. As Mr. Cohen testified, his role within the LOWG was to "mostly listen" and that he was primarily there because his supervisor was "too busy" and Mr. Cohen "took notes for him." *See* Cohen Dep. at

---

[308]    Cohen Dep. at 358:21-359:5; Johnson Dep. at 91:6-17; TMT Knowledge Initiative "Middleware" Presentation by Cohen (bates-labeled GLG00000090-100), attached as Exh. 68; TMT Knowledge Initiative "May TMT Wrap Up" Presentation by T. Johnson and Cohen (bates-labeled GLG00000101-29), attached as Exh. 69.

[309]    Cohen Dep. at 264:13-265:20; Johnson Dep. at 69:17-25, 70:12-21; Exh. 56 at GLG00002012; Cohen 2008 Self-Evaluation (bates-labeled GLG000000070-71), attached as Exh. 70, at GLG000000070; Broadening the Product Portfolio document (bates-labeled GLG 1843-44), attached as Exh. 71 (noting Cohen's role in LOWG presentation); R. Matule E-mail to LOWG (bates-labeled GLG00001965-66), attached as Exh. 72 (assigning work to Cohen for the next meeting); P. Sullivan Email to LOWG (bates-labeled GLG00001972-73), attached as Exh. 73 (discussing Cohen's contributions to LOWG meeting).

265:8-20.  Further, the group, which met approximately once every three weeks, only lasted a few months.  *See* Cohen Dep. at 264:18-265:7.

308.    Cohen served as a Multi-Sector Research ("MSR") Liaison, which required him to provide highlights of the TMT industry to help GLG's MSR group manage key information for the TMT industry.[310]

**RESPONSE:**        While it is undisputed that Mr. Cohen served in this capacity, Defendant has failed to present evidence which establishes that Mr. Cohen did anything other than send a single e-mail to a member of the MSR team and work with members of the MSR team on their project execution work.

309.    Because of Cohen's demonstrated "management skills," he was given the responsibility to manage the TMT group's only summer intern during the summer of 2008.[311]

**RESPONSE:**        While it is undisputed that Mr. Cohen managed TMT's summer intern, as Mr. Cohen explained, this required him to create (along with his supervisors) a series of fairly basic tasks that would help contribute to the team, and meet with the intern for five to ten minutes in the morning.  *See* Cohen Dep. at 267:10-268:22.

310.    Cohen devoted 30 to 45 minutes per day to managing the TMT intern, which included developing projects that were important to the TMT group, meeting with the intern to outline daily tasks, and providing mentoring.[312]

---

[310]    Exh. 70 at bates-labeled GLG00000070-71; Cohen Email to I. Islam (bates-labeled GLG00001832), attached as Exh. 74 (providing TMT updates for the MSR team); Cohen Dep. at 299:16-17; Exh. 46 at GHLG00001982 ("I actively work with Matt Ronen of MSR on his more difficult TMT related projects.").
[311]    Exh.56 at 2013; Cohen Dep. at 266:22-267:7, 278:2-12; Exh. 75 at bates-labeled GLG00002008) "Managing the summer internship program within TMT and played a leadership role in organizing the entire group [of interns in other GLG groups] . . . ."); Exh. 45 at GLG00000086-87 ("I worked hard to create responsibilities that benefited our team in the short term while teaching the intern about our industry, client base, career search tactics, and resume construction. By striving to meet our team objectives along with his individual objectives[,] we derived a strong mutual benefit and excellent outcome.").
[312]    Cohen Dep. at 267:10-24, 299:16-17; Cohen's Linked-in Resume (bates-labeled GLG00000010-11), attached as Exh. 76, at GLG00000010 ("Supervised summer internship program, by developing training materials

**RESPONSE:**         Undisputed for purposes of this motion, however, it is averred that before

Mr. Cohen discussed or assigned any tasks to the intern, he discussed this with his managers,

who also often asked for updates regarding the summer intern's progress.  *See* Cohen Dep. at

268:6-22.

311.    Cohen participated in initiatives within the TMT group to help formulate and

implement that group's long- and short-term business objectives, including tracking and

aggregating the TMT team's data in order to "generate account balancing reports, client usage

breakdowns, and other relevant reports for senior management."[313]

**RESPONSE:**         While it is undisputed that Mr. Cohen performed this task, as he explained

at his deposition, this required him to keep track of who was covering TMT's clients and, every

once in a while, Mr. Cohen's manager would ask for a breakdown of projects done on a month to

month basis.  *See* Cohen Dep. at 358:2-16.

312.    Cohen identified and circulated best practices to GLG's TMT Management for

consideration and made recommendations for business initiatives.[314]

**RESPONSE:**         Disputed to the extent it is a gross overstatement of the exhibits cited in

support of the purported statement of undisputed fact to characterize Mr. Cohen as having

"identified and circulated best practices to GLG's TMT Management for consideration and made

recommendations for business initiatives."  For example, Exhibit 79 to Mr. Puma's declaration,

is simply a request from Mr. Cohen to members of the TMT team for information pertaining to

their accounts so he could aggregate such information and does not relate to either "best

---

and providing a comprehensive timeline of expected production and contribution."); Exh. 31 at COHEN 0083
(same); Essay Two for Admission to the Georgetown MBA Program (bates-labeled COHEN 0121-23), attached as
Exh. 77 (discussing the leadership skills Cohen displayed in managing the internship program).
[313]       Cohen Dep. at 357:23-358:16; Cohen Letter to Park Sutton Advisors (seeking consideration for Analyst
position) (bates-labeled COHEN 0149), attached as Exh. 78.
[314]       T. Johnson E-mail to Cohen (bates-labeled GLG00002048-50), attached as Exh. 79; T. Johnson E-mail to
Cohen (bates-labeled GLG00002060-61), attached as Exh. 80.

practices" or "business initiatives."  Similarly, Exhibit 80 to Mr. Puma declaration represents a single instance where Mr. Cohen made a suggestion to members of his team for pitching a potential project and does not stand for the proposition that Mr. Cohen regularly made such recommendations or that this was his primary duty as a Research Associate.

313.    Cohen worked on an internal initiative called "Strengths, Weaknesses, Opportunities, and Threats" (or "SWOT") analyses that GLG used to identify optimal experts for various companies within the TMT industry.[315]

**RESPONSE:**        While it is undisputed that Mr. Cohen performed this function, Defendant has presented no evidence which supports the conclusion that this was an "internal initiative" instead, this was no different than the work that Mr. Cohen performed as a Research Associate, that is, serving as a liaison between clients and GLG's network of experts to facilitate projects, which primarily included facilitating phone conversations for clients.  *See* Cohen Dep. at 164:17-165:1, 303:3-10.

314.    Cohen developed for GLG an online resource called "Bigdough," which gathered information on individual analysts – including hedge funds, asset managers and private equity firms – to help provide them with better service.[316]

**RESPONSE:**        While it is undisputed that Mr. Cohen came up with this idea, as Mr. Cohen testified at his deposition, this exercise "didn't take very long" and wasn't a major part of his job responsibilities.  *See* Cohen Dep. at 345:17-346:11, 347:13-14.

---

[315]    Exh. 29 (bates-labeled GLG00000001).
[316]    Cohen Dep. at 345:2-346:15; Exh. 43 at COHEN 0124-26; Exh. 31 at COHEN 0083; Exh. 29 at COHEN 0124-25 ("After a conversation with one of my colleagues I realized that they had been utilizing a resource called Bigdough, which is designed to gather intelligence on individual analysts to help provide them with better service. . . . I realized this type of information would provide my colleagues and I with better, more actionable data to win bigger projects from our less informed clients. From there, I began identifying resources within [TMT] that aligned most closely with our client's portfolios. My boss and I saw immediate returns to this exercise and found our conversations with new and less active clients more productive. . . . I [met] with our product development team to implement these resources into our growing proprietary software system. . . . [Eventually, my] suggestions ended up being incorporated in the development teams most recent systems update a few moths ago.").

315.    Cohen was "very happy and proud to know that [he] played a part in advancing [GLG's] systems to drive revenue growth for the firm" through the Bigdough idea that he developed.[317]

**RESPONSE:**        Undisputed for purposes of this motion.

316.    Cohen helped formulate and implement a new function for GLG's computer systems that integrated information from clients' public filings with the SEC (the "13F" reports) into GLG's client-knowledge database to generate customized recommendations and other valuable information regarding clients' investment positions.[318]

**RESPONSE:**        Disputed to the extent that Defendant overstates Mr. Cohen's involvement in this project by characterizing his involvement as helping to "formulate and implement a new function for GLG's computer systems."  As Mr. Cohen explained, this "was really just a series of conversations with the developer of some of the search technology with GLG emphasizing the importance of utilizing" clients' public SEC filings.  *See* Cohen Dep. 303:20-304:4.

317.    Cohen "led the way" in advocating for and assisting with the 13F project.[319]

**RESPONSE:**        Undisputed, however it is averred that, as Mr. Cohen explained, this "was really just a series of conversations with the developer of some of the search technology with GLG emphasizing the importance of utilizing" clients' public SEC filings.  *See* Cohen Dep. 303:20-304:4.

---

[317]       Cohen Dep. at 349:19-350:1; Exh. 43 at COHEN 0124; Cohen Dep. at 346:2-4 ("Q: So [Bigdough] was an idea that you originated; is that correct? A: Yes.").
[318]       Cohen Dep. 303:11-304:21, 347:15-18; Exh. 31 at COHEN 0083).
[319]       Exh. 70 at GLG00000070; Exh. 43 at COHEN 0124-25; Johnson Dep. at 90:5-18 (discussing the significance of Cohen's contributions to the 13F project).

### (ii) Ronen Exercised Independent Judgment And Discretion By Developing Or Implementing Management Policies And Operating Practices

318.    Ronen took a "proactive role in team and firm wide initiatives," which included being an active member of GLG's Research Management Professional ("RMP") working group and working on company initiatives related to Research Associate call plans and a method for systematically identifying Council Members with whom clients did not have positive experiences.[320]

**RESPONSE:**        Disputed that Mr. Ronen was "an active member of GLG's Research Management Professional [sic] working group."  As Mr. Ronen testified at his deposition, he didn't even remember what the Research Management Platform group was.  *See* Ronen Dep. at 132:3-9.

319.    According to David Temple, "[b]ecause of [Ronen's] understanding of [GLG's] products, he was selected to be a member of [GLG's] Research Management Platform working group, which oversees the development of [GLG's] client-facing online system."[321]

**RESPONSE:**        Undisputed for purposes of this motion.

320.    Ronen worked on a GLG initiative to "standardize ways to call clients" and improve GLG's business. In connection with this initiative, Ronen authored a document entitled "Execution: Making the Most of Monthly Client Outreach," was circulated to the MSR team and used as a training tool.[322]

---

[320]      Exh. 49 at GLG0004928-29; Ronen Dep. at 131:23-139:15.
[321]      Exh. 53 at RONEN 01315; Temple Dep. at 47:15-17; 50:20-22 (confirming that the contents of Exh. 53 are true and accurate); Exh. 33 at GLG00004679; Temple Dep. at 87:18-88:17 (confirming that the contents of Exh. 53 are true and accurate).
[322]      Ronen Dep. at 133:7-136:1; 163:15-165:18; August 20, 2008 email correspondence from Ronen attaching document entitled "Execution: Making the Most of Monthly Client Outreach" (bates-labeled RONEN_0000001174-1186), attached as Exh. 81 at RONEN_0000001175.

**RESPONSE:** While it is undisputed that Mr. Ronen prepared this document, which was meant to systemize the call plans that Mr. Ronen and other Research Associates were assigned on a monthly basis, as Mr. Ronen testified, this was not part of his job duties as a Research Associate and it only took him a few hours to write this document. *See* Ronen Dep. at 165:5-166:11.

321.    According to Ronen, "[m]aximizing the efficacy of client outreach is a function of strategic thinking and diligent processes. In the end, your efforts will pay dividends and allow you to focus on the main reasons we started the calling plan: to drive usage and build strong, loyal relationships with our clients."[323]

**RESPONSE:** While it is undisputed that the document contains the language cited by Defendant, there is no evidence which would stand for the proposition that this was Mr. Ronen's belief.

322.    Ronen also formulated and proposed to GLG management an initiative called the Council Member "2-Strike Rule," which was intended to be a process for Research Associates to systematically identify those Council Members with whom clients did not have positive interactions.[324]

**RESPONSE:** Undisputed for purposes of this motion, however, it is also undisputed that this was not part of Mr. Ronen's job duties as a Research Associate. *See* Ronen Dep. at 139:10-15.

---

[323]    Exh. 81 at RONEN_0000001184.
[324]    Ronen Dep. at 136:4-139:4.

323.    Ronen viewed the "2-Strike Rule" as an important concept for GLG to adopt in that it would add a layer of quality control to clients' interactions with Council Members and assist in the future marketing of GLG's network.[325]

**RESPONSE:**          Undisputed for purposes of this motion.

324.    Ronen proposed the "2-Strike Rule" to management and "was soon placed in charge of a working group, a unique and rare responsibility for [his] position, and [was] tasked with testing and implementing [his] solution."[326]

**RESPONSE:**          Disputed.  Defendant has failed to support this purported statement of undisputed fact with a proper citation to evidence which would support such a conclusion. While Defendant cites to Exhibit 81 of Mr. Puma's declaration, this document does not support this statement as it consists of an e-mail to Mr. Ronen's supervisor and not one of Mr. Ronen's applications to business school.  As such, Plaintiffs are unable to respond to this purported statement of undisputed fact.

325.    According to Ronen, in the months following his proposal he "imparted his energy and vision on a team of engineers and employees from sales, marketing, and research to successfully implement [his] innovative solution—an automated system that, without disrupting existing research workflows, seamlessly removes poor performing experts from the network."[327]

---

[325]    Ronen Dep. at 138:12-139:9, 169:10-172:21; July 30, 2008 e-mail from Ronen setting forth proposal for "2-Strike Rule" (bates-labeled GLG00004931-4934), attached as Exh. 82; August 13, 2008 e-mail correspondence from Ronen (bates-labeled GLG00004935-4939), attached as Exh. 83, at GLG00004936 ("By marketing our Councils as selective and Council membership contingent upon quality, we will be able to better position ourselves as the premium expert network."); Ronen Dep. 179:4-13 (confirming that he authored Exh. 83 and that its contents are true and accurate).

[326]    Ronen's Application for Admission to the Kellogg School of Management (bates-labeled RONEN01174-1202), attached as Exh. 81 at RONEN 01186; Ronen Dep. at 223:7-224:11 (confirming that the contents of Exh. 81 are true and accurate).

[327]    Ronen's Application to the Yale School of Management, Essay #2 (bates-labeled RONEN 01234-1260), Exh. 84 at RONEN 01257-58; Ronen Dep. at 186:17-22 (authenticating Exh. 84, his application to Yale); 179:17-182:23 (confirming that he completed and submitted applications to graduate programs, that the statements in all of his applications and essays are true and accurate, and that if there is a discrepancy between his deposition testimony and the contents of the applications, the contents of the applications are more likely to be accurate); 195:8-14.

**RESPONSE:** Undisputed for purposes of this motion, however, it is also undisputed that this was not part of Mr. Ronen's job duties as a Research Associate. *See* Ronen Dep. at 139:10-15.

326. As a result of this proposal, according to Ronen, "research quality has measurably improved and [GLG] now markets itself not only as the largest expert network on Wall Street, but also the premium expert network, a significant differentiator from [GLG's] competitors."[328]

**RESPONSE:** Undisputed for purposes of this motion, however, it is also undisputed that this was not part of Mr. Ronen's job duties as a Research Associate. *See* Ronen Dep. at 139:10-15.

327. In support of his application for admission to Cornell University's Johnson School of Business, Ronen wrote an essay regarding the "2 Strike Rule" in response to the following requested topic: "Describe your greatest professional achievement and how you were able to add value to your organization."[329]

**RESPONSE:** Undisputed for purposes of this motion, however, it is also undisputed that this was not part of Mr. Ronen's job duties as a Research Associate. *See* Ronen Dep. at 139:10-15.

328. Ronen considered the "2 Strike Rule" initiative to be an important achievement and one that added value to GLG.[330]

**RESPONSE:** Undisputed for purposes of this motion, however, it is also undisputed that this was not part of Mr. Ronen's job duties as a Research Associate. *See* Ronen Dep. at 139:10-15.

---

[328] Exh. 84 at RONEN01257-58; Exh. 81 at RONEN 01187 (same); Ronen Dep. at 224:12-23 (confirming that the statement at RONEN 01187 of Exh. 81 is true and accurate).

[329] Exh. 40 at RONEN 01113-14; Ronen Dep. at 210:20-211:3 (confirming that the contents of Exh. 40 are yrue and accurate).

[330] Ronen Dep. at 211:9-212:6.

### (iii) Baldwin Exercised Independent Judgment And Discretion By Developing Or Implementing Management Policies And Operating Practices

329.    Baldwin expanded her role by collaborating with colleagues to develop a FAQ sheet for clients.[331]

**RESPONSE:**        Disputed.  While it is undisputed that Ms. Baldwin worked with two of her colleagues to develop this FAQ for a single client, it is disputed that this "expanded" Ms. Baldwin's role as Ms. Baldwin's supervisor reviewed her work and provided input on this document because Ms. Baldwin's supervisor was the primary point of contact for this client.  *See* Baldwin Dep. at 408:11-409:11.

330.    The sheet was designed to "smooth project starts and communication between GLG RMs and new [client] analysts who are unsure of how to best use us."[332]

**RESPONSE:**        Undisputed except to aver that this document was created by Ms. Baldwin along with two other colleagues.  *See* Baldwin Dep. at 408:11-409:4.

331.    Baldwin participated in managing her team's work flow throughout the day.[333]

**RESPONSE:**        Disputed to the extent that "managing her team's work flow throughout the day" is a gross overstatement of Ms. Baldwin's duties with regard to this tool utilized by her work team.  As Ms. Baldwin testified, her supervisors would place assignments onto this "task pad" (including noting those that were urgent) that Ms. Baldwin and another Research Associate were expected to work through and complete.  *See* Baldwin Dep. at. 411:24-415:6.

332.    Baldwin participated in the training of a new Research Associate, Amy Ottensmeyer.[334]

---

[331]    Baldwin's 2008 Self-Evaluation (bates-labeled GLG00004655), attached as Exh. 85.
[332]    Exh. 85 at GLG00004655.
[333]    Exh. 63 at BALDWIN_00000924; Schaefer Dep. at 93:11-96:22.
[334]    Exh. 24 at GLG00004665.

**RESPONSE:** Disputed to the extent that Defendant overstates Ms. Baldwin's role in characterizing her as having "participated in the training of a new Research Associate." As Ms. Baldwin explained, she sat across from Ms. Ottensmeyer and answered her questions when their supervisor was not around, but she often deferred Ms. Ottensmeyer's questions to their supervisor. *See* Baldwin Dep. at 411:6-22.

## III. GLG ELIMINATED THE RESEARCH ASSOCIATE POSITION AND EMPORARILY PAID OVERTIME TO SOME REMAINING RESEARCH ASSOCIATES OTHER THAN THE PLAINTIFFS

333. After developing the Research Associate position in 2006, GLG officially launched the position in 2007.[335]

**RESPONSE:** Undisputed for purposes of this motion.

334. In the Fall of 2008, as part of a much larger organizational restructuring, GLG decided to phase-out the Research Associate position.[336]

**RESPONSE:** Undisputed for purposes of this motion, however, it is also averred that Defendant's 30(b)(6) witness testified that, "[t]he decision about whether to pay a dozen people overtime for a year or half year, I mean, if it got five minutes of discussion, that's probably the high end of how much discussion was made. The flavor of those discussions was, you know, these are probably not people who are going to get promoted . . . And giving them pay along the way was just designed to increase their compensation. Because a lot of them, they wouldn't be around for the end-of-year bonus. It was just about giving them some more money." *See* Deposition of Dmitri Mehlhorn ("Mehlhorn Dep."), attached to Filosa Decl. as Ex. G, at 270:24-271:9, 272:7-12.

---

[335] Mehlhorn Dep. at 86:12-20.
[336] Mehlhorn Dep. at 86:12-22, 89:9-90:2, 98:7-106:18, 257:9-18 (further explaining the decision to phase-out the Research Associate position).

335.    As part of the reorganization, GLG phased-out the Research Associate position in a process that began in the fall of 2008 and ended in July 2009, which included promoting some high performers (including Plaintiffs) into the different position of Research Manager.[337]

**RESPONSE:**    Undisputed for purposes of this motion, however, this statement of fact is immaterial to the present matter.

336.    Cohen was promoted to a Research Manager position.[338]

**RESPONSE:**    Undisputed for purposes of this motion.

337.    Ronen was promoted to a Research Manager position.[339]

**RESPONSE:**    Undisputed for purposes of this motion.

338.    Baldwin was promoted to a Research Manager position.[340]

**RESPONSE:**    Undisputed for purposes of this motion.

339.    Research Associates who were not promoted by late-2008 either "finish[ed] their predefined career . . . [or] were promoted into research management" in the first half of 2009.[341]

**RESPONSE:**    While it is undisputed for purposes of this motion that Defendant did not employ anyone in the Research Associate after June 2009, it is disputed that those that were not promoted "finished their predefined career" (though Mr. Mehlhorn actually testified that "You could end their employment or you could let them just finish out kind of a predefined career . . . ") as there were also a number that were laid off as part of a reduction in force and a number of others terminated for performance reasons.  *See* Mehlhorn Dep. at 89:18-90:2, 93:25-94:6.

340.    The dozen or so individuals who were not promoted or laid off at the end of 2008 remained in the temporary position of Research Associate for several months in 2009.[342]

---

337    Mehlhorn Dep. at 86:23-88:11, 92:23-94:6, 94:15-95:23, 96:8-106:18.
338    Cohen Dep. at 62:4-66:13.
339    Ronen Dep. at 56:3-13.
340    Baldwin Dep. at 47:7-9.
341    Mehlhorn Dep. at 86:23-88:11, 89:9-90:2.

**RESPONSE:**          Undisputed for purposes of this motion.  Further, it is averred that, unlike

Plaintiffs, these individuals were paid overtime compensation (at one and one-half their regular

rate) for all hours worked in excess of 40 in a given week.  In conjunction with this, Defendant

provided the managers of these Research Associates with a memorandum explaining these

changes which stated, in relevant part, (i) "As part of our annual compensation review and

periodic evaluations of positions, we have determined that certain positions are appropriately

classified as non-exempt under the FLSA effective January 1, 2009;" and (ii) "We reviewed the

actual duties being performed currently, and determined based on those duties that certain

positions are appropriate classified as non-exempt effective January 1, 2009."  *See* Filosa Decl.

Ex. I.

## IV.    COHEN'S "MASS DELETION" CONSTITUTED SPOLIATION OF EVIDENCE

341.    During his employment with GLG, Cohen was provided access to and use of one

of GLG's computers for performing his job duties and responsibilities.[343]

**RESPONSE:**          Undisputed for purposes of this motion.

342.    Cohen received, read, understood, and agreed to comply with GLG's policies

concerning access to and use of GLG information technology assets, including those policies that

expressly prohibited the destruction of any GLG property, including its network and e-mail

systems, and any and all electronic files written, sent, received or stored on GLG's network, hard

drives, and e-mail systems.[344]

---

[342]      Mehlhorn Dep. at 256:16-258:12.
[343]      Cohen Dep. at 99:3-12.
[344]      Cohen Dep. at 97:20-99:12, 101:18-116:20; of GLG's Employee Policies, last updated August 2008
(bateslabeled GLG0000410-49), attached as Exh. 86; GLG End User Computing Policies (bates-labeled
GLG00000333-53), attached as Exh. 87; GLG Intellectual Property, Confidentiality, and Non-Competition
Agreement signed by Cohen (bates-labeled GLG000000083-88), attached as Exh. 88.

**RESPONSE:**        While it is undisputed for purposes of this motion that Mr. Cohen read and received GLG's policies, it is disputed that these policies prohibited the destruction of any GLG property as GLG's End User Computing Policies directs employees to "maintain the disk space on their PCs, regularly deleting old or extraneous files."  See GLG End User Computing Policies, attached as Exhibit 87 to the declaration of Michael Puma, at p. 7.

343.    Cohen also received, read, understood, and agreed to comply with GLG's policies prohibiting employees from installing personal hardware, software, or data on GLG computers, invading data files, causing harm to GLG's computer systems, or violating computer system security.[345]

**RESPONSE:**        Undisputed for purposes of this motion.

344.    Cohen expressly affirmed his understanding of and agreement to comply with these policies in writing on at least two occasions, and he also testified that he understood that the hard drive (and its contents) of the computer that he was assigned at GLG and GLG's network drives and their contents belonged to GLG.[346]

**RESPONSE:**        While it is undisputed for purposes of this motion that Mr. Cohen signed acknowledgements regarding his receipt of GLG's computer use policies twice during his employment, Mr. Cohen did not testify that he understood that his computer's hard drive and network drive, along with their contents, belonged to GLG.  See Cohen Dep. at 99:3-5.

345.    During the course of his employment with GLG, Cohen created Microsoft Word documents, Microsoft Excel documents, Portable Document Format ( "PDF") documents, e-mail messages and other electronic documents (collectively "electronic files") using the GLG

---

[345]        Cohen Dep. at 97:20-99:12, 101:18-116:20; Exh. 86 at GLG00000410; Exh. 13 at GLG00000029-63; Exh. 87 at GLG00000333-53; Exh. 88 at GLG000000083-88.

[346]        Cohen Dep. at 104:1-105:1; Cohen Signed Verification (bates-labeled GLG00000021), attached as Exh. 89 (acknowledging receipt of and compliance with, inter alia, GLG's computer-related employment policies); Exh. 14 at GLG000000074 (same).

computer assigned to him, and he stored these files on both the hard drive inside his assigned

computer and on a network drive on GLG's network.[347]

**RESPONSE:**          Undisputed for purposes of this motion.

     346.     The electronic files that Cohen created included both business-related electronic

files and what he characterized as "personal" e-mail messages and electronic files.[348]

**RESPONSE:**          While it is undisputed for purposes of this motion that Mr. Cohen created

business-related electronic files, at no point in the deposition testimony cited by Defendant did

Mr. Cohen characterize any other electronic files as "personal."

     347.     The business-related and "personal" electronic files that Cohen created and/or

stored on the hard drive and on one of GLG's network drives included documents with

information relevant to the claims and defenses in this action.[349]

**RESPONSE:**          Disputed.  There is no testimony from Mr. Cohen that any of the

electronic files contained evidence relevant to his claims under the Fair Labor Standards Act or

New York Labor Law.  Instead, Mr. Cohen testified only that he created personal files

concerning his thoughts about possibly starting a lawsuit.  *See* Cohen Dep. at 101:9-16.

     348.     In or about December 2008, Cohen prepared a document on his work computer in

which he framed certain questions to discuss with potential counsel concerning the lawsuit that

he was thinking about filing against GLG.[350]

**RESPONSE:**          While it is undisputed for purposes of this motion that Mr. Cohen created

a document to frame some questions for potential counsel to represent him, Mr. Cohen was

unable to state for certainty when this document was created.  *See* Cohen Dep. at 45:21-46:2.

---

[347]      Cohen Dep. at 99:3-7, 116:5-23.
[348]      Cohen Dep. at 93:10-15, 97:8-12, 99:3-22, 109:8-14, 116:5-23.
[349]      Cohen Dep. at 99:3-101:16. See Questions to Ask document (bates-labeled GLG00002065), attached as
Exh. 90.
[350]      Cohen Dep. at 45:17-46:2, 51:11-15; Exh. 90 at GLG00002065.

349.     Commencing in or about January 2009, Cohen was in discussions with fellow GLG Research Associates Matt Ronen and Rachel Hoffheimer regarding the possibility of pursuing claims against GLG. [351]

**RESPONSE:**          Undisputed for purposes of this motion.

350.     By March 2009, Cohen was communicating with his current counsel about potential claims against GLG.[352]

**RESPONSE:**          Undisputed for purposes of this motion.

351.     Cohen testified that, before his last day of employment at GLG, he used the GLG computer assigned to him to forward to his personal e-mail account electronic files that he did not want GLG to see and which he wanted to continue to have access to after his employment ended, including files that he believed would support his claims in this action. [353]

**RESPONSE:**          While it is undisputed for purposes of this motion that Mr. Cohen forwarded emails to his personal email account, Mr. Cohen did not testify that he did so because he did not want GLG to see these emails. *See* Cohen Dep. at 107:15-19. Instead, any files that Cohen deleted were because he did not want GLG to see them were personal in nature. *See* Cohen Dep. at 88:15-24.

352.     After forwarding electronic files from his GLG assigned computer to his personal e-mail account, but before his employment at GLG ended, Cohen performed a "mass deletion" of all the electronic files on the hard drive of his GLG assigned computer and on one of GLG's network drives. [354]

---

[351]      Cohen Dep. at 67:1-71:1, 78:17-86:20.
[352]      Cohen Dep. 83:23-84:10.
[353]      Cohen Dep. at 75:15-77:20, 107:14-19.
[354]      Cohen Dep. at 88:15-20 ("Q: Do you remember when you went into your computer and deleted your – and attempted anyway, to delete your entire memory on your C-drive and your H-drive? A: . . . Before I left."), 91:12-91:21 ("Q: Did you delete each document one document at a time or did you delete – A: It was a mass deletion. Q: . . . [W]hat was within the scope of the mass deletion[ ] . . . ? A: [A]ll files."), 97:8-12 ("Q: Do you know whether in

**RESPONSE:**       While it is undisputed for purposes of this motion that Mr. Cohen testified

he performed a "mass deletion" of files from his computer, his actions were limited to only pdf

and Microsoft Word documents.  *See* Cohen Dep. at 91:24-92:5

353.    Cohen performed the "mass deletion" intentionally.[355]

**RESPONSE:**       While it is undisputed for purposes of this motion that Cohen testified he

performed a "mass deletion," he never testified that any such action was "intentional" and he

further testified that the "mass deletion" was limited to only pdf and Microsoft Word documents.

*See* Cohen Dep. at 88:15-18, 91:24-92:5.

354.    Cohen performed this "mass deletion" with the objective of preventing GLG from

having access to the electronic files after his employment ended and he had brought this lawsuit

against GLG.[356]

**RESPONSE:**       Disputed.  While Mr. Cohen testified that he forwarded emails to his

personal account in order to have that information at his disposal if he chose to begin a lawsuit

against GLG, the files that Mr. Cohen deleted were personal in nature.  *See* Cohen Dep. at 77:15-

20, 88:21-24, 100:13-18.

355.    When Cohen executed his "mass deletion," he did not make any effort to limit the

scope of his deletion to what he believed to be "personal" e-mail messages, documents or

files.[357]

**RESPONSE:**       Disputed.  While it is undisputed for purposes of this motion that Mr.

Cohen testified there were possibly GLG documents among those he deleted, he further testified

---

the course of your – on the deletions, you deleted work-related e-mails? A: It's possible I did. Like I said, I don't
remember . . . . It was a mass deletion.").
[355]       Cohen Dep. at 88:15-18, 91:12-22.
[356]       Cohen Dep. at 77:9-20, 88:21-24, 99:3-101:16.
[357]       Cohen Dep. at 93:10-15.

that that the purpose behind the deletion of files was to delete personal documents with no relevance to this lawsuit.  *See* Cohen Dep. at 88:15-25.

356.    Among the electronic files that Cohen deleted were electronic files containing proprietary business information and data, business records, and other property of GLG.[358]

**RESPONSE:**        While it is undisputed for purposes of this motion that Mr. Cohen testified that he deleted files that he had created, there was no testimony from Mr. Cohen that he deleted any files which contained proprietary business information and data, business records, and other property of GLG.

357.    Cohen performed the "mass deletion" without requesting or receiving authorization from anyone at GLG to do so.[359]

**RESPONSE:**        While is undisputed that Cohen did not request or receive authorization to delete files on his computer, there was no policy in place at GLG requiring him to seek such authorization.  *See* Cohen Dep. at 98:19-21.  In fact, according to GLG's End User Computing Policies direct employees to delete "old and extraneous files."  *See* GLG End User Computing Policies, attached as Exhibit 87 to the declaration of Michael Puma, at p. 7.

358.    Less than two weeks after completing the "mass deletion" of the electronic files on his hard drive and one of GLG's network drives, Cohen filed this lawsuit against GLG.[360]

**RESPONSE:**        While it is undisputed that Mr. Cohen deleted files from his computer before he left GLG, he did not testify as to the exact date that he deleted such files.  *See* Cohen Dep. at 88:15-20.

---

[358]        Cohen Dep. at 93:10-15 ("Q: Among the Word and pdf documents, were there any documents that were GLG documents? A: More than likely. Q: Did you make any effort to limit the scope of your deletion to the non-GLG documents? A: Like I said before, is a mass deletion."), 97:8-12, 99:3-22, 109:8-14, 116:5-23.
[359]        Cohen Dep. at 97:24-98:5, 98:13-99:5.
[360]        Complaint, dated May 5, 2009.

359.    GLG has not been able to fully recover or restore the hard drive and the electronic files previously stored therein to their condition prior to the "mass deletion."[361]

**RESPONSE:**    Disputed.  GLG was able to recover and restore Cohen's hard drive and the electronic files stored therein.  *See* Deposition of David Wolff ("Wolff Dep."), attached to Filosa Decl. as Ex. H, at 135:10-14, 136:12-15.  Further, Cohen testified that he produced all documents that he sent to his personal email account from GLG.  *See* Cohen Dep. at 94:18-22.

360.    Shortly after filing this lawsuit, Cohen revised the information listed on both his Facebook and Linked-In websites, including his descriptions of his employment with GLG.[362]

**RESPONSE:**    Disputed.  As he testified at his deposition, Mr. Cohen was not sure whether he had updated his LinkedIn profile subsequent to the end of employment with GLG.  *See* Cohen Dep. at 134:22-135:6.  Further, there is no support for Defendant's assertion that Mr. Cohen also updated his Facebook page or changed any description of his employment with GLG subsequent to his employment with GLG.  *See* Cohen Dep. at 135:13-16.

361.    Cohen failed to preserve copies of the information listed on his Facebook and Linked-In websites, including his descriptions of his employment with GLG, before he changed them.[363]

**RESPONSE:**    While it is undisputed that Cohen did not "preserve copies of information" on Facebook and LinkedIn, Mr. Cohen testified that he produced all documents and electronic files related to his employment at GLG.  *See* Cohen Dep. at 137:16-138:5.

---

[361]    Declaration of Rudi Peck ("Peck Decl.") at ¶ 3.
[362]    Cohen Dep. at 134:21-135:2.
[363]    Cohen Dep. at 135:10-20.

Dated:  April 8, 2011
       New York, New York

Respectfully submitted,

**THOMPSON WIGDOR & GILLY LLP**

By: /s/ Gregory N. Filosa
      Douglas H. Wigdor
      Gregory N. Filosa

85 Fifth Avenue
New York, NY 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@twglaw.com
gfilosa@twglaw.com

*COUNSEL FOR PLAINTIFFS*